1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Leonard C. Herr (SBN 081896)
Ron Statler (SBN 234177)
HERR PEDERSEN & BERGLUND LLP
100 Willow Plaza, Suite 300
Visalia, California 93291
Telephone: (559) 636-0200

Peter J. Kiel (SBN 221548)
Vincent O. Goble (SBN 346115)
LAW OFFICE OF PETER KIEL PC
PO Box 422
Petaluma, California 95953-422
Telephone: (707) 387-0060
Email: pkiel@cawaterlaw.com

Aubrey A. Mauritson (SBN 272055)
Josh T. Fox (SBN 282072)
RUDDELL, STANTON, BIXLER,
MAURITSON & EVANS LLP
1102 N. Chinowth Street
Visalia, CA 93291
Telephone: (559) 733-5770
Facsimile: (559) 733-4922
Email: amauritson@visalialaw.com

Attorneys for Plaintiffs, Terra Bella Irrigation
District, Saucelito Irrigation District &
Porterville Irrigation District

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

TERRA BELLA IRRIGATION DISTRICT, a
California special district; SAUCELITO
IRRIGATION DISTRICT, a California special
district; and PORTERVILLE IRRIGATION
DISTRICT, a California special district,

        Plaintiffs,

    vs.

DEB HAALAND, Secretary of the U.S.
Department of the Interior, in her official
capacity; CARL STOCK, Regional Director,
Region 10, United States Bureau of
Reclamation; FRIANT WATER
AUTHORITY, a California joint powers
authority; JASON PHILLIPS, Chief Executive
Officer, Friant Water Authority; and DOE 1,

        Defendants.

Case No.:

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**INTRODUCTION**

In an ill-advised scheme to expedite the construction of the Friant-Kern Canal ("FKC") Middle Reach Capacity Correction Project ("Project" or "MRCCP"), the Friant Water Authority ("FWA") pledged, and the U.S. Bureau of Reclamation ("Reclamation" or "BOR") accepted, FWA's illusory funding of future proceeds from a settlement agreement with the Eastern Tule Groundwater Sustainability Agency ("ETGSA") as the non-federal cost share of the project. Put plainly, FWA and Reclamation started a $500 million project without the funding in hand. When FWA realized it was not able to recover sufficient funding from the ETGSA settlement agreement to meet its pledge to the Project, FWA unilaterally imposed a cost recovery methodology for the Project that obligates four FWA member units that are also member agencies of ETGSA to pay the balance of FWA's pledge ("Methodology" or "Unilateral Charge") of approximately $95 million dollars *after the project was constructed*. FWA directors took this action with the goal that the four districts apply pressure on ETGSA to increase payments to FWA.

On January 17, 2025, Regional Director Stock affirmed and ratified the unlawful cost recovery methodology. The cost recovery methodology exceeds the legal authority delegable by the Bureau of Reclamation and violates federal statutory law, including the Administrative Procedure Act, Reclamation's own regulations, and the U.S. Constitution. After exhausting available avenues for dispute resolution, Plaintiffs' position is that, without court action declaring the methodology unlawful and enjoining Defendants from implementing it, Defendants will force Plaintiffs to pay a disproportionate share of the already-completed Project. A declaration from the Court is necessary to make clear that Defendants' actions violate sections 510b and 485h of title 43 of the United States Code, Reclamation's regulations, the Fifth and Fourteenth Amendments of the U.S. Constitution, and the Administrative Procedures Act. Preliminary and permanent injunctions are also necessary to prevent Defendants from implementing the methodology. If the Court rules in Plaintiffs' favor, Defendants have alternatives to the methodology described in FWA's board meeting agenda report dated August 12, 2024, with the subject line *Proposed Cost Recovery Methodology for any Cost-Share Deficit for the Middle Reach Capacity Correction Project* ("Staff Report"), which is attached hereto as Exhibit A.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Accordingly, Plaintiffs, Terra Bella Irrigation District ("TBID"), Saucelito Irrigation District ("SID"), and Porterville Irrigation District ("PID"); collectively referred to as "Plaintiffs" and each a "Plaintiff"), allege as follows:

## I.    JURISDICTION

1.     This Complaint, which seeks injunctive and declaratory relief under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, and 42 U.S.C. § 1983 and seeks damages under 42 U.S.C. § 1983, presents a federal question within this Court's jurisdiction under article III of the U.S. Constitution and 28 U.S.C. § 1331 and 42 U.S.C. § 1983,. Jurisdiction is proper under 28 U.S.C. § 1331.

2.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and by the inherent equitable powers of this Court.

## II.    VENUE

3.     The acts or omissions giving rise to Plaintiffs' claims arose in the County of Tulare, State of California.  Thus, pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court, Eastern District of California, Fresno Division.

## III.    PARTIES

4.     Each of Plaintiffs is, and at all times herein mentioned was, an irrigation district and political subdivision of the State of California, formed and operating pursuant to Division 11 of the California Water Code, residing in the County of Tulare, California.  Each of Plaintiffs— pursuant to their respective water delivery contracts—is a beneficiary of the Friant Division Project, which is managed by the Bureau of Reclamation, an agency under the U.S. Department of the Interior.

5.     Defendant, Deb Haaland, is currently the Secretary of the U.S. Department of the Interior ("Secretary Haaland"). Doe 1, is Secretary Haaland's successor. Secretary Haaland and Doe 1 are collectively referred to as Secretary.

6.     Defendant, Karl Stock, is currently the Regional Director of Region 10 of the Bureau of Reclamation ("Regional Director Stock").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

7.     Defendant, Friant Water Authority ("FWA"), is a joint powers authority formed and operating pursuant to California law.  At all times during the events and actions described herein, FWA acted with the express and implied delegated authority of BOR.

8.     Defendant, Jason Phillips, is currently the Chief Executive Officer of the Friant Water Authority ("Officer Phillips")

9.     FWA, Secretary Haaland, Regional Director Stock, Officer Phillips, and Doe 1 are collectively referred to as "Defendants."

## IV.     STANDING

10.     Pursuant to the U.S. Constitution, article III, Plaintiffs have standing in this court to seek (1) declaratory and injunctive relief, because the relief sought will redress the injury-in-fact that Plaintiffs will suffer if this court does not review Defendants' actions, and (2) damages, because the relief sought will redress the injury-in-fact that Plaintiffs have suffered as a result of Defendants' actions.

## V.     STATEMENT OF SCOPE OF BOR/FWA'S CONTRACTUAL OBLIGATIONS FOR REPAYMENT AND COST SHARE AGREEMENTS RE: XM PROJECTS SUCH AS THE MRCCP

11.     Section 9603 of Public Law 111-11, Title IX, or, Section 510b of Title 43 of the United States Code ("Section 510b"), establishes the conditions under which funds advanced for "extraordinary maintenance" ("XM") projects may be collected from project beneficiaries.  Those conditions are simple: the Secretary is to "negotiate appropriate 50-year repayment contracts with project beneficiaries providing for the return of reimbursable costs, with interest, under this subsection . . ." (43 U.S.C. § 510b(b)(2).)

12.     Directives and Standards ("D&S") PEC 05-03 ("PEC 05-03") of BOR's Reclamation Manual ("RM")—the purpose of which is "[t]o state funding and repayment requirements for extraordinary maintenance" of BOR projects—provides in part, "[t]he XM authority does not include extended repayment of annual, routine operation, maintenance, and replacement (OM&R) costs."  (RM, D&S PEC 05-03, para. 1. (version[1] (678) 03/08/2022).)

[1] Reference to the 2022 version of PEC 05-03 is important because, at the time BOR advanced XM funds to FWA for the MRCCP—November 9, 2023 —PEC 05-03 did not set forth any power to later adjust the Methodology as provided for in the current version of PEC 05-03.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

13.    The Water Infrastructure and Improvements for the Nation ("WIIN") Act, section 4007 limits participation by the Interior to an amount no greater than fifty percent of the total cost of a federally-owned water storage project.  (Water Infrastructure Improvements for the Nation Act ("WIIN Act"), Pub. L. No. 114-322, § 4007, 130 Stat. 1628, 1863-1866 (2016).)  The Secretary is also required—prior to the commencement of any construction—to secure an agreement providing upfront funding as is necessary to pay the non-Federal share of XM project costs.  (WIIN Act, § 4007(b)(3)(B).)

## VI.    STATEMENT OF BOR/FWA DUTIES RE: XM REPAYMENT CONTRACTS

### PEC 05-03'S REQUIREMENT OF ANNUAL APPLICATION NOTICE

14.    PEC 05-03 requires that, "[b]y October 31 of each year, regional office staff will issue a public notice of the annual application process for funding of XM projects. The public notice will include posting information on Reclamation websites and reasonable efforts to notify project beneficiaries on reserved and transferred works and transferred works operating entities." (RM, D&S PEC 05-03, para. 5.A.)

### PEC 05-03'S REQUIREMENT OF PUBLIC PARTICIPATION

15.    PEC 05-03 requires public participation for all XM repayment contracts and specifies that, "[f]or public participation requirements for water-related contracts, see RM Policy, Water-Related Contracts–General Principles and Requirements (PEC P05)."  (RM, D&S PEC 05-03, para. 8.F.)

### PEC P05'S REQUIREMENT OF PUBLIC PARTICIPATION

16.    RM, Policy PEC P05 ("PEC P05") requires:

Contract negotiations will be conducted in a manner that provides opportunities for the public to observe and provide meaningful input. Contract negotiations will be in strict compliance with subsection 9(f) of the 1939 Act (Pub. L. 76- 260, as amended by section 226 of Pub. L. 97-293; 43 USC 485h(f)) and with 43 CFR 426.22. See also RM Policy, Public Involvement in Reclamation Activities (CMP P03), and D&S, Public Involvement in Reclamation Activities (CMP 04-01).

(RM, Policy, PEC P05, para. 3.D.(2).)

- 5 -

///

### PEC P05'S REQUIREMENT FOR ALLOCATION OF COSTS

17.    PEC 05-03 requires Reclamation to allocate costs for XM projects in accordance with the allocation of OM&R costs for the project or facility that is in effect when it incurs costs or advances funds for the XM work.  Any cost allocation is required to be compliant with Paragraph 8 of RM Policy, Allocation of Operation and Maintenance Costs (PEC P07).  Paragraph 8 of RM Policy, Allocation of Operation and Maintenance Costs PEC P07 provides that studies to analyze current benefits for the purpose of modifying an allocation of joint OM&R costs may only be undertaken by a determination of the regional director that the study is warranted and the entities responsible for repayment have been given ample opportunities for consultation and collaboration.  Modification to current OM&R will only be implemented upon completion of a current benefits study, a decision memorandum signed by the regional director detailing the manner in which the OM&R allocation will be modified, the basis for the modification, and extent to which the entities responsible for payment have been given opportunities to collaborate on the proposed costs; and notification to the impacted entities on the intent to adopt.

### SECTION 485h'S REQUIREMENT OF PUBLIC PARTICIPATION

18.    Section 485h of Title 43 of the United States Code ("Section 485h") provides in part that, "[n]o less than sixty days before entering into or amending any repayment contract . . . the Secretary shall—

(1) publish notice of the proposed contract or amendment in newspapers of general circulation in the affected area and shall make reasonable efforts to otherwise notify interested parties which may be affected by such contract or amendment, together with information indicating to whom comments or inquiries concerning the proposed actions can be addressed; and

(2) provide an opportunity for submission of written data, views and arguments, and shall consider all substantive comments so received.

(43 U.S.C. § 485h(f).)

### 43 C.F.R. SECTION 426.22'S REQUIREMENT OF PUBLIC PARTICIPATION

19.    Section 426.22 of Title 43 of the Code of Federal Regulations ("CFR 426.22")

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

provides in part that BOR will "issue announcements in the form of news releases, legal notices, official letters, memoranda, or other forms of written material" and "directly notify individuals and entities who made a timely written request for such notice to the appropriate Reclamation regional or local office." (43 C.F.R. § 426.22(a)(2)-(3).) CFR 426.22 also states that BOR will include the following in published announcements: (1) "A brief description of the proposed contract terms and conditions being negotiated;" (2) "Date, time, and place of meetings, workshops, or hearings;" (3) "The address and telephone number to which inquiries and comments may be addressed to Reclamation; and" (4) "The period of time during which Reclamation will accept comments." (*Id.* § 426.22(c).)

## CMP 04-01'S REQUIREMENT OF PROVISIONS TO INTERESTED PUBLICS

20.    Per RM Policy CMP 04-01 ("CMP 04-01")—the purpose of which is to "systematically provide opportunities for affected individuals, groups, and communities to be informed about the issues" whenever BOR's "actions may significantly affect individuals or groups" (RM Policy CMP 04-01 p. 1)—BOR declares that it "will . . . provide interested publics:" (a) "opportunities to participate in the decision-making process;" (b) "information about decisions being considered; and" (c) "documentation of how the publics' input was considered." (RM Policy CMP 04-01, para. F.(1).)

## VII.    STATEMENT OF FACTS

### THE MRCCP XM PROJECT

21.    In 2018, FWA and BOR identified severe capacity constraints with the Friant-Kern Canal. FWA and BOR sought funding to begin studying and planning repairs. On December 13, 2019, the FWA Board of Directors approved Resolution 2019-06 supporting the allocation of funding of approximately $27,000,000.00 towards critical repairs to the Middle Reach of the Friant-Kern Canal. As an express admission reported therein: "As the Friant Division Contracts affected by the Canal subsidence did not cause the subsidence, FWA is pursuing outside sources of funding for the Project." (Resolution No. 2019-06, FWA, sect. 1, para. I (Dec. 13, 2019).)

22.    On March 28, 2019, the FWA Board of Directors amended its "OM&R Cost

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Recovery Methodology Policy." "OM&R" was defined therein—among other things—to include

2    "funding of emergency or unusual operation and maintenance or extraordinary operation and

3    maintenance costs, [and] unusual or extraordinary repair or replacement costs." (*Extraordinary*

4    *OM&R Cost Allocation* (Agenda Report), FWA at p. 2 (Mar. 28, 2019).)

5         23.    In Winter 2019-2020, BOR conducted a feasibility study that identified various

6    options for construction, including an analysis on cost assignment and recovery. As noted in the

7    January 2020 Feasibility Report, "[r]epayment for Federal water resources projects is based on

8    the principle that beneficiaries pay for benefits received." (*Friant-Kern Canal Middle Reach*

9    *Capacity Correction Project Feasibility Study*, U.S. Bureau of Reclamation (2020).)

10         24.    On October 5, 2020, FWA entered into an agreement with the United States of

11    America to transfer the operation, maintenance and replacement of certain activities related to the

12    Friant-Kern Canal ("Transfer Agreement"). The Transfer Agreement identifies the Friant Water

13    Authority as the "Operating Non-Federal Entity." (*Agreement between the United States of*

14    *America, Bureau of Reclamation and Friant Water Authority to Transfer the Operation,*

15    *Maintenance, and Replacement and Certain Financial and Administrative Activities Related to*

16    *the Friant-Kern Canal and Associated Works* or Contract no. 8-07-20-X0356-X ("Transfer

17    Agreement"), ¶¶ i, k (Recitals; Oct. 5, 2020).) Friant Water Authority is not a "Project

18    Beneficiary."

19         25.    On September 23, 2021, the United States of America, acting by and through the

20    Bureau of Reclamation, entered into a contract with FWA for repayment of extraordinary

21    maintenance costs relating to the Project ("XM Contract"). The XM Contract provides,

22    "[p]ursuant to Section 9603 of P.L. 111-11, the Secretary of the Interior, acting through the

23    Bureau of Reclamation (Reclamation), is authorized to construct Extraordinary Operation and

24    Maintenance (XM) Work and to negotiate a contract for repayment of those Project Costs, with

25    interest . . . ." (*Contract Between the United States of America and Friant Water Authority for*

26    *the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach*

27    *Capacity Correction Project*, Contract No. 21-WC-20-5855 ("XM Contract"), ¶ "c" (Recitals;

28    Sept. 23, 2021).) The XM Contract further provides that, pursuant to the WIIN Act, section 4007:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    [T]he Secretary of Interior may participate in the project in an amount no greater

2    than fifty percent (50%) of the total cost of the Federally-owned water storage

3    project inclusive of other Federal funding.   In order to commence construction of

4    the XM Project, the Secretary of Interior must: a) determine that the project is

5    feasible, b) **secure an agreement *providing upfront funding* as is necessary to**

6    **pay the non-Federal share of the XM Project Costs**, **which is the purpose of**

7    **the Cost Share and Contributed Funds Agreement No. 21-WC-20-5856,**

8    **executed April 28, 2021, ("Cost Share Agreement")** in Exhibit A of this

9    Repayment Contract, and c) determine that in return for the Federal cost-share

10    investment at least a proportionate share of XM Project benefits are Federal

11    benefits.

12    (XM Contract, ¶ "i" (Recitals; emphasis added).)

13    26.    The XM Contract further provides the following: "The Cost Share Agreement

14    further provides that FWA is responsible for the repayment of Reimbursable XM Project Costs

15    of the Federal investment in the XM Project, as determined by Reclamation in addition to

16    providing FWA's share of the XM Project Costs;" (XM Contract, ¶ "n" (Recitals)) and "**The**

17    **repayment of XM Project Costs will be structured consistent with P.L. 111.11, section 9603**

18    . . . ." (XM Contract, ¶ "o" (Recitals)).

19    27.    With regard to the scheduling repayments, "[t]he first Repayment Obligation

20    installment will be due and payable on or before the last day of February of the Year following

21    the date on which the Contracting Officer determines and notifies FWA in writing that the XM

22    Work for each phase is Substantially Complete."  (XM Contract, § 4, ¶ (c).)

23    28.    On April 28, 2021, the FWA and the United States of America entered into an

24    agreement regarding cost share and contributed funds for the Project ("Cost Share Agreement").

25    The Cost Share Agreement provides that:

26    Reclamation has determined that the Project was initiated as an OM&R action and

27    that the Project Costs (defined in Article IV.B of the Agreement) for which FWA

28    is responsible for as Reclamation's non-federal cost share partner under this

- 9 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Agreement are authorized to be collected from Friant Contractors as OM&R

2    charges pursuant to Article 12 of the Transfer Agreement.  Pursuant to the Cost

3    Share Agreement, the non-federal funds were to come from a "variety of sources",

4    including GSA Funds, FMA OM&R funds, non-Federal loans, contributions of

5    investment agreements with Friant Contractors, State and local government funds,

6    bonds or other loans, and in-kind services.

7    (*Cost Share and Contributed Funds Agreement Between the Friant Water Authority and the*

8    *United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project*

9    ("Cost Share Agreement"), art. II.B.iii.1. (Apr. 28, 2021).)  In this regard, FWA committed to

10   Reclamation that FWA anticipated to receive a certain amount of funding from ETGSA, but

11   notably, FWA had not yet received the funds.  Article IV.E.i.2. of the Cost Share Agreement sets

12   forth a procedure should FWA be unable to make its quarterly payments.  Article VI.J. of the Cost

13   Share Agreement sets forth a non-waiver section wherein the Parties to the Cost Share Agreement

14   expressly acknowledge that each Friant Division contractor expressly preserves its right to make

15   any and all claims it may have now, and in the future, specifically regarding any obligation to

16   make payments beyond their respective share of Project OM&R costs budgeted and approved by

17   the FWA Board.

18        29.    FWA did not have money to pay for the nonfederal share of reimbursement at the

19   time of execution.  Instead, FWA had a plan to obtain the necessary funds and Reclamation agreed

20   to a backup plan in the event funding was not realized as planned.  Failure to have the necessary

21   funds is a violation of the WIIN Act.

22        30.    Section 510b authorizes the Secretary to advance funds incurred by the transferred

23   works operating entity in conducting extraordinary operation and maintenance work and is

24   required to negotiate appropriate 50-year repayment contracts with project beneficiaries.  A

25   transferred work entity is not a project beneficiary.  No repayment contract exists with any project

26   beneficiary for the MRCCP.

27        31.    On August 12, 2024, after completion of construction of Phase 1 of the Project,

28   the FWA Board of Directors took action to impose all outstanding repayment obligations to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  Reclamation for Phase 1 of the MRCCP to those Friant Contractors who are also member agencies

2  of the ETGSA.  (*Special Board of Directors Meeting Agenda*, FWA (Exhibit A).)  The staff report

3  indicates that as a general matter, when recovering costs associated with the OM&R of existing

4  project facilities, including full replacement or extraordinary maintenance, the traditional

5  methodology to recover such costs would be to spread the costs among all those that benefit from

6  the project in proportion to the amount each entity would be benefiting from the entire project.

7  (Staff Report at p. 3 (Exhibit A).)  FWA staff indicated their proposal was different where "an

8  OM&R project is necessary due to damage caused by actions of known entities" (*id.*), removing

9  entirely any analysis or rationale for a benefits analysis.

10      32.     Via a letters to BOR and FWA attached hereto as Exhibit B, Plaintiffs initiated a

11  dispute resolution pursuant to section 10 of the Transfer Agreement, article 8 of the XM Contract,

12  the Cost Share Agreement, and article 34 of Plaintiffs' respective contracts providing for project

13  water service from Friant Division and for facilities repayment on or about September 26, 2024,

14  as a result of the August 12, 2024, FWA board action, alleging amongst other things: the board

15  action exceeded BOR's delegable authority; violations of Section 510b; violations of

16  Reclamation's own Policies and Directives and Standards; and various Constitutional violations.

17  (*Proposed FWA MRCCP Cost Recovery Methodology Notice of Dispute Resolution*, TBID (Sept.

18  26, 2024; "TBID Letter").)

19      33.     On December 18, 2024, in a letter BOR attached hereto as Exhibit C, FWA

20  responded to Plaintiffs' dispute resolution letter claiming the Reclamation Manual does not apply

21  to FWA's board action; FWA's authority is set forth in the Transfer Agreement; the Reclamation

22  Manual was followed by Reclamation staff; that contracts with project beneficiaries are not

23  required for XM Repayment Contracts; the Constitution has no application to the Transfer

24  Agreement Contract or its implications to various Districts; and the proposed costs imposed on

25  the Plaintiffs are equitable because Plaintiffs benefit from groundwater pumping that contributed

26  to FKC subsidence.  (*Request for Determination on Dispute Regarding Friant Water Authority's

27  Updated Middle Reach Capacity Correction Project Cost Recovery Methodology*, FWA (Dec.

28  18, 2024).)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    34.    On January 17, 2025, Regional Director Karl Stock of Reclamation provided a

2  "final determination" on the dispute, which is attached hereto as Exhibit D.  He found that Project

3  Beneficiaries for purposes of contracts entered into pursuant to Public Law 111-11 to be satisfied

4  as FWA, as the non-federal operating entity had alleged authority under the Transfer Agreement

5  to recoup OM&R costs; the Reclamation Manual has no applicability to the facts of this dispute;

6  and FWA's proposed methodology is "equitable."  (*Final Determination of Dispute Regarding*

7  *Friant Water Authority's Updated Middle Reach Capacity Correction Project Cost Recovery*

8  *Methodology*, BOR (Jan. 17, 2025; "Final Determination").)  Mr. Stock noted it is his "final

9  determination that FWA has adopted a cost recovery methodology that is otherwise in compliance

10  with state law and is reasonable in the context of FWA responsibilities under the Transfer

11  Agreement." (Final Determination at p. 3.)  In reaching these determinations, Mr. Stock states,

12  in part, that, "Reclamation initiated the Project as an OM&R action" (Final Determination at p.

13  2), while ignoring that Reclamation and FWA agreed that the Project is an XM project, which—

14  by that classification—should be subject to certain statutory and regulatory laws as described in

15  detail below.

16    **BOR REGULATIONS FOR REPAYMENT OF XM PROJECTS**

17    35.    The BOR's own regulations explicitly recognize and reiterate the requirement of

18  contractual negotiation found in Section 510b.  Reclamation's Manual, Directives and Standards,

19  PEC 05-03 provided that the allocation of XM costs was to be made "in accordance with the

20  existing allocation of OMR costs of the project or facility."  The version in existence at the time

21  monies were lent to FWA on March 8, 2022, did not provide any ability to later alter or amend

22  any cost recovery methodology.

23    **COST ALLOCATION METHODOLOGY POST-CONSTRUCTION IS RETALIATION**

24    36.    Each of the Plaintiffs is a member agency of the Eastern Tule Groundwater

25  Sustainability Agency ("ETGSA"), a California joint powers authority.

26    37.    In 2023, FWA filed suit in the California Superior Court, County of Tulare,

27

28

- 12 -

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    seeking to recover damages against ETGSA from an alleged breach of the Settlement Agreement[2]

2    between FWA and ETGSA ("ETGSA Litigation").  In the ETGSA Litigation, FWA hoped to

3    recover a $200 million lump sum in damages, based upon its interpretation of the Settlement

4    Agreement.  The Plaintiffs are neither party to the ETGSA Litigation nor the Settlement

5    Agreement.

6         38.    On July 2, 2024, the Tulare County Superior Court issued a ruling that was critical

7    of FWA's contractual interpretation, rendering it highly unlikely that FWA would recover the

8    damages it expected at the time it filed the ETGSA Litigation.  (Order Overruling Demurrer and

9    Denying Motion to Strike, *Friant Water Authority et al. v. Eastern Tule Groundwater*

10   *Sustainability Agency*, Tulare County Superior Court Case No. VCU306343 (July 2, 2024; "Case

11   No. VCU306343").)

12        39.    Under California law, a joint powers authority is an entity that is separate and

13   independent of its member agencies. (*See* Cal. Gov. Code § 6507).

14        40.    FWA, moved by an animus against the Plaintiffs based upon their affiliation with

15   ETGSA and motivated by a desire to punish both the Plaintiffs and ETGSA following the July 2,

16   2024, ruling in the ETGSA Litigation and a desperate attempt to fulfill FWA's illusory funding

17   commitment to Reclamation, took the actions described below.

18                          **THE UNILATERAL CHARGE**

19        41.    On or about August 12, 2024, in contravention of statutory and regulatory law and

20   BOR's policies, FWA purported to unilaterally establish the terms of Plaintiffs' repayment

21   obligations for the MRCCP—without (i) negotiating a contract as required by Section 510b and

22   the WIIN Act, and (ii) providing for public participation as provided for by PEC 05-03, PEC P05,

23   Section 485h, CFR 426.22, and CMP 04-01 (collectively referred to as "PEC 05-03 et al.").

24   FWA's action (hereinafter "**Unilateral Charge**") was and is, as further described below, a

25   capricious, irrational, "extra-legal" attempt to impose liability for payments, rather than undertake

26   

27   _____

     [2] FWA and ETGSA entered into the Settlement Agreement on January 21, 2021, in order to resolve a dispute
     concerning the impact that land subsidence—resulting from groundwater pumping within the boundaries of
28   ETGSA—was having on the capacity of the FKC to convey surface water to Central Valley Project, Friant
     Division contractors.  The Settlement Agreement contains terms aimed at raising funding for the MRCCP from
     ETGSA landowners that pump groundwater falling within certain tiered penalty allocation classifications.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the negotiation and public participation required by Section 4007, Section 510b and PEC 05-03 et al., respectively.  Through the Unilateral Charge, FWA seeks—ipse dixit—to render the Plaintiffs liable to pay between $95 million dollars and $200 million dollars for the MRCCP, *while not requiring any of the other project beneficiaries of the Friant-Kern Canal to contribute*.

42.    At the August 12, 2024, meeting, FWA staff did not present the pretense of compliance with the numerous laws and regulations discussed above.  The "reason" for FWA's unlawful conduct, according to FWA at that time, was to cause Plaintiffs—who have voting representatives on *ETGSA's* governing board—to "do something" to provide more money to FWA, in light of the Tulare County Superior Court's ruling in Case No. VCU306343 on FWA's own deceptive conduct.  Moreover, FWA's brazen approach toward Plaintiffs is properly characterized as civil extortion under California law.  (*See Flatley v. Mauro*, 39 Cal.4th 299, 326-333 (2006).

43.    An equal protection cause of action exists when specific persons or entities are "singled out" in an irrational and arbitrary manner.  (*See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (Citation omitted)).)    TBID's landowners rely almost exclusively upon surface water and use only minimal groundwater. (Exhibit B, TBID Letter at p. 9.)  PID and SID operate under conjunctive use, primarily relying on surface water.  Nevertheless, FWA has purported to "order" Plaintiffs to pay millions of dollars in excess of Plaintiffs' obligation in reality.  The only reason for FWA's unlawful attempt at altering XM repayment cost allocations was to create greater pressure upon Plaintiffs as voting members of ETGSA.  In other words, the only basis for "punishing" Plaintiffs was to optimize the extortionary effect of FWA's unlawful conduct.

44.    While the Unilateral Charge was taking place, text messages between FWA administrative staff, Johnny Amaral, and representatives of other FWA members (*i.e.*, other project beneficiaries) show that FWA staff was fully cognizant of the fact that minimal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

groundwater is pumped by Plaintiffs, and, therefore, *cannot*, as a matter of both analytic logic and very simple physics, be responsible for overextraction of groundwater.

### EXCEEDANCE OF DELEGABLE AUTHORITY

45.    At the time it adopted the Unilateral Charge, FWA claimed to act under the authority delegated to it by BOR.  Plaintiffs claim that *neither BOR nor FWA* possesses the authority or discretion to simply bypass Section 510b's requirement that the terms of repayment *be negotiated with Plaintiffs*.  Further, Plaintiffs claim that neither BOR nor FWA possess the authority or discretion to bypass the public participation requirements of PEC 05-03 *et al.* outlined above [list paragraph numbers].

46.    Furthermore, under PEC 05-03 (version (678) 03/08/2022), BOR had no authority to unilaterally change the cost recovery methodology ("Methodology") provided for in the XM Repayment Agreement *ex post*, and, accordingly, FWA had no such authority either.

47.    At the time BOR advanced funds to FWA for the MRCCP—November 9, 2023— PEC 05-03 did not set forth any power to later adjust the Methodology as provided for in the current version of PEC 05-03 (version (703) 07/10/2024).  Specifically, the 2022 version of PEC 05-03 provides, BOR "will allocate costs for XM . . . work in accordance with the *existing* allocation of OM&R costs of the project or facility."  (PEC 05-03 (678) 03/08/2022, ¶ 8.A (*emphasis* added).)  Accordingly, in November 2023 when the 2022 version of PEC 05-03 was still in effect, BOR's standard for the allocation of costs for XM work did not contemplate modifying OM&R cost allocations.  Instead, in 2023, BOR was directing that the basis for the allocation of XM costs be *existing* methodologies.

48.    The basis for all cost recovery methodologies is an analysis of the benefits associated with project beneficiaries.  BOR possesses no authority under law or policy that it may allocates costs for a XM project based on tort liability theories of damage and causation.  Therefore, FWA exceeded BOR's delegable authority by approving the Unilateral Charge in a manner contrary to PEC 05-03 (version (678) 03/08/2022).

### NECESSITY OF DECLARATORY RELIEF

49.    FWA's assertion of authority to unilaterally impose XM repayment obligations

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  upon Plaintiffs, rather than negotiating the terms as required by Section 510b and providing for

2  public participation as required by PEC 05-03 *et al.*, has effectively clouded the ability of the

3  parties to engage in the negotiation and public participation contemplated by Section 510b and

4  PEC 05-03 *et al.* FWA continues to assert the right to impose the Unilateral Charge, and BOR

5  contends the statutory, regulatory, and policy requirements found in Section 510b and PEC 05-

6  03 *et al* simply do not apply.

7      50.    FWA's continued efforts to impose the Unilateral Charge, Plaintiffs' continued

8  assertion that any attempt to impose a unilateral charge to recover XM funds from project

9  beneficiaries violates section 510b and PEC 05-03 et al. Plaintiffs request a judgment declaring

10  that the Unilateral Charge, and any other unilateral action purporting to unilaterally impose XM

11  repayment obligations upon project beneficiaries, violates Section 510b and PEC 05-03 et al.

12      51.    In essence, because FWA predicts a shortfall in funds coming from the Settlement

13  Agreement (in the ballpark of $200 million) that FWA pledged as the non-federal cost share for

14  the Project, FWA wants Plaintiffs to pay the difference due to their membership in the ETGSA

15  joint powers authority. As Central Valley Project, Friant Division contractors that receive the

16  vast majority of their irrigation water from the FKC, Plaintiffs are predominantly users of surface

17  water and, thus, have not substantially contributed to land subsidence impacts to the FKC—and

18  certainly not to the degree that would warrant FWA's Unilateral Charge.

19      52.    Accordingly, the declaratory and injunctive relief sought herein is necessary to

20  ensure that (1) the Unilateral Charge, itself an unlawful act, is not utilized to leverage payment

21  by the Plaintiffs despite the unlawful character of the Unilateral Charge, and (2) no similar

22  unilateral charges are attempted against the Plaintiffs in the future.

### VIII.    CLAIMS FOR RELIEF

#### FIRST CLAIM FOR RELIEF

**(Declaratory Relief – 28 U.S.C. § 2201 (Violation of Section 510b and PEC 05-03 *et al.*))**

26      53.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through

27  50, as though fully set forth herein.

28      54.    A controversy exists regarding whether the Unilateral Charge and Final

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Determination violated Section 510b and PEC 05-03 *et al.*, and a judicial declaration is necessary for the Plaintiffs to protect themselves from continued extortionate use of the Unilateral Charge in order to induce Plaintiffs to pay money that they do not owe.

## SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)

55.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 52, as though fully set forth herein.

56.    The Unilateral Charge is without statutory authority.  Section 510b requires that repayment obligations for XM Projects be established by means of contractual negotiation.  FWA, acting in its capacity as agent for the BOR, violated this statutory requirement when it purported to levy the Unilateral Charge.  The Unilateral Charge should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF

### (Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)

57.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 52, as though fully set forth herein.

58.    The Unilateral Charge is without statutory authority.  The WIIN Act, section 4007 requires the Secretary—prior to the commencement of any construction—to secure an agreement providing upfront funding as is necessary to pay the non-Federal share of XM project costs and to make certain determinations regarding the feasibility of the project and the federal share of the benefits of the project.  FWA, acting in its capacity as agent for the BOR, violated this statutory requirement when it purported to levy the Unilateral Charge.  The Unilateral Charge should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

## FOURTH CLAIM FOR RELIEF

### (Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)

59.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 54, as though fully set forth herein.

60.    The Unilateral Charge is without statutory authority.  Section 485h requires that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

negotiation of XM contracts be subject to public participation.  FWA, acting in its capacity as agent for BOR, violated this statutory requirement when it purported to levy the Unilateral Charge without public participation in a manner outside of BOR's delegable authority.  The Unilateral Charge should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

### FIFTH CLAIM FOR RELIEF

**(Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)**

61.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 56, as though fully set forth herein.

62.    The Unilateral Charge exceeds BOR's delegable authority.  PEC 05-03 version (678) 03/08/2022—the version in effect at the time BOR distributed funds to FWA—does not provide for the unilateral altering of the Methodology in the XM Repayment Agreement.  Thus, FWA, acting in its capacity as agent for BOR, violated BOR's policies and, thus, exceeded BOR's delegable authority.  The Unilateral Charge should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

### SIXTH CLAIM FOR RELIEF

**(Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)**

63.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 58, as though fully set forth herein.

64.    The Final Determination is without statutory authority.  Section 510b requires that repayment obligations for XM Projects be established by means of contractual negotiation.  BOR violated this statutory requirement when it issued the Final Determination.   The Final Determination should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

### SEVENTH CLAIM FOR RELIEF

**(Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)**

65.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 52, as though fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

66.     The Final Determination is without statutory authority.  The WIIN Act, section 4007 requires the Secretary—prior to the commencement of any construction—to secure an agreement providing upfront funding as is necessary to pay the non-Federal share of XM project costs and to make certain determinations regarding the feasibility of the project and the federal share of the benefits of the project.  BOR violated this statutory requirement when it issued the Final Determination.  The Final Determination should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

### EIGHTH CLAIM FOR RELIEF

**(Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)**

67.     Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 60, as though fully set forth herein.

68.     The Final Determination is without statutory authority.  Section 485h requires that negotiation of XM contracts be subject to public participation.  BOR violated this statutory requirement when it issued the Final Determination without public participation.  The Final Determination should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

### NINTH CLAIM FOR RELIEF

**(Administrative Procedure Act, Excess of Statutory Authority – 5 U.S.C. § 706)**

69.     Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 62, as though fully set forth herein.

70.     The Final Determination exceeds BOR's authority under its own regulations.  PEC 05-03 version (678) 03/08/2022—the version in effect at the time BOR distributed funds to FWA—does not provide for the unilateral altering of the cost recovery methodology in the XM Repayment Agreement.  Thus, BOR violated its own policies and, thus, exceeded its own authority.  The Final Determination should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

/ / /

/ / /

1

2

**TENTH CLAIM FOR RELIEF**

**(Administrative Procedure Act, Arbitrary and Capricious – 5 U.S.C. § 706)**

3    71.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through

4    64, as though fully set forth herein.

5    72.    The Unilateral Charge is arbitrary, capricious, an abuse of discretion, and

6    otherwise not in accordance with the law and should be set aside as unlawful pursuant to the

7    Administrative Procedure Act, 5 U.S.C. § 706.

8

**ELEVENTH CLAIM FOR RELIEF**

9

**(Administrative Procedure Act, Arbitrary and Capricious – 5 U.S.C. § 706)**

10    73.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through

11    66, as though fully set forth herein.

12    74.    The Final Determination is arbitrary, capricious, an abuse of discretion, and

13    otherwise not in accordance with the law and should be set aside as unlawful pursuant to the

14    Administrative Procedure Act, 5 U.S.C. § 706.

15

**TWELFTH CLAIM FOR RELIEF**

16

**(Administrative Procedure Act, Without Observance of Procedure – 5 U.S.C. § 706)**

17    75.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through

18    42, as though fully set forth herein.

19    76.    The Unilateral Charge was approved by FWA without observance of procedure as

20    required by law.  PEC 05-03 *et al.* require that an amendment of an XM contract be subject to

21    public participation.  FWA, acting in its capacity as agent for BOR, violated this procedural

22    requirement when it purported to levy the Unilateral Charge.  The Unilateral Charge should thus

23    be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

24

**THIRTEENTH CLAIM FOR RELIEF**

25

**(Administrative Procedure Act, Without Observance of Procedure – 5 U.S.C. § 706)**

26    77.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through

27    70, as though fully set forth herein.

28    78.    The Final Determination was issued by BOR without observance of procedure as

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

required by law.  PEC 05-03 *et al.* require that an amendment of an XM contract be subject to public participation.  BOR violated this procedural requirement when it issued the Final Determination.  The Final Determination should thus be set aside as unlawful pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.

**FOURTEENTH CLAIM FOR RELIEF**

**(Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution –**

**42 U.S.C. § 1983)**

79.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 72, as though fully set forth herein.

80.    FWA, purporting to act on its authority under federal law as agent for BOR, acted with irrational animus in purporting to levy the Unilateral Charge, contrary to the constitutional guarantees of due process and equal protection found in both the Fifth and Fourteenth Amendments to the United States Constitution.

**FIFTEENTH CLAIM FOR RELIEF**

**(Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution –**

**42 U.S.C. § 1983)**

81.    Plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 74, as though fully set forth herein.

82.    BOR, by approving FWA's Unilateral Charge in the Final Determination, approved the irrational animus with which FWA levied the Unilateral Charge and, thus, acted contrary to the constitutional guarantees of due process and equal protection found in both the Fifth and Fourteenth Amendments to the United States Constitution.

**IX.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.   Declare, pursuant to 28 U.S.C. § 2201, that the Unilateral Charge violates Section 510b;

2.   Declare, pursuant to 28 U.S.C. § 2201, that the Unilateral Charge violates the WIIN Act;

Declare, pursuant to 28 U.S.C. § 2201, that the Unilateral Charge violates Section

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

485h;Declare, pursuant to 28 U.S.C. § 2201, that the Unilateral Charge violates the Fifth and Fourteenth Amendments to the United States Constitution; Declare, pursuant to 28 U.S.C. § 2201, that the Unilateral Charge violates BOR's own regulations; Declare that the Unilateral Charge violates the Administrative Procedure Act;

3. Declare, pursuant to 28 U.S.C. § 2201, that the Final Determination violates Section 510b;

4. Declare, pursuant to 28 U.S.C. § 2201, that the Final Determination violates the WIIN Act;

5. Declare, pursuant to 28 U.S.C. § 2201, that the Final Determination violates Section 485h;

6. Declare, pursuant to 28 U.S.C. § 2201, that the Final Determination violates the Fifth and Fourteenth Amendments to the United States Constitution;

7. Declare, pursuant to 28 U.S.C. § 2201, that the Final Determination violates BOR's own regulations;

8. Declare that the Final Determination violates the Administrative Procedure Act;

9. Preliminarily enjoin, pursuant to Federal Rules of Civil Procedure Rule 65, Defendants from implementing the Unilateral Charge and Final Determination;

10. Award costs and fees for this action, including attorney's fees; and

11. Award, pursuant to 28 U.S.C. § 2202 such further relief as this Court deems necessary and proper.


Dated: January 27, 2025                    HERR PEDERSEN & BERGLUND LLP


                                           By:  */s/ Leonard C. Herr*

                                           LEONARD C. HERR
                                           RON STATLER
                                           Attorneys for Plaintiffs,
                                           Terra Bella Irrigation District, Saucelito
                                           Irrigation District & Porterville Irrigation
                                           District

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT A



City of Fresno - 1626 E Street, Fresno 93706
Fresno I.D. – 2907 S. Maple Ave, Fresno 93725
Hills Valley I.D.  – 12201 Ave 480, Orange Cove 93646

# SPECIAL BOARD OF DIRECTORS MEETING

## MONDAY, AUGUST 12, 2024
## 8:30 A.M.
## LINDSAY CONFERENCE ROOM
## 854 N. HARVARD LINDSAY, CA 93247

**CALL TO ORDER/ROLL CALL – (ERICKSON)**

**APPROVAL OF THE AGENDA – (ERICKSON)**

**OPEN SESSION**

**1.    ACTION ITEM**

A.    Establishment of an Updated Cost Share Methodology for the Friant-Kern Canal Middle Reach Capacity Correction Project and Provision of 60-day Notice to Friant-Kern Canal Contractors.

**ADJOURN TO CLOSED SESSION (If Necessary)**

**2.    CLOSED SESSION**

   A.  CONFERENCE WITH REAL PROPERTY NEGOTIATORS
   (Government Code section 54956.8)
    Property: Friant-Kern Canal facilities and right-of-way
    Agency negotiator: CEO, COO, CFO, General Counsel
    Negotiating parties: United States (Bureau of Reclamation)
    Under negotiation: Middle Reach Capacity Correction Project Cost Share Agreement
   (price and terms of payment)

**ADJOURNMENT**

### PUBLIC PARTICIPATION INFORMATION

Under the Americans with Disabilities Act, if you require a disability-related modification or accommodation to participate in this meeting, including auxiliary aids or services, please contact Vivian Garcia at 559-562-6305 or vgarcia@friantwater.org prior to the meeting.

1



## Agenda Report                                    No. 1.A

**DATE:**          August 12, 2024

**TO:**            Board of Directors

**FROM:**          Jason Phillips, CEO; Wilson Orvis, CFO

**SUBJECT:**       **Proposed Cost Recovery Methodology for any Cost-Share Deficit for the Middle Reach Capacity Correction Project**

---

**SUMMARY:**

In accordance with the Cost Share and Contributed Funds Agreement ("Cost-Share Agreement") between the Friant Water Authority (FWA) and the Bureau of Reclamation (Reclamation) for the Middle Reach Capacity Correction Project (Project) and the associated "Repayment Agreement", FWA is responsible for providing 50% of the up-front Project costs from non-federal sources and, after substantial completion, is responsible for repayment of the reimbursable federal share of the Project costs.  The Project has been split into two phases:

- Phase 1 is currently estimated to cost $326.2 million, of which there is a projected:
    - Cost-share deficit during construction of approximately $5.1 million; and
    - Repayment Obligation of approximately $90 million (~$4 million / year in debt service for 30 years)

- Phase 2 is currently estimated to cost $247.2 million, of which all of the non-federal funding required to proceed has yet to be secured.

FWA's funding plan for the Phase 1 provides for $50 million in collections from the Friant-Kern Canal (FKC) Contractors, funding from the State, and the balance of the cost-share derived from revenues from Settlement Agreements executed with the Eastern Tule Groundwater Sustainability Agency (ETGSA) and the Pixley Groundwater Sustainability Agency (Pixley GSA).  Pixley GSA made a full lump sum payment of $11 million under its Settlement Agreement.  ETGSA did not provide the $125 million lump sum payment to FWA under the Settlement Agreement. To date, the revenues under ETGSA's alternative obligation to collect and remit to FWA up to $200 million under its transitional pumping penalty program have been substantially lower than expected.  Additionally, it appears increasingly unlikely that the manner in which the ETGSA is implementing the transitional pumping penalty program will provide sufficient revenues to cover the remaining Project cost obligations.  As a result, without additional revenues, FWA is anticipating a cost-share deficit for the Project during the remainder of construction and an additional, more substantial deficit to meet the annual debt service payments under the Repayment Agreement.

Reclamation is aware of FWA's projected cost-share deficit for the Project and, in recent meetings, has asked that FWA make a determination on the cost recovery methodology for the deficit as soon as possible as it will affect several matters including future funding/Phase 2+ decisions.

After incorporating input received at the July 25, 2024 Board meeting and conducting further analysis, FWA staff have developed a recommended cost recovery methodology for the anticipated funding deficit for the Project. The rationale for this recommendation as well as the proposed provisions of this cost recovery methodology are provided below. In accordance with Article 12 of the Transfer Agreement between FWA and Reclamation, any new, proposed OM&R cost recovery methodology requires FWA to provide notice to all affected contractors for at least 60-days prior to the effective date of the cost recovery methodology.

Staff is requesting that the Board of Directors make a determination on the cost recovery methodology to be used in the event there is a deficit of available funding to cover outstanding costs associated with the Middle Reach Capacity Correction Project so that the methodology can be submitted for the 60-day review period.

## COST RECOVERY OPTIONS:

FWA staff identified the following four options for cost recovery for any future Project deficits.

- **Option 1 – Default**. This option represents a scenario in which the Board takes no action on how to collect funds for repaying Reclamation for money owed under the Cost-Share Agreement, and FWA informs Reclamation that it is unable to make the required payments. As a reminder, if the Board, after good faith efforts to agree upon an updated cost recovery methodology, including seeking alternative sources of funding, is unable to do so, then the default provision of Section IV.E.i. of the Cost Share Agreement would apply, which provides that Reclamation will step in and assist in securing a third-party contributor. If Reclamation does so, the resulting loan must be repaid within 5 years with interest incurred by the contributor plus four percent and have priority for repayment from all sources of funding for the Project. (Note – based upon previous feedback from the Board of Directors, the "Default/No-Action" option was determined to be non-viable as it still requires the Board to determine a cost recovery methodology for the loan repayment.)

- **Option 2 – "Family Plan" Alternative.** Under this option, the Board would allocate any future Project funding deficits using the existing OM&R cost allocation methodology (25-year rolling average of all deliveries), effectively increasing the Friant-Kern Canal (FKC) Contractor contributions to the Project beyond the current $50 million ceiling.

- **Option 3 – Direct Beneficiary Alternative.** Under this option, the Board would allocate any future Project funding deficits to FKC Contractors using an agreed upon cost allocation methodology that considers direct benefits of the Project.

- **Option 4 – ETGSA District Alternative.** Under this option, the Board would allocate any future Project deficits to those FKC Contractors within the boundaries of the Eastern Tule Groundwater Sustainability Agency (ETGSA).

## STAFF RECOMMENDATION AND RATIONALE:

As a general matter, when recovering costs associated with the operation, maintenance and replacement (OM&R) of existing project facilities, including full replacement or extraordinary maintenance (XM), the traditional methodology to recover such costs would be to spread the costs among all those that benefit from the original project in proportion to the amount each entity would be benefitting from the entire project.  The rationale being that contractors should only receive the expected benefits from the project so long as everyone contributes proportionally to the entire project being kept in a condition to deliver the originally intended benefits to all contractors.  This is especially true when any particular OM&R project does not result in new benefits exceeding the originally authorized project.  If a project is not able to be maintained to deliver the benefits to all contractors as intended, presumably the delivery of water may need to be revised to ensure the benefits are still being distributed equitably.

However, the situation is different if an OM&R project is necessary due to damage caused by actions of known entities.  In these circumstances, the recovery of costs for the project should be guided by the equitable principle to collect from the entities that caused the damage, and only seek to recover funds from other contractors if collecting the full project costs from the damaging entities is not possible.  In the case of the MRCCP, it is well-established that the project is necessary due to land subsidence along the Middle Reach of the Friant Kern Canal (FKC) resulting from the excessive groundwater pumping taking place within the Tule Subbasin.  At the outset of the Project, FWA prepared an analysis that demonstrated that, if unmitigated, the future additional subsidence along the FKC caused by continued excessive groundwater pumping in the Tule Subbasin would result in water supply impacts in excess of $265 million in 2020 dollars.  As such, an equitable approach for recovering the costs of the MRCCP would be for the landowners within the areas covered by Tule Subbasin Groundwater Sustainability Agencies (GSAs) to be allocated all of the project costs, as they are the sole beneficiaries of the overdraft groundwater pumping causing the subsidence along the FKC.  With that objective in mind, FWA pursued recovering costs from certain Tule Subbasin GSAs through negotiated settlement agreements. As a result of the negotiations and other factors, the FWA board decided that the collection of a lump sum payment of $125 million by December 2022, or up to $200 million over time by ETGSA, and a lump sum payment of $11 million from Pixley GSA by December 2021, along with funding from others, would result in an equitable recovery of costs for the MRCCP.

The landowners in Pixley GSA have already paid their allocated share in full.  It appears highly unlikely, however, in part for reasons currently under litigation, that landowners in ETGSA will pay sufficient penalties or other charges to ETGSA to cover the share of the MRCCP allocated to this area.  This is in spite of the fact that overdraft groundwater pumping along with its subsidence inducing damage is continuing at a rate that is substantially higher than originally projected, while the financial benefits of this pumping as well as the related water credit and transitional water trading continue to accrue to landowners in the area covered by ETGSA.  If landowners in the ETGSA are not charged and therefore do not pay substantially more penalties or other charges than they have since 2021, FWA will have a sizable deficit owed to Reclamation and will need to take action to collect from the FKC Contractors to cover the difference.

**Recommended Cost Recovery Methodology.**

FWA staff recommends the following cost recovery methodology for the remainder of the MRCCP costs, including Phase 1 and any project work that proceeds under Phase 2.

"**Middle Reach Capacity Correction Project Cost Recovery Methodology**
If and when any cost obligations related to the MRCCP are due by FWA and FWA has insufficient revenues to cover the amount due, FWA will assess and collect the full amount due from the four FKC Contractors within the ETGSA boundaries (Porterville ID, Saucelito ID, Terra Bella ID, and Tea Pot Dome WD), subject to the following:

- The recovery of any costs between Porterville ID, Saucelito ID, Tea Pot Dome WD, and Terra Bella ID will be on the basis of irrigable acreage.
- The amount recovered under this methodology, when combined with the total amount received from ETGSA under the Settlement Agreement and any separate agreement(s) with ETGSA District(s), will not exceed $200 million.
- Subject to Board approval, any FKC contractor within the ETGSA boundaries can enter into a separate agreement with FWA which may include, but is not limited to provisions that address payment of their equitable share of the Project costs which recompenses FWA for the District landowners actions that resulted in unmitigated non-sustainable groundwater pumping, a framework to ensure that the District's landowners properly mitigate for any actions that contribute to non-sustainable groundwater pumping, and any other provisions the Board finds necessary to ensure the District takes all reasonable actions to mitigate for the activities of its landowners as it relates to the impacts to the Friant-Kern Canal.

FWA staff believes that the recommendation is equitable due to the fact that the landowners in the FKC contractor districts within ETGSA receive the potential benefit of transitional overdraft pumping and are able to engage in the beneficial transfer and sale of groundwater credits as well as transitional overdraft water allocations. These districts also have significant control over the actions of the ETGSA Board of Directors. Further, as ETGSA distributes groundwater allocations and credits based upon irrigable acreage to all landowners, the relative allocation of costs between the four FKC contractor districts is on the same basis. If ETGSA during any period is able to collect and remit to FWA enough funds to pay the then current FWA repayment obligation, no costs will be assessed to these four FKC contractor districts under this cost recovery methodology.

## SUGGESTED MOTION:

I move that the Board of Directors approve the staff recommended (Option 4) MRCCP Cost Recovery Methodology, effective October 12, 2024, and direct staff to provide notice of the MRCCP Cost Recovery Methodology to all affected Friant Division Contractors and Reclamation.

## ATTACHMENTS

- None.



854 N. Harvard Ave.    (559) 562-6305
Lindsay, CA 93247

# Memorandum

**DATE:**        August 12, 2024

**TO:**          Friant Division Contractors

**FROM:**        Wilson Orvis, Chief Financial Officer

**SUBJECT:**     Notice of Friant Water Authority's Middle Reach Capacity Correction Project Cost Recovery Methodology, Effective October 12, 2024

---

Below is the full text of Friant Water Authority's (FWA) Middle Reach Capacity Correction Project Cost Recovery Methodology. This cost recovery methodology was approved at the August 12, 2024 Special Board of Directors Meeting. For background regarding the development, please see attached agenda report from the special board meeting.

"**Middle Reach Capacity Correction Project Cost Recovery Methodology**
If and when any cost obligations related to the MRCCP are due by FWA and FWA has insufficient revenues to cover the amount due, FWA will assess and collect the full amount due from the four FKC Contractors within the ETGSA boundaries (Porterville ID, Saucelito ID, Terra Bella ID, and Tea Pot Dome WD), subject to the following:

- The recovery of any costs between Porterville ID, Saucelito ID, Tea Pot Dome WD, and Terra Bella ID will be on the basis of irrigable acreage.

- The amount recovered under this methodology, when combined with the total amount received from ETGSA under the Settlement Agreement and any separate agreement(s) with ETGSA District(s), will not exceed $200 million.

- Subject to Board approval, any FKC contractor within the ETGSA boundaries can enter into a separate agreement with FWA which may include, but is not limited to provisions that address payment of their equitable share of the Project costs which recompenses FWA for the District landowners actions that resulted in unmitigated non-sustainable groundwater pumping, a framework to ensure that the District's landowners properly mitigate for any actions that contribute to non-sustainable groundwater pumping, and any other provisions the Board finds necessary to ensure the District takes all reasonable actions to mitigate for the activities of its landowners as it relates to the impacts to the Friant-Kern Canal.

In accordance with Article 12 of the Transfer Agreement between FWA and the Bureau of Reclamation, for any new cost recovery methodology, FWA must provide notice to all affected contractors and the Bureau of Reclamation at least 60-days prior to the effective date. Friant Division Contractors may submit written comments to FWA by Friday, October 11, 2024 via email to worvis@friantwater.org. Please do not hesitate to contact me by email or phone (559-420-1602) with any questions or concerns regarding this policy.

cc:    Michael P. Jackson, Area Manager, Central California Area Office

# EXHIBIT B



Saucelito Irrigation District
Board of Directors:
Steven G. Kisling, President
Erick R. Merritt, V.P.
Lucille Demetriff
Jeffrey M. Noble
Mark O. Merritt

Manager/Assistant Secretary
Sean P. Geivet

Assessor, Collector, Treasurer, Secretary
Diane M. Ennis

Legal Counsel
Ruddell, Cochran
Stanton, Smith & Bixler, LLP
Aubrey Mauritson

"Serving the
irrigation needs of
our community
since 1941"

September 26, 2024

**VIA EMAIL**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

> Re:    Objection to FWA's Proposed MRCCP Cost Recovery Methodology;
> Demand for Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite:

The purpose of this letter is to inform the Bureau of Reclamation (hereafter, "Reclamation") that Saucelito Irrigation District (hereafter, "Saucelito ID") objects to the Friant Water Authority's proposed Cost Share Methodology for Advanced Costs (hereafter "Methodology") for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project (hereafter, "MRCCP"). Friant Water Authority (hereafter, "FWA") proposed the Methodology at its August 12, 2024 Special Meeting and, in doing so, diverged from Reclamation law, rules, standards, directives, and policy in an alarming and disingenuous

manner, as described in Terra Bella Irrigation District's September 26, 2024 letter (hereafter, "TBID Letter") to Reclamation.

The Methodology seeks to force special districts within the Eastern Tule Groundwater Sustainability Agency, including Saucelito ID, as well as Terra Bella Irrigation District, Porterville Irrigation District, and Tea Pot Dome Water District, to pay at least $95 million dollars for Phase 1 of the MRCCP. The Methodology seeks to compel a similar obligation on the districts for Phase 2. Meanwhile, the Methodology releases all other beneficiaries of the Friant-Kern Canal from any such obligation, even though a benefits analysis drives extraordinary maintenance cost allocations under Reclamation law, and FWA has given full-throated support for a transparent and inclusive benefits analysis in the context of the extraordinary maintenance cost recovery allocations for the Delta-Mendota Canal subsidence fix.

Saucelito ID agrees with and supports in full the TBID Letter's analysis and conclusion that the Methodology is unlawful. The bases for that conclusion include FWA (1) exceeding Reclamation's delegable authority concerning cost recovery methodologies for extraordinary maintenance, (2) breaching multiple contracts, including the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violating basic constitutional and contractual rights of the districts.

Accordingly, Saucelito ID hereby notifies Reclamation of this dispute concerning the Methodology and, pursuant to the following agreements, demands dispute resolution thereof:

1. Article 34 of the Contract Between the United States and Saucelito Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment (Contract Nos. I75r-2604-D and 14-06-200-7430E);

2. Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works (Contract No. 8-07-20-X0356-X);

3. Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project (Contract No. 21-WC-20-5855); and

4. Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project (Contract No. 21-WC-20-5856).

Saucelito ID hereby consents to informally meet and confer with Reclamation to resolve this dispute and encourages the involvement of Terra Bella Irrigation District, Porterville Irrigation District, and Tea Pot Dome Water District. However, Saucelito ID's participation in the dispute resolution discussed above shall not constitute a waiver of any rights or remedies, including but not limited to any rights to legal action against Reclamation and FWA.

Saucelito Irrigation District

By: _____

Steven G. Kisling, President



*Saucelito Irrigation District*
*Board of Directors:*
Steven G. Kisling, President
Erick R. Merritt, V.P.
Lucille Demetriff
Jeffrey M. Noble
Mark O. Merritt

*Manager/Assistant Secretary*
Sean P. Geivet

*Assessor, Collector, Treasurer, Secretary*
Diane M. Ennis

*Legal Counsel*
Ruddell, Cochran
Stanton, Smith & Bixler, LLP
Aubrey Mauritson

*"Serving the irrigation needs of our community since 1941"*

September 26, 2024

**VIA EMAIL**

Jason R. Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave
Lindsay, CA 93247

   Re: Objection to FWA's Proposed MRCCP Cost Recovery Methodology

Dear Mr. Phillips:

Friant Water Authority's proposed Cost Share Methodology for Advanced Costs (hereafter, "Methodology") for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project (hereafter, "MRCCP") is (1) unlawful as explained in Terra Bella Irrigation District's letter dated September 26, 2024, (hereafter, "Demand Letter") to the Bureau of Reclamation (hereafter, "BOR"), and (2) voidable or void due to Brown Act violations involving serial meetings. Therefore, Saucelito Irrigation District (hereafter, "Saucelito ID") objects to the Methodology and demands FWA rescind the actions it took at the August 12, 2024 Special Meeting (hereafter, "Board Action").

First, the Methodology unlawfully seeks to force special districts within the Eastern Tule Groundwater Sustainability Agency, including Saucelito ID, as well as Terra Bella Irrigation District, Porterville Irrigation District, and Tea Pot Dome Water District, to pay between $95 million dollars and $200 million dollars for Phases 1 and 2 of the MRCCP. Meanwhile, the Methodology releases all other beneficiaries of the Friant-Kern Canal from any such obligation.

Second, the Board Action is void or voidable because FWA staff and directors committed severe serial meeting violations of the Brown Act before and during the Special Meeting. Moreover, in blatant disregard for the Brown Act, FWA staff continues to conduct serial meetings in order to influence FWA Board of Directors' support for the Methodology. The letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP dated September 18, 2024, receives Saucelito ID's full support. FWA should anticipate Saucelito ID commencing legal action based upon the Brown Act violations unless FWA takes corrective action.

Saucelito ID supports and adopts the position of the Terra Bella Irrigation District as stated in the Demand Letter, which explains why the proposed Methodology (1) exceeds Reclamation's delegable authority concerning cost recovery methodologies for extraordinary maintenance, (2) breaches multiple contracts, including the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violates basic constitutional and contractual rights of the districts.

FWA must rescind the proposed Methodology.

Saucelito Irrigation District

By: _____
Steven G. Kisling, President

# TERRA BELLA IRRIGATION DISTRICT

| | | |
|---|---|---|
| 24790 Avenue 95 | | 559/535-4414 |
| Terra Bella CA 93270 | *Established 1915* | Fax 559/535-5168 |

| | | |
|---|---|---|
| EDWIN L. WHEATON, President | | SEAN P. GEIVET |
| Division 3 | *General* | Manager |
| | | |
| GEOFFREY C. GALLOWAY, Vice-President | | ANN NELMS |
| Division 2 | | Secretary-Treasurer |
| BRENT E. DOYEL | | AUBREY CAIRNS MAURITSON |
| Division 1 | | Legal Counsel |
| KURT PARSONS | | KELLER-WEGLEY |
| Division 4 | | ENGINEERING |
| ALFREDO MARTINEZ | | Consulting Engineer |
| Division 5 | | |

September 26, 2024

**BY EMAIL ONLY**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

> Re:    Proposed FWA MRCCP Cost Recovery Methodology
>         Notice of Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite,

Please consider this correspondence on behalf of Terra Bella Irrigation District ("**TBID**") regarding Friant Water Authority's ("**FWA's**" or "**Authority's**") attempts to revise the Cost Share Methodology for Advanced Costs ("**Methodology**") for purposes of Phase 1 of the Middle Reach Capacity Correction Project ("**MRCCP**").

On August 12, 2024,[1] FWA held a special board meeting to consider taking action on the following as listed on the board agenda:

---

[1] Please note that TBID has given FWA an opportunity to cure severe Brown Act violations that occurred immediately prior to and during the August 12, 2024 meeting.  FWA staff has conducted, and continues to conduct, serial meetings in an effort to obtain and coerce preferred votes of the FWA Board of Directors.

---

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 37 of 115
TERRA BELLA
IRRIGATION DISTRICT

**Establishment of an Updated Cost Share Methodology for the Friant-Kern Canal Middle Reach Capacity Correction Project and Provision of 60-day Notice to Friant-Kern Canal Contractors.**

After discussion of this agenda item, FWA voted to "establish" the following "methodology:" FWA will unilaterally *impose* an obligation exclusively upon TBID—and three other special districts contracting for FKC water, Porterville Irrigation District ("**PID**"), Saucelito Irrigation District ("**SID**"), and Tea Pot Dome Water District (collectively with TBID, the "**Districts**")—to pay amounts in excess of $95 million dollars for Phase 1 of the MRCCP and additional amounts for Phase 2, not to exceed $200 million for the two phases combined ("**Board Action**").

TBID's understanding is that FWA purports this "methodology" to be an "equitable" application of its "authority" to implement the "cost recovery methodology" for allocation of future repayment of costs relating to extraordinary maintenance ("**XM**") of the Friant-Kern Canal ("**FKC**") via the MRCCP.[2] FWA's *Special Board of Directors Agenda Report* ("***Special Report***") admits, "the traditional methodology to recover such costs would be to spread the costs among all those that benefit from the original project in proportion to the amount each entity would be benefitting from the entire project."[3] The *Special Report* rationalizes parting from the traditional methodology because "the situation is different if an OM&R project is necessary due to damage caused by actions of known entities."[4] The *Special Report* continues, "[i]n these circumstances, the recovery of costs for the project *should* be guided by the equitable principle to collect from the entities that caused the damage, and only seek to recover funds from other contractors if collecting the full project costs from the damaging entities is not possible."[5] Accordingly, contrary to the law, FWA purports to have revised the Methodology based upon its own opinion of what the "principles" guiding the process *should* be—as opposed to what the principles and processes actually are—as explained further below.

Bluntly, the Board Action reached far beyond the authority that the Bureau of Reclamation ("**BOR**" or "**Reclamation**") delegates to FWA for FKC management, as FWA has no authority in equity to unilaterally adjust the Methodology relating to extraordinary maintenance of federal water project contracts.[6] Specifically, at the outer most limit of delegable authority is a requirement that FWA—if it has the basis in this case for reaching the outer most limit at all—must follow certain procedures when adjusting the Methodology for XM costs,[7] the process requires negotiations with project beneficiaries

---

TBID will pursue all legal avenues to ensure the practice is ceased. TBID fully supports the September 18, 2024, letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP regarding FWA's serial violations of the Brown Act ("**Herr Firm Letter**").

[2] See *Special Board of Directors Agenda Report*, Friant Water Authority at p. 3 (Aug. 12, 2024).

[3] *Ibid.*

[4] *Ibid*. (*emphasis added*).

[5] *Ibid*. (*emphasis added*).

[6] The irony of FWA's actions versus the MRCCP cannot be understated given FWA's own statements concerning the Delta-Mendota Canal Subsidence Correction Project ("DMC").

[7] *See* Reclamation Manual, Policy PEC P07 ("**PEC P07**"), ¶ 8. In April 2024, San Luis & Delta Mendota Water Authority and FWA entered into an MOU formalizing DMC compliance with PEC P07. (*See Second Amended and Restated Memorandum of Understanding Between Friant Water Authority and San Luis &*

Proposed FWA MRCCP Cost Recovery Methodology         TERRA BELLA
Notice of Dispute Resolution                IRRIGATION DISTRICT
September 26, 2024

(who are responsible for repaying reimbursable costs[8]). Here, FWA's process encompassing the Board Action completely ignored that procedure, which appears in paragraph 8 of Reclamation Manual Policy PEC P07, *Allocation of Operation, Maintenance, and Replacement Costs*.[9]

Paradoxically, in the context of the Delta-Mendota Canal Subsidence Correction Project ("**DMC**"), FWA underscores the importance of complying with PEC P07. For example, FWA voiced support for the "establishment of a new Planning Committee that will be responsible for reviewing, evaluating, and recommending cost allocation of any proposed large XM project cost based upon a benefits analysis."[10] Importantly for FWA, the "new Planning Committee will include FWA and other potential ratepayers, and XM project recommendations will require unanimous findings and recommendations from the Committee."[11] Given its conduct in the context of the MRCCP—described in detail in this letter—FWA adds a rather hollow commentary on the importance of full participation of project stakeholders, "[s]uccessful initiation and completion of a project like the DMC Project requires transparency, engagement, and support from stakeholders."[12] TBID asserts that the process for revising the MRCCP Methodology should be the same as the process that FWA demanded in the DMC context.

For these reasons—and numerous others—TBID's position is twofold: (1) the Board Action is void, and (2) BOR should support the Districts in demanding FWA change course.

**I.**

**BACKGROUND.**

The Board Action arises from FWA's contractual obligation to pay for Phase 1 of the MRCCP. In 2021, FWA and BOR entered into numerous agreements for the MRCCP, including an XM Repayment Contract, a Cost Share Agreement, and an amended Transfer Agreement regarding the operation, maintenance, and replacement of the FKC. In 2021, FWA also entered into a Settlement Agreement with Eastern Tule Groundwater Sustainability Agency ("**ETGSA**") regarding mitigation costs associated with future subsidence along the FKC.

On September 23, 2021, FWA and BOR entered into an agreement entitled, *Contract Between the United States of American and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project* ("**XM Contract**"). In the XM Contract, FWA and BOR both

---

*Delta-Mendota Water Authority Relating to Allocation, Collection, and Payment of Operation, Maintenance, and Replacement Costs for Water Delivered Through Certain Central Valley Project Facilities*, ¶ V.A.4(c).)

[8] *See* PEC P07, ¶ 2 fn. 1 ("Project costs allocated to reimbursable purposes are repaid by project beneficiaries, such as irrigation, municipal and industrial (M&I), and commercial power.").

[9] PEC P07, *Allocation of Operation, Maintenance, and Replacement Costs* (version (345) 5/29/2020).

[10] Friant Water Authority January 18, 2024, letter re *Significant Progress on Resolving Friant Water Authority's Concerns Related to the Proposed Delta-Mendota Canal Subsidence Correction Project* at p. 1.

[11] *Id*. at pp. 1-2.

[12] *Id*. at p. 2.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 39 of 115

specifically acknowledge that the MRCCP "meets the definition of 'Extraordinary Operation and Maintenance Work'" under Title IX, Section 9601 of Public Law 111-11.[13] Furthermore, in the XM Contract, both FWA and BOR *expressly promise* that "[t]he Repayment of XM Project Costs will be structured consistent with P.L. 111-11, Section 9603."[14]

A key basis for FWA's assertion of authority to the XM Methodology for the MRCCP is that certain *Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant Kern Canal and Associated Works* ("**Transfer Agreement**") that BOR and FWA entered into on October 5, 2020. Article 12 of the Transfer Agreement states that, "Reclamation hereby delegates to the Authority all required authority under statutes, contracts, regulations, and policies to collect for [annual, routine operation, maintenance, and replacement ("**OM&R**")] . . . of the Project Works."[15] Moreover, the XM Contract states that the Transfer Agreement establishes the basis for FWA's identification, planning, financing, construction, and collection of funds for the XM work that is the subject of the XM Contract.[16] As explained in Section III below, FWA's attempted exercise of this authority contradicts the Districts' 9(d) long-term repayment contracts.

## II.
### FWA'S BOARD ACTION EXCEEDS THE SCOPE OF BOR'S DELEGABLE AUTHORITY.

Put simply, BOR does not have the power to delegate authority to FWA to either (a) *sua sponte* adjust the Methodology for XM costs relating to the MRCCP or (b) unilaterally allocate—*ex post*—such costs to entities based on their alleged culpability in causing damage to the FKC (as opposed to allocating those costs to project beneficiaries).

To start, Public Law 111-11 authorizes BOR to fund XM work and "execute contracts for extended repayment of the reimbursable costs[,]" *e.g.*, agreements concerning repayment for the MRCCP.[17] Accordingly, it would appear that the authority to establish the Methodology is readily delegable from BOR to FWA.[18] While such delegation of authority is possible under Public Law 111-11, due to BOR's and FWA's characterization of XM Costs as OM&R costs for the purpose of establishing the Methodology, FWA's Board Action is invalid under Reclamation Manual, Directive and Standards, *Extended*

---

[13] XM Contract, Recital "l." ("Reclamation has determined that the XM Project in this Repayment Contract meets the definition of 'Extraordinary Operation and Maintenance Work' (Title IX, Section 9601 of Public Law 111-11).").

[14] XM Contract, Recital "o."

[15] Transfer Agreement, Article 12 (bracketed language added).

[16] XM Contract, ¶ 3(d) ("[The] Transfer Agreement including but not limited to Articles 1, 3, 5 and 12, establishes what constitutes the OM&R of the Friant-Kern Canal and how FWA may identify, plan, finance, construct and collect funds for such work, including the XM Work that is the subject of this Repayment Contract.").

[17] Reclamation Manual, Directives & Standards, *Extended Repayment of Extraordinary Maintenance Costs* ("**PEC 05-03**"), ¶ 1 (678) 03/08/2022. Unless otherwise stated, the references to PEC 05-03 stated herein are to the 2022 version cited in this footnote.

[18] *See, e.g.,* RM, Delegations of Authority, ¶ 4.N.(3)(a).

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 40 of 115

TERRA BELLA
IRRIGATION DISTRICT

*Repayment of Extraordinary Maintenance Costs* ("**PEC 05-03**"), which plainly states, "**[t]he XM authority does not include extended repayment of [OM&R] costs**."[19]

More importantly, even if BOR can delegate the authority for FWA to develop the Methodology for XM costs as OM&R costs, that authority does not allow FWA to alter the methodology *ex post*.[20] At the time BOR advanced funds to FWA for the MRCCP—November 9, 2023[21]—PEC 05-03 did not set forth any power to later adjust the Methodology as provided for in the current version of PEC 05-03. Specifically, the 2022 version of PEC 05-03 provides, BOR "will allocate costs for XM . . . work in accordance with the *existing* allocation of OM&R costs of the project or facility."[22] The 2024 version of PEC 05-03, on the other hand, adds the following to the end of the provision quoted in the preceding sentence, "that is in effect when it incurs costs or advances funds for XM work, *subject to any modified cost allocation formally identified in an XM Justification Report prepared for support of the work*, in accordance with CMP 09-04, *provided the modified cost allocation and initiation of changes to the cost allocation are compliant with the Paragraph 8 of RM Policy, Allocation of Operation and Maintenance Costs (PEC P07)*."[23] Accordingly, in November 2023 when the 2022 version of PEC 05-03 was still in effect, BOR's standard for the allocation of costs for XM work did not contemplate modifying OM&R cost allocations. Instead, in 2023, BOR was directing that the basis for the allocation of XM costs be *existing* methodologies.

Moreover, even if the 2024 revisions to PEC 05-03 would have authorized FWA to adjust the Methodology for MRCCP XM work, FWA has not met the requirements of Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**"), paragraph 8, which set forth rules concerning the initiation of adjustments to the Methodology, as explained in Section V below.[24]

### III.
### FWA'S CONDUCT IS UNLAWFUL, AND VIOLATES MULTIPLE CONTRACTUAL, STATUTORY, AND REGULATORY REQUIREMENTS AND PROTECTIONS.

FWA claims that it possesses the authority to impose XM cost allocations ("XM Charges") based upon Article 12 Transfer Agreement, which provides, "Reclamation hereby delegates to the Authority all required authority under statutes, contracts, regulations, and policies to collect for OM&R of the Project Works." FWA contends that the authority delegated to it in Article 12 includes the power to unilaterally impose these XM Charges upon the Districts.

---

[19] PEC 05-03, ¶ 1 (*emphasis added*).
[20] PEC 05-03 (678) 03/08/2022). Notably, FWA apprised none of the Districts as to substantial lobbying efforts undertaken to amend PEC 05-03, despite the clear impacts those changes would have on the Districts. (*See* Farm Family Alliance memorandum at p. 4 (Dec. 4, 2023), https://www.sldmwa.org/OHTDocs/pdf_documents/Meetings/Board/Prepacket/AgendaItem16b_December_2023_FFA.pdf?_ga=2.114810951.1544190283.1702576819-1600878817.1667342599).
[21] Resolution of San Luis & Delta-Mendota Water Authority (Nov. 9, 2023).
[22] PEC 05-03 (678) 03/08/2022, ¶ 8.A (*emphasis added*).
[23] PEC 05-03 (703) 07/10/2024, ¶ 8.A (*emphasis added*).
[24] Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**"), ¶ 8.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 41 of 115

TERRA BELLA
IRRIGATION DISTRICT

Unfortunately, FWA has disregarded the basic contractual, statutory, and regulatory requirements and strictures associated with extraordinary maintenance. Under Reclamation Manual, Directives and Standards, "[t]he XM authority does not address funding for or authorize extended repayment of annual, routine operation, maintenance, and replacement (OM&R) costs."[25]

A similar disregard was recently noted by the Tulare County Superior Court, with respect to FWA's tendency to frame its own obligations in deceptive fashion. In each case, FWA's attempts to mislead others has led only to its own detriment. In this case, FWA's act of *purporting to unilaterally "bind"* the Districts to a "cost allocation" without their consent, and above their objection, reflects a fundamental ignorance of very elementary and conspicuous statutory and regulatory requirements. Attempting to further "double down" on its ill-conceived and unlawful demand for money will only make the situation worse for all parties involved, including BOR.

Even more fundamentally, FWA's actions are clearly unlawful in a number of respects, the result being that FWA's attempt to treat XM Costs under the Transfer Agreement violates the Transfer Agreement, federal "9(d) contracts" (defined below), and the statutory and policy structure governing XM finance.

### A. FWA's Board Action Violates Article 29(a) of the 9(d) Contracts.

FWA's actions violate the specific protection afforded to the Districts in Article 29(a) of their long-term repayment contracts ("**9(d) contracts**"). In Article 29(a) thereof, BOR agreed that the Transfer Agreement "**shall not interfere with or affect the rights or obligations of the Contractor or the United States hereunder.**"[26] One of the rights afforded to the Districts by their 9(d) contracts is the *exclusion of capital replacement costs from the contractors' OM&R obligations*.[27] The complete text of Article 1(w) is as follows (*emphasis added*):

> "Operation and Maintenance" or "O&M" shall mean **normal and reasonable care, control, operation, repair, replacement (other than Capital replacement), and maintenance** of Project facilities . . . .

Neither BOR nor FWA assert that the MRCCP constitutes "normal" operation, maintenance, or repair. Both FWA and BOR acknowledge that the MRCCP constitutes "extraordinary operation maintenance." BOR's regulations—like the 9(d) contract—categorically separate XM costs from normal operation and maintenance. FWA's purported exercise of authority under the Transfer Agreement would destroy the contractual protection found in Article 1(w) of the 9(d) contracts and would, as a

---

[25] PEC 05-03, ¶ 1.

[26] *Contract Between the United States and Terra Bella Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment*, Article 29(a) (Dec. 16, 2010) (*emphasis added*) ("**9(d) Contract**").

[27] 9(d) Contract, Article 1(w).

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 42 of 115

TERRA BELLA
IRRIGATION DISTRICT

consequence, also violate Article 29(a) of the 9(d) contracts. Neither BOR nor FWA can disregard this categorical distinction and levy charges for XM projects.

**B. FWA's Board Action Violates the Statutory Requirements for Extraordinary Maintenance Repayment Contracts Under 43 U.S.C. § 510b.**

Section 510b of Title 43 of the United States Code governs the conditions under which extraordinary operation and maintenance work may be financed. In the XM Contract, FWA and BOR both specifically acknowledge that the MRCCP "meets the definition of 'Extraordinary Operation and Maintenance Work'" under Title IX, Section 9601 of Public Law 111-11.

The Secretary of the Interior advanced the costs of the MRCCP, with BOR and FWA contemplating in the XM Contract that FWA would be responsible for reimbursement. Subdivision (b) of Section 510b imposes specific requirements in the context of such reimbursement (*emphasis added*):[28]

> For transferred works, the Secretary is authorized to advance the costs incurred by the transferred works operating entity in conducting extraordinary operation and maintenance work **and negotiate appropriate 50-year repayment contracts with project beneficiaries** providing for the return of reimbursable costs, with interest, under this subsection . . . .

On April 28, 2021, prior to execution of the XM Contract, BOR and FWA entered into a Cost Share and Contributed Funds Agreement ("**Cost Share Agreement**"). The Cost Share Agreement is appended to the XM Contract. The Cost Share Agreement explicitly recognizes that the phrase "project beneficiaries" means the Friant Contractors—not FWA.[29] Accordingly, 50-year repayment contracts with the Friant Contractors are a legally necessary component of any reimbursement to BOR.

It is noteworthy that, in connection with the Cost Share Agreement in 2021, BOR and FWA *did obtain written MOUs with the actual project beneficiaries.* However, for reasons unknown to TBID, no 50-year repayment contracts with project beneficiaries were negotiated, as required by Section 510b(b).

However, FWA's Board Action simply ignores the basic statutory requirement that BOR must negotiate 50-year repayment contracts with project beneficiaries, rejects the MOUs between BOR, FWA, and the project beneficiaries, and makes not even the slightest pretense of compliance. Instead, without any intelligible analysis, FWA simply claims authority to impose the "charges" under Article 12 of the Transfer Agreement. Had BOR desired to levy those charges for the purposes of reimbursement, Section 510b would have mandated that BOR *negotiate those terms with the project beneficiaries*. As BOR itself

---

[28] 43 U.S.C. § 510b(b).

[29] Cost Share Agreement, Article VI.C. For the purpose of funding and extended repayment of extraordinary maintenance costs, "project beneficiary" is defined as "[a]n entity that receives benefits from a Reclamation project and is responsible for repayment of reimbursable costs on reserved or transferred works." (PEC 05-03, ¶ 11.E.)

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG   Document 1   Filed 01/27/25   Page 43 of 115
TERRA BELLA
IRRIGATION DISTRICT

could not simply "allocate" costs to project beneficiaries without first negotiating repayment contracts with the project beneficiaries to be charged, FWA certainly also lacks the authority to do so.

### C. FWA's Board Action Violates BOR's Directives and Standards for Repayment of Extraordinary Maintenance Costs.

The Reclamation Manual's Directives and Standards for Funding and Extended Repayment of Extraordinary Maintenance Cost, PEC 05-03, provides as follows at Paragraph 8(a) (*emphasis added*):

> Reclamation will allocate costs for XM and EXM work **in accordance with the allocation of OM&R costs for the project or facility that is in effect when it incurs costs or advances funds for XM work** . . . .[30]

As noted above, although there was no execution of 50-year repayment contracts with FKC project beneficiaries in 2021, there was, at least, a process of negotiating written memorandums of understanding ("**MOUs**") between FWA and certain project beneficiaries, including TBID, PID, and SID. Through the MOUs, project beneficiaries agreed to a specific cost share allocation, equal to a portion of the $50 million set forth in section 2, paragraph A of FWA Resolution No. 2021-02.[31] The methodology for determining that cost share allocation was the allocation in effect at the time FWA incurred and BOR advanced the costs for the MCRRP; *i.e.*, the invalid methodology set forth in the XM Contract. Accordingly, that allocation, insofar as it was lawful in the first place, determines the relative cost share responsibilities of the parties. The Board Action violates the MOUs because (1) it purports to unilaterally increase cost share allocations of the project beneficiaries and (2) rely on a new Methodology altogether.

Despite this fact, on August 12, 2024, FWA determined that it possessed the authority to unilaterally alter the relative responsibilities of the project beneficiaries and the MOUs with project beneficiaries, even though FWA has no such authority.[32] Moreover, the Board Action also violates BOR's regulations for cost allocation as described in Section V below. Even more problematic are FWA's representative's statements at the August 12, 2024 meeting: **FWA's lead executive, Jason Phillips, represented to the Friant Contractors that BOR had sanctioned and approved the "revised allocation," which FWA purported to impose upon the Districts.**

Moreover, as discussed in Section IV below, FWA's conduct is offensive to fundamental constitutional protections, in addition to the contractual, statutory, and regulatory protections discussed above.

---

[30] PEC 05-03 (703) 07/10/2024.
[31] *Memorandum of Understanding Regarding the Project OM&R Budget and the Cost Share and Contributed Funds Agreement with the Bureau of Reclamation for the Friant-Kern Canal Middle Reach Capacity Correction Project* between FWA and TBID, section 1.
[32] Section IV below discusses FWA's egregious and highly improper conduct.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 44 of 115

TERRA BELLA
IRRIGATION DISTRICT

## IV.

### FWA IS ATTEMPTING TO EXTORT THE DISTRICTS IN VIOLATION OF THE EQUAL PROTECTION CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

FWA's action was made in response to a judicial ruling in pending litigation in California, *Friant Water Authority et al. v. Eastern Tule Groundwater Sustainability Agency*, Tulare County Superior Court Case No. VCU306343. For several years, FWA has falsely claimed that a contract between FWA and the ETGSA requires that ETGSA pay FWA a "lump sum" in the amount of $220,000,000.00. This claim is incorrect, as the terms of that contract make clear.

On July 2, 2024, the Tulare County Superior Court made specific findings concerning FWA's claim. Specifically, the Court found that FWA's argument was deceptive, and expressly found that the contract with ETGSA "does not state an obligation to collect an unconditional minimum of $220,000,000.00 . . . ." FWA reacted to this ruling as if there had been some type of surprise change in circumstances. However, the only change occasioned by the Court's ruling was that FWA could no longer rely upon the fiction it had created regarding the ETGSA contract. The contract never contained the terms represented by FWA, and any person willing to read the contract can confirm that conclusion.

In response to the Court's ruling, FWA orchestrated the August 12, 2024 action described in this letter. Incredibly, at the August 12, 2024 meeting, FWA staff did not even present the pretense of compliance with the numerous laws and regulations discussed above. The "reason" for FWA's unlawful conduct, according to FWA at that time, was to cause the Districts—who have voting representatives on *ETGSA's* governing board—to "do something" to provide more money to FWA, in light of the Court's ruling on FWA's own deceptive conduct. The fact that FWA openly admitted to this purpose shows that the action was not based upon any legitimate legal considerations. Moreover, FWA's brazen approach toward the Districts is properly characterized as civil extortion under California law.[33]

An equal protection cause of action exists when specific persons or entities are "singled out" in an irrational and arbitrary manner.[34] **TBID's landowners rely almost exclusively upon surface water and use only minimal groundwater.** PID and SID operate under conjunctive use, primarily relying on surface water. Nevertheless, FWA has purported to "order" TBID to pay millions of dollars in excess of TBID's obligation in reality. The only reason for including TBID in FWA's unlawful attempt at allocation was to *create greater pressure upon TBID as a voting member of ETGSA*. In other words, the only basis for including TBID among the "punished" members was to optimize the extortionary effect of FWA's unlawful conduct.

---

[33] *See* Flatley v. Mauro (2006) 39 Cal.4th 299, 326-333.

[34] *See* Village of Willowbrook v. Olech (2000) 528 U.S. 562, 564 ("[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (citation omitted)).

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 45 of 115

TERRA BELLA
IRRIGATION DISTRICT

While the Board Action was taking place, text messages between FWA administrative staff, Johnny Amaral, and representatives of other FWA members shows that FWA staff was **fully cognizant** of the fact that minimal groundwater is pumped in TBID, and, therefore, *cannot*, as a matter of both analytic logic and very simple physics, be responsible for overextraction of groundwater.[35]

In light of the foregoing, TBID is skeptical that, as FWA has reported, BOR has joined or will join FWA in this effort to circumvent federal law concerning finance of XM projects. TBID is also highly doubtful that BOR would repudiate the protections it agreed upon in Article 29(a) of the 9(d) contracts.  However, BOR would be a necessary party to any federal proceeding concerning the validity of FWA's claims to the authority discussed in this letter.

## V.

### FWA's Conduct is Wholly Contrary to BOR's Own Polices Concerning the Modification of OM&R Changes.

As referenced above, pursuant to BOR's own policy, MRCCP XM costs *are not* regular OM&R costs.  As such, FWA's attempt to characterize MRCCP construction costs as "OM&R" is sorely misguided.

However, even if that characterization is correct, each of the Friant Contractors—including the Districts—should reasonably expect that FWA follow BOR's Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**").  But FWA failed to do so.  PEC P07 applies "to all future changes in the allocation of project OM&R costs on both reserved and transferred Reclamation project facilities where such allocation is not otherwise specifically addressed in law or in a contract executed prior to the release of this Policy."[36]

Paragraph 8 of PEC P07 sets forth the requirements for the "initiation of changes to present OM&R allocations."[37]  Subparagraph A of paragraph 8 sets forth prerequisites for the undertaking of "studies to analyze current benefits for the purpose of modifying the allocation of joint MO&R costs:"[38]

> (1) A determination by the regional director that the study is warranted and that the entity or entities responsible for repayment of the reimbursable joint OM&R costs have been given ample opportunities for consultation and collaboration in the decision to perform the study; and

---

[35] *See* Herr Firm Letter (Sept. 18, 2924).

[36] PEC P07, ¶ 2.  As discussed above, the repayment of statutory XM costs is subject to the *statutory* requirement of a contract between BOR and the project beneficiaries.  Nonetheless, discussion of the norms governing OM&R modifications appears appropriate in this instance, given the Board Action's degree of deviation from BOR policy.

[37] *Id.*, ¶ 8.

[38] *Id.*, ¶ 8.A.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 46 of 115

(2) Payment in advance by the appropriate entity or entities of Reclamation's estimated costs of conducting the benefits study. The payment responsibility will be in accordance with the allocation in effect at the time of the decision to conduct the study.

Moreover, paragraph 8, subparagraph B requires that *all 3 of the following conditions* be met prior to modification of current OM&R charges:[39]

(1) Completion of a current benefits study conducted at no less than an appraisal level and no more than 5 years prior to the proposed modification;

(2) A decision memorandum signed by the regional director detailing the manner in which the OM&R allocation will be modified, the basis for the modification, and the extent to which the entity or entities responsible for payment of the reimbursable OM&R costs have been given opportunities to collaborate with Reclamation in the development of the study and the propose modification to the cost allocation; and

(3) Notification of the entity or entities responsible for payment of the reimbursable OM&R costs of the intent to adopt the propose modification . . . .

FWA's Board Action is violative of portions or all of each component of subparagraphs A and B of paragraph 8 of PEC P07 enumerated above.

First, FWA failed to give entities responsible for the reimbursable joint OM&R costs (e.g., Project Beneficiaries) ample opportunities for consultation and collaboration in the decision of whether to perform a study analyzing current benefits for the purpose of modifying the allocation of the OM&R costs.[40]

Second, FWA failed to collect payment in advance from project beneficiaries for the costs of conducting FWA's purported benefits study.[41]

Third, FWA failed to complete a current benefits study (a) at least at an appraisal level and (b) at least five years prior to the proposed modification to the current OM&R allocations.[42]

Fourth, FWA failed to include in a decision memorandum an explanation of how FWA gave project beneficiaries an opportunity to collaborate with FWA in the development of the study and proposed modification concerning the cost allocation.[43]

Fifth, FWA failed to provide notification to project beneficiaries of FWA's intent to adopt modifications to OM&R allocations as described in a decision memorandum.[44]

---

[39] *Id*., ¶ 8.B.
[40] *Id*., ¶ 8.A.1.
[41] *Id*., ¶ 8.A.2.
[42] *Id*., ¶ 8.B.1.
[43] *Id*., ¶ 8.B.2.
[44] *Id*., ¶ 8.B.3.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 47 of 115



TBID looks forward to working with BOR in a manner that affords proper consideration to the considerable statutory and regulatory guidance at the parties' disposal.

## VI.
### DEMAND FOR DISPUTE RESOLUTION.

As a result of the forgoing, TBID hereby provides notice of its dispute of FWA's proposed Cost Recovery Methodology for the MRCCP. The notice is made pursuant to:

1) Article 34 of the Contract Between the United States and Terra Bella Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment, Contract No. I75r-2446D;

2) Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works, Contract No. 8-07-20-X0356-X;

3) Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855; and

4) the Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5856.

## VII.
### CONCLUSION.

FWA's Board Action is in violation of numerous laws and regulations as described above. In addition, the revisions to the Methodology is troubling on a policy level. To allow a non-federal operating entity to adjust the Methodology after the advancement of funds and to the detriment of a small subset of contractors is not sound policy and would result in devasting impacts to the overall project. The purpose of Reclamation Law, Rules and Regulations, Policies, and Standards and Directives is to avoid this exact result.

**It is imperative that BOR (1) take immediate corrective measures to enforce its own regulations concerning the Methodology, and (2) clarify that it was not involved in FWA's unlawful attempt to circumvent basic statutory and regulatory requirements in a clear attempt to exact severe financial harm upon the Districts. BOR must strongly condemn FWA's conduct, if only to effectively enforce BOR's own regulations.**

TBID opposes the "Updated Cost Recovery Methodology" as reported at FWA's August 12, 2024, board meeting.

Very truly yours,

TERRA BELLA IRRIGATION DISTRICT

Edwin L. Wheaton, President

Dated: September 26, 2024

# TERRA BELLA IRRIGATION DISTRICT

24790 Avenue 95                                                                    559/535-4414

Terra Bella CA 93270                    *Established 1915*                    Fax 559/535-5168

EDWIN L. WHEATON, President                                              SEAN P. GEIVET
Division 3                                                                           Manager
                                        General

GEOFFREY C. GALLOWAY, Vice-President                                      ANN NELMS
Division 2                                                              Secretary-Treasurer

BRENT E. DOYEL                                            AUBREY CAIRNS MAURITSON
Division 1                                                              Legal Counsel

KURT PARSONS                                                          KELLER-WEGLEY
Division 4                                                              ENGINEERING
                                                                      Consulting Engineer
ALFREDO MARTINEZ
Division 5

September 26, 2024

**VIA EMAIL**

Jason R. Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave
Lindsay, CA 93247

Re:    Objection to FWA's Proposed MRCCP Cost Recovery Methodology

Dear Mr. Phillips,

Friant Water Authority's ("FWA's") proposed Cost Share Methodology for Advanced Costs ("Methodology") for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project ("MRCCP") is unlawful and void or voidable for the reasons set forth below.  Accordingly, Terra Bella Irrigation District ("TBID") objects to the Methodology and demands FWA rescind the actions it took at the August 12, 2024 Special Meeting ("Special Meeting").

As explained in TBID's letter to the Bureau of Reclamation ("Reclamation") dated September 25, 2024, the Methodology (1) oversteps Reclamation's delegable cost recovery methodology authority for extraordinary maintenance ("XM"), (2) breaches numerous contracts, including the MRCCP XM Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violates constitutional and contractual protections afforded to TBID, as well as Porterville Irrigation District, Saucelito Irrigation District, and Tea Pot Dome Water District (collectively, the "Districts").

The proposed Methodology unlawfully seeks to obligate the Districts to pay between $95 million dollars and $200 million dollars for Phases 1 and 2 of the MRCCP, while not

Proposed FWA MRCCP Cost Recovery Methodology
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

requiring any of the other beneficiaries of the Friant-Kern Canal to contribute. FWA must rescind the proposed Methodology.

Further, the Board Action is void or voidable because FWA staff and directors violated the Brown Act in the lead up and during the Special Meeting by conducting serial meetings. Moreover, FWA staff continues that practice as a means of influencing FWA directors' support for the Methodology. TBID supports the letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP dated September 18, 2024, that articulates the serial meetings violations. The Brown Act violations will be the basis for TBID commencing legal action unless FWA takes corrective action.

TBID urges FWA to rescind the Methodology and take all actions necessary to comply with the Brown Act.

TERRA BELLA IRRIGATION DISTRICT

By: _____
Edwin L. Wheaton

SEAN P. GEIVET
General Manager

JEFFREY S.ROW
Secretary-Treasurer
Assessor/Collector

AUBREY A. MAURITSON
Ruddell, Stanton, Bixler, Mauritson
 & Evans LLP

ERIC L. BORBA
President

DAVID E. GISLER
Vice-President

TIMOTHY J. WITZEL
Director

JOSEPH "BRETT" McCOWAN
Director

EDWIN L. CHAMBERS
Director

**PORTERVILLE IRRIGATION DISTRICT**

September 30, 2024

**VIA EMAIL**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

> Re:     Objection to Proposed FWA MRCCP Cost Recovery Methodology and
>         Demand for Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite,

Porterville Irrigation District writes to notify the Bureau of Reclamation that it objects to
the Cost Share Methodology for Advanced Costs (Methodology) for Phase 1 of the
Friant-Kern Canal Middle Reach Capacity Correction Project (MRCCP) proposed by the
Friant Water Authority (FWA) at its August 12, 2024 Special Meeting.  The proposed
Methodology would unlawfully obligate four FWA contractors within the boundary of
Eastern Tule Groundwater Sustainability Agency—Porterville Irrigation District,
Saucelito Irrigation District, Tea Pot Dome Water District and Terra Bella Irrigation
District—to pay between $95 million dollars and $200 million dollars for Phases 1 and 2
of the MRCCP. The Methodology would not impose payment obligations on other FWA
contractors who benefit from the Friant-Kern Canal and MRCCP.  Porterville Irrigation

District supports and adopts the arguments and analysis presented in Terra Bella Irrigation District's September 26, 2024 letter to Reclamation that explains why the proposed Methodology by FWA exceeds any legal cost recovery authority that could have been delegated by Reclamation pursuant to the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA and why the Methodology also violates basic contractual and constitutional protections afforded to the four districts.

Porterville Irrigation District provides this written notice of dispute and demand for dispute resolution regarding the Methodology in accordance to the following agreements and contracts:

- Article 34 of the Contract Between the United States and Porterville Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment, Contract Nos. I75r-4309-D and 175r-4309-LTR;

- Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works, Contract No. 8-07-20-X0356-X;

- Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855; and

- Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5856.

To resolve this dispute, Porterville Irrigation District consents to participate in informal meet and confer efforts with Reclamation that also involve Saucelito Irrigation District, Tea Pot Dome Water District and Terra Bella Irrigation District. This letter also provides notice that Porterville Irrigation District's willingness to participate in dispute resolution with Reclamation is not a waiver of any rights and remedies, including its rights to commence legal action against FWA and Reclamation.

Porterville Irrigation District

By: _Eric L. Borba_

Eric L. Borba, President

SEAN P. GEIVET
General Manager

JEFFREY S.ROW
Secretary-Treasurer
Assessor/Collector

AUBREY A. MAURITSON
Ruddell, Stanton, Bixler, Mauritson
& Evans LLP

PORTERVILLE
IRRIGATION DISTRICT

ERIC L. BORBA
President

DAVID E. GISLER
Vice-President

TIMOTHY J. WITZEL
Director

JOSEPH "BRETT" McCOWAN
Director

EDWIN L. CHAMBERS
Director

September 30, 2024

**VIA EMAIL**

Jason R. Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave
Lindsay, CA 93247

      Re:    Objection to Proposed FWA MRCCP Cost Recovery Methodology

Dear Mr. Phillips,

Porterville Irrigation District vehemently objects to the Cost Share Methodology for Advanced Costs (Methodology) for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project (MRCCP) proposed by the Friant Water Authority (FWA) at its August 12, 2024 Special Meeting and demands that FWA rescind the actions it took on August 12. The proposed Methodology would unlawfully obligate four FWA contractors within the boundary of Eastern Tule Groundwater Sustainability Agency—Porterville Irrigation District, Saucelito Irrigation District, Tea Pot Dome Water District and Terra Bella Irrigation District—to pay between $95 million dollars and $200 million dollars for Phases 1 and 2 of the MRCCP. The Methodology would not impose payment obligations on other FWA contractors who benefit from the Friant-Kern Canal and MRCCP.

FWA's action on August 12, 2024 is either void or voidable due to severe serial meeting violations of the Brown Act committed prior to and during the meeting by FWA staff and directors. FWA staff has conducted, and continues to conduct, serial meetings in an effort to obtain and coerce preferred votes of the FWA Board of Directors. Porterville Irrigation District fully supports the September 18, 2024, letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP regarding FWA's serial violations of the Brown Act. Porterville Irrigation District will take legal action if FWA's violations are not cured.

The proposed Methodology is unlawful and must be rejected. Porterville Irrigation District supports and adopts the arguments and analysis presented in Terra Bella Irrigation District's September 26, 2024 letter to Reclamation that explains why the proposed Methodology (1) exceeds Reclamation's delegable cost recovery authority for extraordinary maintenance, (2) breaches multiple contracts, including the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violates basic constitutional and contractual protections afforded to the four districts.

Porterville Irrigation District demands that FWA rescind the proposed Methodology.

Porterville Irrigation District

By: _____

Eric L. Borba, President

# EXHIBIT C



**Jim Erickson**
Madera I.D.
*Chairman of the Board*

**Rick Borges**
Tulare I.D.
*Vice Chairman*

**Josh Pitigliano**
Lower Tule River I.D.
*Secretary-Treasurer*

............................................

**Edwin Camp**
Arvin-Edison W.S.D.

**Roger Schuh**
Chowchilla W.D.

**Jerry Dyer**
City of Fresno

**Kelley Hampton**
Delano-Earlimart I.D.

**Joe Ferrara**
Exeter I.D.

**George Porter**
Fresno I.D.

**Loren Booth**
Hills Valley I.D.

**Doug Phillips**
Ivanhoe I.D.

**Chris Tantau**
Kaweah Delta W.C.D.

**Kent H. Stephens**
Kern-Tulare W.D.

**Michael Brownfield**
Lindmore I.D.

**Cliff Loeffler**
Lindsay-Strathmore I.D.

**Arlen Miller**
Orange Cove I.D.

**Bill De Groot**
Pixley I.D.

**Brett McCowan**
Porterville I.D.

**Mark Merritt**
Saucelito I.D.

**Craig Fulwyler**
Shafter-Wasco I.D.

**Matt Leider**
Tea Pot Dome W.D.

**Kurt Parsons**
Terra Bella I.D.

............................................

**Jason R. Phillips**
*Chief Executive Officer*

*854 N. Harvard Ave.
Lindsay, CA  93247
(559) 562-6305*

friantwater.org

December 18, 2024

Sent Via Email Only

Karl Stock, Regional Director
United States Bureau of Reclamation
Region 10, California-Great Basin
2800 Cottage Way
Sacramento, CA 95825-1863

**Re:    Request for Determination on Dispute Regarding Friant Water Authority's Updated Middle Reach Capacity Correction Project Cost Recovery Methodology**

Dear Director Stock:

The Friant Water Authority (FWA) is providing its final position with respect to a dispute that has arisen with the Terra Bella Irrigation District (TBID), the Porterville Irrigation District (PID), and the Saucelito Irrigation District (SID) (collectively, "Districts") regarding FWA's updated Middle Reach Capacity Correction Project Cost Recovery Methodology, adopted by the FWA Board of Directors on August 12, 2024. FWA requests a final, written determination from your office as "Contracting Officer" pursuant to Article 10, "Resolution of Disputes," and Article 12, "Cost Recovery for Authority OM&R Activities; Termination of Water Deliveries" of the Agreement between the United States of America, Bureau of Reclamation and Friant Water Authority to Transfer the Operation, Maintenance, and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works dated October 5, 2020 (Contract No. 8-07-20-X0356-X) ("Transfer Agreement"). FWA respectfully requests that the Bureau of Reclamation (Reclamation) affirm FWA's position on the dispute for the reasons set forth in this letter.

### BACKGROUND

This dispute arises from FWA's recently updated Cost Recovery Methodology ("Cost Recovery Methodology" or "Methodology") for the Friant-Kern Canal Middle Reach Capacity Correction Project ("MRCCP" or "Project"), adopted by the Board of Directors on August 12, 2024.  (A copy of the August 12 board agenda package, which includes the staff report and full text of the Cost Recovery Methodology, as well as the meeting minutes are attached as **Attachment 1**.)  FWA provided the Methodology to all Friant-Kern Canal Contractors for a 60-day review (in accordance with Article 12(b)(3) of the Transfer Agreement), and it became effective as of October 12, 2024.

During the review period, the Districts submitted individual notices of dispute to Reclamation and FWA in late September 2024. (See **Attachment 2**.) In their notices, PID and SID essentially incorporated by reference the more detailed arguments in a letter from TBID, which we refer to as the "Dispute Letter." (See **Attachment 3**.)

It is important to note that a Friant-Kern Canal Contractor subject to the Methodology, Tea Pot Dome Water District (TPDWD), has elected to pursue the separate agreement option outlined in the Methodology.  The proposed agreement includes provisions addressing the payment of an equitable share of MRCCP costs as mitigation for prior non-sustainable groundwater pumping and related practices and the establishment of new groundwater management policies and procedures within TPDWD that will properly mitigate for non-sustainable groundwater pumping going forward, and equally as important, minimize or avoid further subsidence impacts to the Friant-Kern Canal (FKC).  A draft of the agreement has been presented to the FWA Board for consideration.

In light of the all or nothing legal positions taken by the Districts and their expressed disinterest in exploring at this time the separate settlement agreement option set forth in the Methodology, FWA's final position relative to their various contentions is set forth below.  Reclamation should affirm FWA's Methodology on the grounds that (1) FWA has the full authority under the Transfer Agreement to develop and implement an equitable cost recovery methodology, (2) the Reclamation Manual does not apply to FWA's cost allocation authority under the Transfer Agreement, (3) FWA developed and approved the Methodology in a transparent and equitable manner, following the procedures set forth in the Transfer Agreement and consistent with the MOUs between FWA and the Districts.

### FWA'S POSITION ON THE ISSUES RAISED BY THE DISTRICTS

FWA's responses to the arguments or issues raised in the Dispute Letter are addressed, by topic area, below.

**A.**    **The Referenced Reclamation Manual Directives And Standards Are Not Applicable To FWA's Adoption Of The Cost Recovery Methodology And Have Not Been Violated By Reclamation.**

The Districts contentions in Section II of the Dispute Letter regarding the alleged violation of  certain Reclamation Manual Policies, Directives and Standards ("Reclamation Manual"), specifically PEC P07 and PEC 05-03, miss the mark for the simple reason that such policies are not applicable to FWA's adoption of the Methodology.

      **1.**    **The Reclamation Manual Provides Internal Policy Directives To Reclamation Employees But Does Not Have the Force of Law.**

The Reclamation Manual is Reclamation's compilation of policies and directives to its  employees in order to ensure uniform, consistent administration of Reclamation's programs and activities.  As set forth in Reclamation Manual RCD P03, the purpose of the Manual is to establish "*internal,*

    

Reclamation-wide requirements necessary for consistent and efficient accomplishment of its mission." (Emphasis added.)  The Reclamation Manual does not have the force of law, which can only come from a federal statute or regulation promulgated pursuant to statute, and with respect to the Manual, there has been no such promulgation.  Moreover, in 120 plus years of Reclamation law, Reclamation has never asserted that its policies and directives have the force of law and none are codified in the code of federal regulations.

      **2.**     **Reclamation Policy PEC P07 Is By its Own Terms Not Applicable.**

In Sections II and V of the Dispute Letter, the Districts rely heavily on purported violations of Policy PEC P07.  Although the Districts exclusively cite Paragraph 8 of that Policy, they cannot be allowed to ignore the Introduction and Applicability provisions, which state in relevant part:

> 1. Introduction. … This Policy sets the parameters within which _Reclamation will establish_ allocations of OM&R costs.

> 2. Applicability. This Policy will apply to all future changes in the allocation of project OM&R costs on both reserved and transferred Reclamation project facilities _where such allocation is not otherwise specifically addressed in law or in a contract executed prior to the release of this Policy_.  (Emphasis added.)

PEC P07 (first adopted in 2008) is expressly inapplicable here because: (1) FWA and not Reclamation is allocating the Project OM&R costs; and (2) FWA's ability to allocate the Project OM&R costs is specifically addressed in the Transfer Agreement, which was originally executed in 1998 with substantially similar OM&R cost recovery provisions (and thus the Manual is expressly deemed inapplicable because OM&R costs are covered by "a contract executed prior to the release of this [2008] Policy").

      **3.**     **FWA's Authority And Requirements For The OM&R Of The Friant-Kern Canal Are Set Forth In The Transfer Agreement.**

FWA's authority and the requirements related to OM&R cost allocation are those set forth in the terms of the Transfer Agreement, and specifically in regards to the cost allocation for the MRCCP, the provisions of Article 12: "The procedures and authorities to be utilized by the Authority for such direct [OM&R] funding are set forth in this Article 12." (Transfer Agreement, Art. 12, last sentence of the first paragraph.)  Nothing in Article 12 references the Reclamation Manual or any other Reclamation-specific requirements.  In short, if Reclamation had intended the policies of the Reclamation Manual to be applicable, it would have simply stated that FWA must follow the current Reclamation policies when developing a cost recovery methodology.  But Reclamation intentionally did not do that, in part for the reasons noted in Section A(1) and (2) above, and as a result, FWA's discretionary cost allocation authority for the OM&R of its transferred facilities is not bound by the Reclamation Manual, including PEC P07.

4.     **While Not Applicable To FWA, Reclamation Manual Policies PEC P07 And PEC 05-03 Were Followed By Reclamation In Implementing And Providing Funding For The MRCCP.**

As demonstrated above, the Districts' contentions that FWA violated certain provisions of the Reclamation Manual are misplaced as those provisions do not apply to FWA and its authority to allocate Project OM&R costs. However, it is important to note that Reclamation staff, in taking the actions necessary to provide federal funding for the MRCCP, did in fact comply with the subject provisions of the Reclamation Manual.

a.     **Reclamation Manual PEC P07 Was Followed by Reclamation.**

The Districts' argument that the requirements of PEC P07 were violated also reflects a misunderstanding of the scope of PEC P07. This Policy is directed at the allocation of Project costs "to the various *project purposes* as identified in the project authorizing legislation." (Emphasis added.) As it relates to the MRCCP, and in accordance with the San Joaquin River Restoration Settlement (Title X, Subtitle A) provisions of Public Law [P.L.] 111-11 (Settlement Act), the Omnibus Public Land Management Act of 2009; Section 9603, Extraordinary Operation and Maintenance Work Performed by the Secretary, of P.L. 111-11; and The Water Infrastructure Improvements for the Nation Act (WIIN Act) (P.L. 114-322) of 2016, a Feasibility Study was developed jointly by Reclamation and FWA under Reclamation's guidelines (including PEC P07) for the MRCCP.

For the recommended project alternative, a benefits analysis was conducted, and three authorized project purposes were identified as benefiting from the MRCCP: (1) water supply, (2) flood control, and (3) fish and wildlife enhancement. Under the Cost Share and Contributed Funds Agreement between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project dated April 28, 2021 (Cost Share Agreement), FWA is responsible for 50% of the mandatory non-federal cost-share for the MRCCP as well as repayment of the federal funds provided for the Project attributable to the reimbursable water supply benefit. The relative share of project benefits established in the Feasibility Study has not changed. FWA's Cost Share Methodology simply establishes the methodology FWA will use to allocate and collect funds if there is a deficit of available non-federal funds from other sources to cover the existing reimbursable water supply project benefit allocation. Accordingly, even though it is inapplicable to FWA, no violation of PEC P07 has occurred with respect to the adoption of the Methodology.

b.     **Reclamation Manual PEC 05-03 Was Followed by Reclamation.**

The Dispute Letter misstates and misconstrues PEC 05-03. On the top of page 5, the portion of PEC 05-03 referenced for the purpose of implying that extraordinary maintenance (XM) authority does not allow for extended repayment is taken out of context. The full text of the final sentence in Paragraph 1 of that policy states: "The XM authority does not address funding for or authorize extended repayment of annual, *routine* operation, maintenance, and replacement (OM&R) costs." (Emphasis added.) The MRCCP is an XM project – not "routine" OM&R, so this argument is irrelevant. The portion of Paragraph 1 that is relevant and which was followed by Reclamation is the

first sentence, which states: "Title IX, Subtitle G, of Public Law 111-11 authorizes Reclamation to advance funding for extraordinary maintenance (XM) to non-federal operators of Reclamation facilities (operating entities), to extend repayment of reimbursable XM costs, and to execute repayment contracts."  As such, this policy was also not violated by FWA's approval of the Methodology.

       **c.**       **A Project Feasibility Study Was Approved And Did Not Need To Be Modified In Order To Adopt The Methodology.**

The Districts argue that FWA does not have the authority to adjust the Methodology without a modified cost allocation identified in an XM Justification Report.  (Dispute Letter, p. 5.)  Consistent with the clarifications provided above, FWA's Cost Recovery Methodology does not modify the OM&R cost allocation between *project purposes* established in the Feasibility Study.  Further, for the purposes of the MRCCP, the Feasibility Study is the XM Justification Report for the Project. Accordingly, this misapplication of federal policy must also be rejected.

**B.**       <u>**FWA's Authority To Allocate Extraordinary Maintenance (XM) Costs Does Not Conflict With Article 29(a) Of The Districts' 9(d) Contracts.**</u>

In Section III.A of the Dispute Letter, the Districts attempt to resurrect an argument previously rejected by Reclamation as to an alleged conflict between FWA's cost recovery authority under the Transfer Agreement and certain provisions of each District's 9(d) contract with Reclamation.  This red-herring of an argument is derived from the Districts improper attempt to conflate the term "Capital replacement" with "Extraordinary Maintenance" (XM).  In early 2021, while FWA was in the process of finalizing the initial funding plan for the MRCCP, several Friant-Kern Canal Contractors made the same argument and FWA requested clarification from Reclamation.  Reclamation provided such written clarification in a letter dated February 23, 2021 (which was forwarded to all Friant-Kern Canal Contractors by FWA). (See **Attachment 4**.)  As previously determined by Reclamation: (1) XM is a type of OM&R activity, (2) FWA is responsible for and has been delegated the authority to conduct and collect for all OM&R of the Friant-Kern Canal, and (3) "Capital replacement" in the 9(d) contracts is not synonymous with XM – instead it refers to "construction costs associated with the original construction authority for the facilities."

Moreover, when it renewed the Transfer Agreement in 2020, Reclamation expressly amended the language in Article 12 to remove any ambiguity on purported conflicts between its 9(d) contracts and the Transfer Agreement on this issue: "Reclamation acknowledges and agrees that the provisions of its Water Delivery Contracts regarding the obligation to pay the Authority for the operation and maintenance of the Project Works performed by the Authority under this Agreement, but which do not have the same definition of OM&R as in this Agreement, were not intended to and do not limit the delegation of authority to charge and collect for the OM&R of the Project Works as provided in this Article 12."

Having previously rejected these very contentions (which were not challenged at the time by these Districts), Reclamation should do so again here.

**C.**     **Reclamation And FWA Are The Proper Parties To The Repayment Contract And Cost Share Agreement And Reclamation Had Discretionary Authority To Set The Repayment Period At 30 Years.**

Despite the fact that each of the District's representatives on the FWA Board voted to approve the renewed Transfer Agreement, the Cost Share Agreement, and the Repayment Contract over a span of many months (nor did any of the Districts as a separate entity challenge the legality of any of these agreements), the Districts now assert in Section III.B of the Dispute Letter that Reclamation was (1) required to negotiate separate MRCCP repayment contracts with each of the Friant-Kern Canal Contractors, and (2) the repayment term for the reimbursable costs advanced by Reclamation should be 50 years instead of the 30-year term in the Repayment Contract that their representative approved.  The Districts attempt to diminish FWA's role and authority as the Operating Non-Federal Entity for the FKC and associated works reflects not only a misinterpretation of the statute cited (43 U.S.C. § 510b) but also a troubling misinterpretation of the Transfer Agreement and a potential repudiation of Article 29(b) the Districts' 9(d) contracts wherein each agreed to make specified payments to FWA as the Operating Non-Federal Entity.

The statute (and PEC 05-03, which Reclamation established to provide uniform implementation of the statute) allows Reclamation, in the case of transferred works, to advance funds to the transferred works operating entity.  In the case of the Friant-Kern Canal, Reclamation has a Transfer Agreement with FWA for the OM&R of the canal and associated works.  Therefore, prior to commencing with construction of the MRCCP, as an XM project, Reclamation negotiated the Cost Share Agreement and Repayment Contract with FWA, as the Operating Non-Federal Entity responsible under the Transfer Agreement for funding the work in the first place and who has the full responsibility for developing and implementing a cost recovery methodology among the Friant-Kern Canal Contractors.  Indeed, as Article 12 of the Transfer Agreement makes abundantly clear at the outset: "The Authority is responsible for directly funding the OM&R of the Project Works." (Emphasis added.)  Accordingly, and as reflected in the Repayment Contract (see Recitals b, n, and r) and the Cost Share Agreement (see Recital B and Section 2.B.iii and iv), FWA is the proper legal party to each agreement acting in its contractual role as the collective representative of the Friant-Kern Canal Contractors.

As to the belated argument regarding a 50-year repayment period, Reclamation advised FWA during the Repayment Contract negotiations that its interpretation of PEC 05-03 was that the Policy allowed for a repayment period of up to 50-years.  Accordingly, Reclamation's determination on repayment for the MRCCP, based upon the ability-to-pay analyses that were conducted as part of the Feasibility Study, was to limit repayment to a 30-year term.  FWA explained Reclamation's interpretation to the Friant-Kern Canal Contractors prior to executing the Repayment Contract and no one (including these Districts) submitted any written objection let alone filed a legal challenge to the execution of the contract.

D.     **The Approved Methodology Is Not Limited By The Memorandum of Understanding Between FWA And The Districts.**

Concurrent with the execution of the Cost Share Agreement, FWA entered into individual but identical Memorandum of Understanding (MOU) with some of the Friant-Kern Canal Contractors (including each of the Districts).  (See **Attachment 5**.)  The terms of the one-page MOU are simple: each executing entity agreed to pay its share of the then approved $50 million MRCCP Budget (Section 1) and in exchange FWA acknowledged that the entity was not waiving its right to contest a future "share of the [MRCCP] costs budgeted and *approved by the FWA Board*" (MOU, Section 2; emphasis added.).  Having specifically acknowledged in Section 2 of the MOU that the FWA Board had the authority to revise the MRCCP Budget and associated Cost Recovery Methodology, the Districts' complaint of "unilateral" action by the FWA Board in approving the updated Cost Recovery Methodology rings hollow.  This is particularly true in light of the text of FWA Resolution 2021-01 that established the initial $50 million cost allocation to the Friant-Kern Canal Contractors, and which provided as follows:

> SECTION 4.     Revision to Project OM&R Budget.
>
> Once the updated Project OM&R Budget is adopted, the Project OM&R Budget may not be increased except by a vote of the Board of Directors following notice to all affected Friant Contractors and an opportunity for comment on the proposed revisions in accordance with Article 12 of FWA's Transfer Agreement.  Moreover, consistent with FWA's OM&R policy with respect to extraordinary repairs and replacements, any Board consideration of an increase in the Project OM&R Budget will also include consideration of how the additional costs are to be allocated among Friant Contractors."

As this is precisely the process that was followed by FWA in establishing the August 12, 2024, Cost Recovery Methodology, the action of the FWA Board was not "unilateral", but rather, was in full compliance with the MOU.  And with respect to the second substantive term of the MOU (non-waiver), while FWA believes that all of the Districts' contentions in this dispute are meritless, at no time and certainly nowhere in this position letter does FWA assert that under either the Transfer Agreement or these MOUs that the Districts are precluded from raising this dispute regardless of the lack of merit.  In short, no violation of the limited terms of the referenced MOUs has occurred.

E.     **The Equal Protection Clauses of the Fifth And Fourteenth Amendments Of The United States Constitution Are Not Applicable To This Contract Dispute.**

The sole case cited by the Districts in Section IV of the Dispute Letter in support of their equal protection argument, *Village of Willowbrook v. Olech* (2000) 528 U.S. 562, is wholly inapplicable to the subject dispute.  The case involved an allegation that under its municipal police powers, a small town improperly attempted to exact a longer easement (33 feet) to connect to its water system than the length it required of other residents (15 feet).  The U.S. Supreme Court held that although a "class of one," the private property owner had standing to allege a violation under the Equal

Protection Clause of the United States Constitution against the municipality.  Here, FWA's adoption of the Cost Recovery Methodology was done pursuant to the contract authority of its Transfer Agreement, which authority the Districts expressly acknowledged and agreed to in their own 9(d) contracts.  In short, provisions of the United States Constitution have no application to this contract dispute.

**F.      The Cost Recovery Methodology Is Equitable As Applied To The Districts.**

The Districts citation in Section IV of the Dispute Letter to a case involving criminal (not civil) extortion is even more misplaced than their equal protection argument.  Contrary the Districts' assertion that FWA has "ordered" the Districts to pay "millions of dollars in excess" of some unstated and allegedly more appropriate obligation, the Methodology only imposes a contingent financial obligation upon the Districts for revenue shortfalls under the ETGSA Settlement Agreement.  The Districts also mischaracterizes the relevance to this dispute to the pending litigation regarding the ETGSA Settlement Agreement cited in the Dispute Letter (*Friant Water Authority et al. v Eastern Tule Groundwater Sustainability Agency*, Tulare County Superior Court Case No. VCU30643).  While it is true that FWA is pursuing breach of contract and declaratory relief claims regarding ETGSA's interpretation and implementation of the Settlement Agreement, the need for FWA to adopt the updated Cost Recovery Methodology has been building in the years following the execution of the Settlement Agreement.

Initially, when FWA entered into the Cost Share Agreement and Repayment Contract for the MRCCP, FWA's funding plan for securing the 50% non-federal cost share during construction and the funds necessary to meet the annual repayment obligations after construction was predicated, in large part, on anticipated revenues from the ETGSA Settlement Agreement.  However, as ETGSA began implementation of the water accounting action and transitional pumping penalty program (collectively "Program") that are at the core of the Settlement Agreement, it become apparent that the Program has multiple deficiencies that prevent the recognition and collection of the full amount of mitigation penalties or fees for the non-sustainable pumping that are intended to fund a share the MRCCP.  FWA has attempted repeatedly to engage cooperatively with ETGSA to address these deficiencies, including hiring expert consultants to review the Program and provide recommendations.  All of these efforts have either been repeatedly ignored or rebuffed by ETGSA, including by the Districts' representatives, staff, and consultants that serve ETGSA in an official capacity.  Indeed, very little happens within ETGSA without the support and approval of the Districts.

From the onset of the MRCCP, FWA has been fully transparent on funding issues, providing monthly reports to the Finance Committee and Board of Directors as well as periodic cash flow projections to the Board of Directors.  The lack of sufficient funding on-hand, as well as lack of progress in rectifying the shortcomings and deficiencies associated with the ETGSA Program has required the FWA Board to make difficult decisions, including cancelling the proposed contract award for the replacement pump stations in February 2024.  The Districts, through their membership and representation on FWA's Board of Directors, have directly participated in these discussions and deliberations.

In accordance with the Transfer Agreement, FWA has an obligation to ensure that a cost recovery methodology "provide(s) for the equitable allocation of the costs to be recovered among the Water Delivery Contractors with an obligation to pay for water delivered or conveyed through the Project Works … ." (Transfer Agreement, Art. 12(b)(1).)  In their report to the Board at the meeting where the subject Methodology was adopted, FWA staff outlined the equitable nature of the proposed Methodology as follows:

> FWA staff believes that the recommendation is equitable due to the fact that the landowners in the FKC contractor districts within ETGSA receive the benefit of transitional overdraft pumping and are able to engage in the beneficial transfer and sale of groundwater credits as well as transitional overdraft water allocations. These districts also have significant control over the actions of the ETGSA Board of Directors.  Further, as ETGSA distributes groundwater allocations and credits based upon irrigable acreage to all landowners, the relative allocation of costs between the four FKC contractor districts is on the same basis. If ETGSA during any period is able to collect and remit to FWA enough funds to pay the then current FWA repayment obligation, no costs will be assessed to these four FKC contractor districts under this cost recovery methodology. (See **Attachment 1**, Agenda Report, p. 4.)

In light of this background, the adopted Methodology meets the equitable standard set forth in the Transfer Agreement as applied to the Districts.

## CONCLUSION

For the reasons detailed above, Reclamation should affirm FWA's adoption of the updated MRCCP Cost Recovery Methodology.  Should you require any additional information to make your determination, however, please do not hesitate to contact me.

Sincerely,

Jason Phillips, CEO
Friant Water Authority

cc:      Via email only
         Anna Braithwaite, Esq., Office of the Solicitor
         Edwin L. Wheaton, President, TBID
         Steve Kisling, President, SID
         Eric Borba, President, PID
         Sean Geivet, General Manager, PID, SID, TBID
         FWA Board of Directors

*Karl Stock, Regional Director*
*December 18, 2024*

**ATTACHMENTS:**

1.  Agenda Package and Minutes of FWA Meeting Adopting the Updated Middle Reach Capacity Correction Project Cost Recovery Methodology (August 12, 2024).
2.  Notices of Dispute: Porterville Irrigation District, Saucelito Irrigation District, and Terra Bella Irrigation District.
3.  Dispute Letter dated 9/26/24, Terra Bella Irrigation District.
4.  Letter Exchanges and Distribution (February 9 and 23, 2021) – "Request for a Determination on the Obligation of Friant Division Water Delivery Contractors to Pay for Board Approved Self-Financed Capital Improvements as OM&R under FWA's Transfer Agreement (Contract No. 8-07-20-X0356-X)."
5.  Memorandum of Understanding between FWA and TPDWD dated April 16, 2021.

ATTACHMENT 1



City of Fresno - 1626 E Street, Fresno 93706
Fresno I.D. – 2907 S. Maple Ave, Fresno 93725
Hills Valley I.D.  – 12201 Ave 480, Orange Cove 93646

# SPECIAL BOARD OF DIRECTORS MEETING

## MONDAY, AUGUST 12, 2024
## 8:30 A.M.
## LINDSAY CONFERENCE ROOM
## 854 N. HARVARD LINDSAY, CA 93247

**CALL TO ORDER/ROLL CALL – (ERICKSON)**

**APPROVAL OF THE AGENDA – (ERICKSON)**

**OPEN SESSION**

**1.    ACTION ITEM**

A.    Establishment of an Updated Cost Share Methodology for the Friant-Kern Canal Middle
Reach Capacity Correction Project and Provision of 60-day Notice to Friant-Kern Canal
Contractors.

**ADJOURN TO CLOSED SESSION (If Necessary)**

**2.    CLOSED SESSION**

  A.  CONFERENCE WITH REAL PROPERTY NEGOTIATORS
     (Government Code section 54956.8)
     Property: Friant-Kern Canal facilities and right-of-way
     Agency negotiator: CEO, COO, CFO, General Counsel
     Negotiating parties: United States (Bureau of Reclamation)
     Under negotiation: Middle Reach Capacity Correction Project Cost Share Agreement
     (price and terms of payment)

**ADJOURNMENT**

### PUBLIC PARTICIPATION INFORMATION

Under the Americans with Disabilities Act, if you require a disability-related modification or
accommodation to participate in this meeting, including auxiliary aids or services, please contact Vivian
Garcia at 559-562-6305 or vgarcia@friantwater.org prior to the meeting.

1



## Agenda Report                                                    No. 1.A

**DATE:**        August 12, 2024

**TO:**          Board of Directors

**FROM:**        Jason Phillips, CEO; Wilson Orvis, CFO

**SUBJECT:**     **Proposed Cost Recovery Methodology for any Cost-Share Deficit for the
                 Middle Reach Capacity Correction Project**

---

**SUMMARY:**

In accordance with the Cost Share and Contributed Funds Agreement ("Cost-Share Agreement")
between the Friant Water Authority (FWA) and the Bureau of Reclamation (Reclamation) for the
Middle Reach Capacity Correction Project (Project) and the associated "Repayment Agreement",
FWA is responsible for providing 50% of the up-front Project costs from non-federal sources and,
after substantial completion, is responsible for repayment of the reimbursable federal share of the
Project costs.  The Project has been split into two phases:

- Phase 1 is currently estimated to cost $326.2 million, of which there is a projected:
    - Cost-share deficit during construction of approximately $5.1 million; and
    - Repayment Obligation of approximately $90 million (~$4 million / year in debt
      service for 30 years)

- Phase 2 is currently estimated to cost $247.2 million, of which all of the non-federal funding
  required to proceed has yet to be secured.

FWA's funding plan for the Phase 1 provides for $50 million in collections from the Friant-Kern
Canal (FKC) Contractors, funding from the State, and the balance of the cost-share derived from
revenues from Settlement Agreements executed with the Eastern Tule Groundwater Sustainability
Agency (ETGSA) and the Pixley Groundwater Sustainability Agency (Pixley GSA).  Pixley GSA made a
full lump sum payment of $11 million under its Settlement Agreement.  ETGSA did not provide the
$125 million lump sum payment to FWA under the Settlement Agreement. To date, the revenues
under ETGSA's alternative obligation to collect and remit to FWA up to $200 million under its
transitional pumping penalty program have been substantially lower than expected.  Additionally, it
appears increasingly unlikely that the manner in which the ETGSA is implementing the transitional
pumping penalty program will provide sufficient revenues to cover the remaining Project cost
obligations.  As a result, without additional revenues, FWA is anticipating a cost-share deficit for
the Project during the remainder of construction and an additional, more substantial deficit to
meet the annual debt service payments under the Repayment Agreement.

Reclamation is aware of FWA's projected cost-share deficit for the Project and, in recent meetings,
has asked that FWA make a determination on the cost recovery methodology for the deficit as
soon as possible as it will affect several matters including future funding/Phase 2+ decisions.

After incorporating input received at the July 25, 2024 Board meeting and conducting further analysis, FWA staff have developed a recommended cost recovery methodology for the anticipated funding deficit for the Project. The rationale for this recommendation as well as the proposed provisions of this cost recovery methodology are provided below. In accordance with Article 12 of the Transfer Agreement between FWA and Reclamation, any new, proposed OM&R cost recovery methodology requires FWA to provide notice to all affected contractors for at least 60-days prior to the effective date of the cost recovery methodology.

Staff is requesting that the Board of Directors make a determination on the cost recovery methodology to be used in the event there is a deficit of available funding to cover outstanding costs associated with the Middle Reach Capacity Correction Project so that the methodology can be submitted for the 60-day review period.

## COST RECOVERY OPTIONS:

FWA staff identified the following four options for cost recovery for any future Project deficits.

- **Option 1 – Default**. This option represents a scenario in which the Board takes no action on how to collect funds for repaying Reclamation for money owed under the Cost-Share Agreement, and FWA informs Reclamation that it is unable to make the required payments. As a reminder, if the Board, after good faith efforts to agree upon an updated cost recovery methodology, including seeking alternative sources of funding, is unable to do so, then the default provision of Section IV.E.i. of the Cost Share Agreement would apply, which provides that Reclamation will step in and assist in securing a third-party contributor. If Reclamation does so, the resulting loan must be repaid within 5 years with interest incurred by the contributor plus four percent and have priority for repayment from all sources of funding for the Project. (Note – based upon previous feedback from the Board of Directors, the "Default/No-Action" option was determined to be non-viable as it still requires the Board to determine a cost recovery methodology for the loan repayment.)

- **Option 2 – "Family Plan" Alternative.** Under this option, the Board would allocate any future Project funding deficits using the existing OM&R cost allocation methodology (25-year rolling average of all deliveries), effectively increasing the Friant-Kern Canal (FKC) Contractor contributions to the Project beyond the current $50 million ceiling.

- **Option 3 – Direct Beneficiary Alternative.** Under this option, the Board would allocate any future Project funding deficits to FKC Contractors using an agreed upon cost allocation methodology that considers direct benefits of the Project.

- **Option 4 – ETGSA District Alternative.** Under this option, the Board would allocate any future Project deficits to those FKC Contractors within the boundaries of the Eastern Tule Groundwater Sustainability Agency (ETGSA).

## STAFF RECOMMENDATION AND RATIONALE:

As a general matter, when recovering costs associated with the operation, maintenance and replacement (OM&R) of existing project facilities, including full replacement or extraordinary maintenance (XM), the traditional methodology to recover such costs would be to spread the costs among all those that benefit from the original project in proportion to the amount each entity would be benefitting from the entire project. The rationale being that contractors should only receive the expected benefits from the project so long as everyone contributes proportionally to the entire project being kept in a condition to deliver the originally intended benefits to all contractors. This is especially true when any particular OM&R project does not result in new benefits exceeding the originally authorized project. If a project is not able to be maintained to deliver the benefits to all contractors as intended, presumably the delivery of water may need to be revised to ensure the benefits are still being distributed equitably.

However, the situation is different if an OM&R project is necessary due to damage caused by actions of known entities. In these circumstances, the recovery of costs for the project should be guided by the equitable principle to collect from the entities that caused the damage, and only seek to recover funds from other contractors if collecting the full project costs from the damaging entities is not possible. In the case of the MRCCP, it is well-established that the project is necessary due to land subsidence along the Middle Reach of the Friant Kern Canal (FKC) resulting from the excessive groundwater pumping taking place within the Tule Subbasin. At the outset of the Project, FWA prepared an analysis that demonstrated that, if unmitigated, the future additional subsidence along the FKC caused by continued excessive groundwater pumping in the Tule Subbasin would result in water supply impacts in excess of $265 million in 2020 dollars. As such, an equitable approach for recovering the costs of the MRCCP would be for the landowners within the areas covered by Tule Subbasin Groundwater Sustainability Agencies (GSAs) to be allocated all of the project costs, as they are the sole beneficiaries of the overdraft groundwater pumping causing the subsidence along the FKC. With that objective in mind, FWA pursued recovering costs from certain Tule Subbasin GSAs through negotiated settlement agreements. As a result of the negotiations and other factors, the FWA board decided that the collection of a lump sum payment of $125 million by December 2022, or up to $200 million over time by ETGSA, and a lump sum payment of $11 million from Pixley GSA by December 2021, along with funding from others, would result in an equitable recovery of costs for the MRCCP.

The landowners in Pixley GSA have already paid their allocated share in full. It appears highly unlikely, however, in part for reasons currently under litigation, that landowners in ETGSA will pay sufficient penalties or other charges to ETGSA to cover the share of the MRCCP allocated to this area. This is in spite of the fact that overdraft groundwater pumping along with its subsidence inducing damage is continuing at a rate that is substantially higher than originally projected, while the financial benefits of this pumping as well as the related water credit and transitional water trading continue to accrue to landowners in the area covered by ETGSA. If landowners in the ETGSA are not charged and therefore do not pay substantially more penalties or other charges than they have since 2021, FWA will have a sizable deficit owed to Reclamation and will need to take action to collect from the FKC Contractors to cover the difference.

**Recommended Cost Recovery Methodology.**

FWA staff recommends the following cost recovery methodology for the remainder of the MRCCP costs, including Phase 1 and any project work that proceeds under Phase 2.

"**Middle Reach Capacity Correction Project Cost Recovery Methodology**
If and when any cost obligations related to the MRCCP are due by FWA and FWA has insufficient revenues to cover the amount due, FWA will assess and collect the full amount due from the four FKC Contractors within the ETGSA boundaries (Porterville ID, Saucelito ID, Terra Bella ID, and Tea Pot Dome WD), subject to the following:

- The recovery of any costs between Porterville ID, Saucelito ID, Tea Pot Dome WD, and Terra Bella ID will be on the basis of irrigable acreage.
- The amount recovered under this methodology, when combined with the total amount received from ETGSA under the Settlement Agreement and any separate agreement(s) with ETGSA District(s), will not exceed $200 million.
- Subject to Board approval, any FKC contractor within the ETGSA boundaries can enter into a separate agreement with FWA which may include, but is not limited to provisions that address payment of their equitable share of the Project costs which recompenses FWA for the District landowners actions that resulted in unmitigated non-sustainable groundwater pumping, a framework to ensure that the District's landowners properly mitigate for any actions that contribute to non-sustainable groundwater pumping, and any other provisions the Board finds necessary to ensure the District takes all reasonable actions to mitigate for the activities of its landowners as it relates to the impacts to the Friant-Kern Canal.

FWA staff believes that the recommendation is equitable due to the fact that the landowners in the FKC contractor districts within ETGSA receive the potential benefit of transitional overdraft pumping and are able to engage in the beneficial transfer and sale of groundwater credits as well as transitional overdraft water allocations.  These districts also have significant control over the actions of the ETGSA Board of Directors.  Further, as ETGSA distributes groundwater allocations and credits based upon irrigable acreage to all landowners, the relative allocation of costs between the four FKC contractor districts is on the same basis. If ETGSA during any period is able to collect and remit to FWA enough funds to pay the then current FWA repayment obligation, no costs will be assessed to these four FKC contractor districts under this cost recovery methodology.

**SUGGESTED MOTION:**

I move that the Board of Directors approve the staff recommended (Option 4) MRCCP Cost Recovery Methodology, effective October 12, 2024, and direct staff to provide notice of the MRCCP Cost Recovery Methodology to all affected Friant Division Contractors and Reclamation.

**ATTACHMENTS**

- None.

**friant** WATER AUTHORITY

## SPECIAL BOARD OF DIRECTORS MEETING | Minutes
### OPEN SESSION – 8:30 A.M.
### LINDSAY CONFERENCE ROOM
### 854 N. HARVARD AVE., LINDSAY, CA 93247

### CALL TO ORDER/ROLL CALL
Chairman Jim Erickson called to order the noticed meeting of the Board of Directors of the Friant Water Authority at 8:30 a.m.

### ATTENDANCE:
#### Directors Present:

| | |
|---|---|
| Edwin Camp | Arvin-Edison W.S.D. (AEWSD) |
| Brock Buche | City of Fresno (CofF) (remote) |
| Kelley Hampton | Delano Earlimart Irrigation District (DEID) |
| David Neilsen | Exeter Irrigation District (EID) (remote) |
| George Porter | Fresno I.D. (FID) (remote) |
| Loren Booth | Hills Valley I.D. (HVID) (remote) |
| Doug Phillips | Ivanhoe Irrigation District (IID) |
| Chris Tantau | Kaweah Delta W.C.D. (KDWCD) |
| Kent Stephens | Kern-Tulare W.D. (KTWD) (Open) |
| Michael Brownfield | Lindmore I.D. (LID) |
| Cliff Loeffler | Lindsay-Strathmore I.D. (LSID) |
| Josh Pitigliano | Lower-Tule River I.D. (LTRID) |
| Jim Erickson | Madera I.D. (MID) |
| Arlen Miller | Orange Cove I.D. (OCID) |
| Brett McCowan | Porterville I.D. (PID) |
| Steve Kisling | Saucelito I.D. (SID) |
| Craig Fulwyler | Shafter Wasco Irrigation District (SWID) |
| Dave Roberts | Stone Corral I.D. (SCID) |
| Matthew Leider | Teapot Dome W.D. (TPWD) |
| L. Edwin Wheaton | Terra Bella I.D. (TBID) |
| Rick Borges | Tulare I.D. (TID) |

#### Directors Absent:

| | |
|---|---|
| Roger Schuh | Chowchilla W.D. (CWD) |
| Bill DeGroot | Pixley Irrigation District (PIXID) |

### APPROVAL OF THE AGENDA
The Board approved the agenda as presented.

**M/S/C** – Motion by Director Loeffler, seconded by Director Borges, to approve the agenda. The motion carried. (Roll Call Vote: Ayes – AESWD, CofF, DEID, EID, FID, IID, KDWCD, KTWD, LID, LSID, LTRID, MID, OCID, PID, SID, SCID, SWID, TBID, TID, TPWD; Nays – 0; Absent – CWD and PIXID)

1

**PUBLIC COMMENT / PUBLIC PRESENTATIONS**

There was no public comment.

**1.    ACTION ITEM**

    A.  Establishment of an Updated Cost Share Methodology for the Friant-Kern Canal Middle Reach Capacity Correction Project and Provision of 60-day Notice to Friant-Kern Canal Contractors.

CEO Jason Phillips went over the agenda report.  He emphasized that when the referenced Cost Share Agreement with the Bureau of Reclamation (Reclamation) was being drafted, the Friant Water Authority (FWA) had a high level of confidence based on representations made by officials and staff members of FWA member districts that are also members of the Eastern Tule Groundwater Sustainability Agency (ETGSA) that the transitional pumping penalty program to be implemented by ETGSA under the Settlement Agreement with FWA would generate sufficient revenues to cover FWA's remaining obligations under the referenced Cost Share Agreement.  Nevertheless, Reclamation insisted on the anti-deficiency provisions in Article IV.E of the Cost Share Agreement that address what happens if FWA is unable to meet its cost share and repayment obligations.  As noted in the agenda report, Reclamation is aware of FWA's projected cost-share deficit for the Friant-Kern Canal Middle Reach Capacity Correction Project (Project), and, in recent meetings with FWA staff, has asked that FWA make a determination on the cost recovery methodology for the deficit as soon as possible.

CEO Phillips then went over the estimated funding deficits for the remainder of the Phase 1 construction period, as well as the anticipated funding deficits when FWA's repayment obligation begins under the referenced Repayment Agreement.

As outlined in the agenda report, FWA staff has identified four options for cost recovery for any future Project deficits.   In accordance with Article 12 of FWA's Transfer Agreement with Reclamation for the OM&R of the Friant-Kern Canal (FKC), any new, proposed OM&R cost recovery methodology requires FWA to provide notice to all affected FKC Contractors for at least 60 days prior to the effective date of the cost recovery methodology.

If there's a dispute with a contractor regarding an OM&R cost recovery methodology that FWA decides it is unable to resolve with a contractor, then FWA can submit the dispute to Reclamation for a decision.  Phillips reminded the Board of the dispute with the City of Fresno over its allocation of a share of the Board-approved Project Spending Plan and allocation of $50 million from FKC Contractors towards the Project.  Reclamation determined the allocation was appropriate and reasonable, and shortly after that decision was issued, the City of Fresno dropped its objection to the initial Project cost share allocation methodology.

Phillips then reviewed the options summarized in the agenda report.

2

• **Option 1 – Default.** This option represents a scenario in which the Board takes no action on how to collect funds for repaying Reclamation for money owed under the Cost-Share Agreement, and FWA informs Reclamation that it is unable to make the required payments resulting in a "Default/No-Action." CEO Phillips added that there are many unknowns regarding the default option, including what interest Reclamation would charge if outside funding was obtained.

• **Option 2 – "Family Plan" Alternative.** Under this option, the Board would allocate any future Project funding deficits using the existing OM&R cost allocation methodology (25-year rolling average of all deliveries), effectively increasing FKC Contractor contributions to the Project beyond the current $50 million ceiling.

• **Option 3 – Direct Beneficiary Alternative.** Under this option, the Board would allocate any future Project funding deficits to FKC Contractors using an agreed upon cost allocation methodology that considers direct benefits of the Project. CEO Phillips noted that significant additional work needs to be done to analyze this option and develop a proposed allocation methodology.

• **Option 4 – ETGSA District Alternative.** Under this option, the Board would allocate any future Project deficits to those FKC Contractors within the boundaries of ETGSA. Phillips noted that based on the Board's initial allocation of Project costs, which included a significant reliance on anticipated ETGSA funding, that placing the remaining Project deficits on the ETGSA districts would be equitable for the reasons stated in the report, including the potential benefit that landowners within these districts have received of transitional overdraft pumping and the ability to engage in the beneficial transfer and sale of groundwater credits as well as transitional overdraft water allocations. These districts also have significant control over the actions of the ETGSA Board of Directors, which, as alleged in FWA's pending litigation against ETGSA, have resulted in the under assessment and collection of penalty revenues to fund the Project. CEO Phillips added that this option was equitable for all these reasons. In response to a question regarding whether there was a financial cap on this methodology, Phillips noted that these funds collected under this cost allocation methodology would be tracked along with all revenues received from ETGSA, and the total amount would not exceed $200 million, which is the collection cap in the Settlement Agreement.

After completing his report, CEO Phillips opened the discussion up for questions.

Director Porter (FID) asked if this would change the Settlement Agreement. CEO Phillips stated that the cost allocation methodology is separate from the settlement agreement.

Director Phillips (IID) asked how many actual acres are being irrigated with pumping. COO Amaral checked and reported back that there was pumping occurring in ETGSA on about 54,000 acres.

Director Tantau (KDWCD) asked if the initial $5 million shortage was the first hit and could the cost of the pump stations be another source. He also asked if the repayment obligation would then be added to Phase 2? (CEO Phillips responded "yes" to both questions.)

Director Rising (SID) stated that the ETGSA lump sum failed because of an increase in interest rates.  He stated that the districts could not pay these costs, and that the allocation was not equitable.

Director Camp (AEWSD) asked if there was a hard date to make this decision from Reclamation. CEO Phillips repeated that Reclamation wanted a decision soon.

Director McCowan (PID) asked do we stop subsidence or increase revenue? CEO Phillips responded that right now we're getting subsidence but not revenue. Director McCowan then made comments about other water districts getting potential benefits from credits moved into ETGSA areas.  CEO Phillips responded that if there is evidence of this it should be pursued, but that does not change the Settlement Agreement with ETGSA.

Director Stephens (KTWD) asked whether there was excessive ground water pumping, and how much was pumped versus charged.  CEO Phillips, that there is less pumping characterized as transitional pumping then assumed that this was an issue that is part of the litigation with ETGSA.

Director Leider (TPDWD) stated that ETGSA has done nothing to make the penalty program more operational, and that after four years of being a lone wolf, his district has decided to leave ETGSA.  He stated that he resented his district being lumped in with the other ETGSA member districts.

Director Hampton (DEID) stated interest rates were low in 2021 and the lump sum should have been approved. He doesn't understand why the Settlement Agreement is not being implemented properly, and all games being played. As a result, this allocation needs to be done.

Director Pitigliano (LTRID) stated FWA has not collected sufficient funds, and the canal is subsiding. The penalty program is broken and needs fixing.

Director Camp (AEWSD) stated he was on the ad hoc settlement committee.  The Settlement Agreement was done in good faith, but the program has only been to benefit of those that we negotiated with.

Chairman Jim Erickson allowed for the Managers and others to provide their comments and questions.

Tom Barcellos (Director, LTRID) stated that the loophole for water credit transfers and trading must be resolved.

Sean Geivet (Manger, PID, SID, TBID) stated that he did not know of any loopholes in the ETGSA program.  He stated that if we make it through this year with no subsidence, it'll be two years in a row.  He stated that the ETGSA penalty program would generate $5 million a year going forward.

Director Leider (TPDWD) responded to Manager Geivet regarding what Leider said were three occasions ETGSA was given notice of issues with its penalty program and each time it dismissed them out of hand, which is why we're here now on this issue.

4

Director Pitigliano (LTRID) also responded to Manager Geivet to state that the Friant-Kern Canal is still subsiding.

Director Kisling (SID) stated that the landowners have done little to no pumping for the last two years; therefore if subsidence is still happening, then you have the wrong persons.

CEO Phillips responded to Director Kisling's comment by stating that there would be people who disagree that no one in Saucelito ID is benefiting from pumping water that is causing damage to the FKC.

Eric Limas (Manager, LTRID, TPDWD) suggested that a pumping analysis would be an alternative to the amount of irrigated acreage for assessing the Project deficiencies.

Chairman Erickson then went around the table and asked each director to share any further comments before voting.

Director Camp (AEWSD): Default is not a great option. Option 2 holds those that didn't create the problem accountable and would have to pay again - I don't like it. Option 3, we fought this fight already. Therefore, that leaves Option 4.

Director Hampton (DEID): Option 4. It's not fair for all to pay.

Director Porter (FID): It was a battle just to do the $50 million. I can't get any more from my district. Option 4 is best.

Director Loeffler (LSID):  My board would favor Option 4.

Director Brownfield (LID):  In favor of Option 4 in the short term.

Director Phillips (EID):  I don't like any of the options but with SGMA there are two categories of farmers: those who lose and the really big losers. In Ivanhoe we have infrastructure problems to pay for, so Option 4.

Director Stephens (KTWD): I'd like to see why the ETGSA program isn't working. What are the loopholes? I want to know on transitional pumping, what are the numbers? We need to get to the bottom. Until then, everyone feels the pain. Option 2.

Director Pitigliano (LTRID): Default is out. I hate all the options but am considering Option 2.

Director Tantau (KDWCD): These districts were the founding members of ETGSA.  Option 4 shifts the burden back.

Director Miller (OCID): We've talked extensively about this at Orange Cove. We're not significantly impacted but why would we pay. Option 4.

Director McCowan (PID): I understand both sides. I have had many arguments with my manager about the improprieties of gifting the precipitation credits to all landowners by the GSA. It is

causing the short fall and there are other loopholes . This is putting the four districts in a precarious position. Option 2. There is going to be pumping close to $5 million a year.

Director Roberts (SCID): Option 4.

Director Kisling (SCID): I agree with everything Director McCowan said. Proposing Option 4 is divisive and seems vindictive and it's not going to be successful.  Option 2.

Director Fulwyler (SWID): Unfortunately, in this position, Option 4.

Director Wheaton (TBID) – When we started this, we all agreed. I don't want to be singled out. I'm not convinced all the subsidence is created by those mentioned.  Option 2.

Director Leider (TPDWD): I resent Option 4. Option 2 makes the most sense. Option 4 needs more technical analysis, do we kick the can for 2 weeks? Maybe I will abstain.

Director Borges (TID): All good comments. Any option is hurting someone.  The family plan was agreed and the $50 million was the back stop but that's the most we can put out. We have infrastructure that needs to get done. Option 4 has the GSA to hold accountable.

Director Buche (CofF): Option 2 is off the table. They disbelieve in subsidence.  It is real and happens where pumping is happening. They should pay.  Option 4.

Director David Neilsen (EID): Option 4.

Director Loren Booth (HVID): Supports Option 2.

***SUGGESTED MOTION:***
*I move that the Board of Directors approve the staff recommended (Option 4) MRCCP Cost Recovery Methodology, effective October 12, 2024, and direct staff to provide notice of the MRCCP Cost Recovery Methodology to all affected Friant Division Contractors and Reclamation.*

**M/S/C** – Motion by Director Camp, seconded by Director Porter, to proceed with Option 4 – ETGSA District allocation.  The motion carried.

    Roll Call Vote:
    Ayes – AESWD, CofF, DEID, EID, FID, IID, KDWCD, LID, LTRID, LSID, OCID, SCID, SWID, TID.
    Nays – KTWD, PID, SID, TBID.
    Abstain – TPWD.*

    *Director Leider requested the following statement be entered on the record: "It is acknowledged that my vote on behalf of Tea Pot Dome will be subject to a reservation of the right to dispute the cost recovery methodology, both administratively with the Bureau of Reclamation and judicially with a court, and FWA will not oppose an action by Tea Pot Dome to dispute this cost recovery methodology on the basis of not opposing this motion."

**CLOSED SESSION**
It was determined not necessary to go into closed session.

**ADJOURNMENT**

The meeting adjourned at 10:37 a.m.

_____
Jason R. Phillips, Chief Executive Officer
Friant Water Authority

_____
Vivian Garcia, Recording Secretary
Friant Water Authority

**OTHERS IN ATTENDANCE:**

| | |
|---|---|
| Aaron Fukuda | Tulare I.D. |
| Alan Doud | Young Wooldridge |
| Alex Peltzer | PR Law Corp |
| Allison Tristao | LTRID |
| Andrew Hart | KTWD |
| Aubrey Mauritson | Visalia Law |
| Austin Ewell | California Blueprint |
| Bill Luce | Luce Consulting |
| Bill Stretch | FID |
| Brandon Tomlinson | CWD |
| Brian Thomas | FWA Consultant |
| Charmel Cajimat | FWA |
| Chris Hickernell | FWA |
| Chris Hunter | Lindmore I.D. |
| Craig Wallace | Lindsay-Strathmore I.D. |
| Dave Loquaci | Madera I.D. |
| David Dees | FWA |
| Daymon Qualls | City Manager for Lindsay |
| Derek Kliewer | Nossaman |
| Dina Nolan | Madera I.D. |
| Don Davis | FWA Counsel |
| Douglas Brown | Stradling Law |
| Eric Limas | LTIRD, TPDWD, PIXID |
| Eric Quinley | DEID |
| Fergus Morrissey | OCID |
| Gene Kilgore | EID, IID, SCID |
| Geoff Vanden Heuvel | Milk Producers Council |
| Ian Buck-Macleod | FWA |
| Heoth Wooten | DEID |
| Jason Phillips | FWA |
| Jeevan Muhar | Arvin-Edison W.S.D. |
| Johnny Amaral | FWA |
| Katie Duncan | FWA |
| Kris Lawrence | SWID |
| Maggie Suarez | FWA |

ATTACHMENT 2

# TERRA BELLA IRRIGATION DISTRICT

24790 Avenue 95                                                                                                      559/535-4414

Terra Bella CA 93270                          *Established 1915*                              Fax 559/535-5168

| | | |
|---|---|---|
| EDWIN L. WHEATON, President<br>Division 3 | | SEAN P. GEIVET<br>Manager |
| GEOFFREY C. GALLOWAY, Vice-President<br>Division 2 | General | ANN NELMS<br>Secretary-Treasurer |
| BRENT E. DOYEL<br>Division 1 | | AUBREY CAIRNS MAURITSON<br>Legal Counsel |
| KURT PARSONS<br>Division 4 | | KELLER-WEGLEY<br>ENGINEERING |
| ALFREDO MARTINEZ<br>Division 5 | | Consulting Engineer |

September 26, 2024

**VIA EMAIL**

Jason R. Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave
Lindsay, CA 93247

      Re:     Objection to FWA's Proposed MRCCP Cost Recovery Methodology

Dear Mr. Phillips,

Friant Water Authority's ("FWA's") proposed Cost Share Methodology for Advanced Costs ("Methodology") for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project ("MRCCP") is unlawful and void or voidable for the reasons set forth below. Accordingly, Terra Bella Irrigation District ("TBID") objects to the Methodology and demands FWA rescind the actions it took at the August 12, 2024 Special Meeting ("Special Meeting").

As explained in TBID's letter to the Bureau of Reclamation ("Reclamation") dated September 25, 2024, the Methodology (1) oversteps Reclamation's delegable cost recovery methodology authority for extraordinary maintenance ("XM"), (2) breaches numerous contracts, including the MRCCP XM Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violates constitutional and contractual protections afforded to TBID, as well as Porterville Irrigation District, Saucelito Irrigation District, and Tea Pot Dome Water District (collectively, the "Districts").

The proposed Methodology unlawfully seeks to obligate the Districts to pay between $95 million dollars and $200 million dollars for Phases 1 and 2 of the MRCCP, while not

---

Proposed FWA MRCCP Cost Recovery Methodology
September 26, 2024

requiring any of the other beneficiaries of the Friant-Kern Canal to contribute. FWA must rescind the proposed Methodology.

Further, the Board Action is void or voidable because FWA staff and directors violated the Brown Act in the lead up and during the Special Meeting by conducting serial meetings. Moreover, FWA staff continues that practice as a means of influencing FWA directors' support for the Methodology. TBID supports the letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP dated September 18, 2024, that articulates the serial meetings violations. The Brown Act violations will be the basis for TBID commencing legal action unless FWA takes corrective action.

TBID urges FWA to rescind the Methodology and take all actions necessary to comply with the Brown Act.

TERRA BELLA IRRIGATION DISTRICT

By: _____

Edwin L. Wheaton

SEAN P. GEIVET
General Manager

JEFFREY S.ROW
Secretary-Treasurer
Assessor/Collector

AUBREY A. MAURITSON
Ruddell, Stanton, Bixler, Mauritson
& Evans LLP

ERIC L. BORBA
President

DAVID E. GISLER
Vice-President

TIMOTHY J. WITZEL
Director

JOSEPH "BRETT" McCOWAN
Director

EDWIN L. CHAMBERS
Director

**PORTERVILLE IRRIGATION DISTRICT**

September 30, 2024

**VIA EMAIL**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

> Re:     Objection to Proposed FWA MRCCP Cost Recovery Methodology and
>         Demand for Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite,

Porterville Irrigation District writes to notify the Bureau of Reclamation that it objects to the Cost Share Methodology for Advanced Costs (Methodology) for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project (MRCCP) proposed by the Friant Water Authority (FWA) at its August 12, 2024 Special Meeting. The proposed Methodology would unlawfully obligate four FWA contractors within the boundary of Eastern Tule Groundwater Sustainability Agency—Porterville Irrigation District, Saucelito Irrigation District, Tea Pot Dome Water District and Terra Bella Irrigation District—to pay between $95 million dollars and $200 million dollars for Phases 1 and 2 of the MRCCP. The Methodology would not impose payment obligations on other FWA contractors who benefit from the Friant-Kern Canal and MRCCP. Porterville Irrigation

District supports and adopts the arguments and analysis presented in Terra Bella Irrigation District's September 26, 2024 letter to Reclamation that explains why the proposed Methodology by FWA exceeds any legal cost recovery authority that could have been delegated by Reclamation pursuant to the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA and why the Methodology also violates basic contractual and constitutional protections afforded to the four districts.

Porterville Irrigation District provides this written notice of dispute and demand for dispute resolution regarding the Methodology in accordance to the following agreements and contracts:

- Article 34 of the Contract Between the United States and Porterville Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment, Contract Nos. I75r-4309-D and 175r-4309-LTR;

- Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works, Contract No. 8-07-20-X0356-X;

- Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855; and

- Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5856.

To resolve this dispute, Porterville Irrigation District consents to participate in informal meet and confer efforts with Reclamation that also involve Saucelito Irrigation District, Tea Pot Dome Water District and Terra Bella Irrigation District. This letter also provides notice that Porterville Irrigation District's willingness to participate in dispute resolution with Reclamation is not a waiver of any rights and remedies, including its rights to commence legal action against FWA and Reclamation.

Porterville Irrigation District

By: _Eric L. Borba_

Eric L. Borba, President



*Saucelito Irrigation District*
*Board of Directors:*
Steven G. Kisling, President
Erick R. Merritt, V.P.
Lucille Demetriff
Jeffrey M. Noble
Mark O. Merritt

*Manager/Assistant Secretary*
Sean P. Geivet

*Assessor, Collector, Treasurer, Secretary*
Diane M. Ennis

*Legal Counsel*
Ruddell, Cochran
Stanton, Smith & Bixler, LLP
Aubrey Mauritson

*"Serving the
irrigation needs of
our community
since 1941"*

September 26, 2024

**VIA EMAIL**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

Re:    Objection to FWA's Proposed MRCCP Cost Recovery Methodology;
Demand for Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite:

The purpose of this letter is to inform the Bureau of Reclamation (hereafter, "Reclamation") that Saucelito Irrigation District (hereafter, "Saucelito ID") objects to the Friant Water Authority's proposed Cost Share Methodology for Advanced Costs (hereafter "Methodology") for Phase 1 of the Friant-Kern Canal Middle Reach Capacity Correction Project (hereafter, "MRCCP"). Friant Water Authority (hereafter, "FWA") proposed the Methodology at its August 12, 2024 Special Meeting and, in doing so, diverged from Reclamation law, rules, standards, directives, and policy in an alarming and disingenuous

manner, as described in Terra Bella Irrigation District's September 26, 2024 letter (hereafter, "TBID Letter") to Reclamation.

The Methodology seeks to force special districts within the Eastern Tule Groundwater Sustainability Agency, including Saucelito ID, as well as Terra Bella Irrigation District, Porterville Irrigation District, and Tea Pot Dome Water District, to pay at least $95 million dollars for Phase 1 of the MRCCP. The Methodology seeks to compel a similar obligation on the districts for Phase 2. Meanwhile, the Methodology releases all other beneficiaries of the Friant-Kern Canal from any such obligation, even though a benefits analysis drives extraordinary maintenance cost allocations under Reclamation law, and FWA has given full-throated support for a transparent and inclusive benefits analysis in the context of the extraordinary maintenance cost recovery allocations for the Delta-Mendota Canal subsidence fix.

Saucelito ID agrees with and supports in full the TBID Letter's analysis and conclusion that the Methodology is unlawful. The bases for that conclusion include FWA (1) exceeding Reclamation's delegable authority concerning cost recovery methodologies for extraordinary maintenance, (2) breaching multiple contracts, including the MRCCP Extraordinary Maintenance Repayment Contract, Cost Share Agreement, and Transfer Agreement entered into between Reclamation and FWA, and (3) violating basic constitutional and contractual rights of the districts.

Accordingly, Saucelito ID hereby notifies Reclamation of this dispute concerning the Methodology and, pursuant to the following agreements, demands dispute resolution thereof:

1. Article 34 of the Contract Between the United States and Saucelito Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment (Contract Nos. I75r-2604-D and 14-06-200-7430E);

2. Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works (Contract No. 8-07-20-X0356-X);

3. Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project (Contract No. 21-WC-20-5855); and

4. Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project (Contract No. 21-WC-20-5856).

Saucelito ID hereby consents to informally meet and confer with Reclamation to resolve this dispute and encourages the involvement of Terra Bella Irrigation District, Porterville Irrigation District, and Tea Pot Dome Water District.   However, Saucelito ID's participation in the dispute resolution discussed above shall not constitute a waiver of any rights or remedies, including but not limited to any rights to legal action against Reclamation and FWA.

Saucelito Irrigation District

By: _____
Steven G. Kisling, President

ATTACHMENT 3

# TERRA BELLA IRRIGATION DISTRICT

| | | |
|---|---|---|
| 24790 Avenue 95 | | 559/535-4414 |
| Terra Bella CA 93270 | *Established 1915* | Fax 559/535-5168 |

EDWIN L. WHEATON, President
Division 3

GEOFFREY C. GALLOWAY, Vice-President
Division 2
BRENT E. DOYEL
Division 1
KURT PARSONS
Division 4
ALFREDO MARTINEZ
Division 5

General

SEAN P. GEIVET
Manager

ANN NELMS
Secretary-Treasurer
AUBREY CAIRNS MAURITSON
Legal Counsel
KELLER-WEGLEY
ENGINEERING
Consulting Engineer

September 26, 2024

**BY EMAIL ONLY**

Karl J. Stock
Regional Director
U.S. Bureau of Reclamation
2800 Cottage Way
Sacramento CA 95825-1898
KStock@usbr.gov

Anna D. Brathwaite, Esq.
Solicitor
U.S. Department of Interior
Office of the Solicitor
2800 Cottage Way Ste E1712
Sacramento, CA 95825-1863
anna.brathwaite@sol.doi.gov

> Re:    Proposed FWA MRCCP Cost Recovery Methodology
>        Notice of Dispute Resolution

Dear Mr. Stock and Ms. Brathwaite,

Please consider this correspondence on behalf of Terra Bella Irrigation District ("**TBID**") regarding Friant Water Authority's ("**FWA's**" or "**Authority's**") attempts to revise the Cost Share Methodology for Advanced Costs ("**Methodology**") for purposes of Phase 1 of the Middle Reach Capacity Correction Project ("**MRCCP**").

On August 12, 2024,[1] FWA held a special board meeting to consider taking action on the following as listed on the board agenda:

---

[1] Please note that TBID has given FWA an opportunity to cure severe Brown Act violations that occurred immediately prior to and during the August 12, 2024 meeting. FWA staff has conducted, and continues to conduct, serial meetings in an effort to obtain and coerce preferred votes of the FWA Board of Directors.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 89 of 115

TERRA BELLA
IRRIGATION DISTRICT

**Establishment of an Updated Cost Share Methodology for the Friant-Kern Canal Middle Reach Capacity Correction Project and Provision of 60-day Notice to Friant-Kern Canal Contractors.**

After discussion of this agenda item, FWA voted to "establish" the following "methodology:" FWA will unilaterally *impose* an obligation exclusively upon TBID—and three other special districts contracting for FKC water, Porterville Irrigation District ("**PID**"), Saucelito Irrigation District ("**SID**"), and Tea Pot Dome Water District (collectively with TBID, the "**Districts**")—to pay amounts in excess of $95 million dollars for Phase 1 of the MRCCP and additional amounts for Phase 2, not to exceed $200 million for the two phases combined ("**Board Action**").

TBID's understanding is that FWA purports this "methodology" to be an "equitable" application of its "authority" to implement the "cost recovery methodology" for allocation of future repayment of costs relating to extraordinary maintenance ("**XM**") of the Friant-Kern Canal ("**FKC**") via the MRCCP.[2] FWA's *Special Board of Directors Agenda Report* ("***Special Report***") admits, "the traditional methodology to recover such costs would be to spread the costs among all those that benefit from the original project in proportion to the amount each entity would be benefitting from the entire project."[3] The *Special Report* rationalizes parting from the traditional methodology because "the situation is different if an OM&R project is necessary due to damage caused by actions of known entities."[4] The *Special Report* continues, "[i]n these circumstances, the recovery of costs for the project *should* be guided by the equitable principle to collect from the entities that caused the damage, and only seek to recover funds from other contractors if collecting the full project costs from the damaging entities is not possible."[5] Accordingly, contrary to the law, FWA purports to have revised the Methodology based upon its own opinion of what the "principles" guiding the process *should* be—as opposed to what the principles and processes actually are—as explained further below.

Bluntly, the Board Action reached far beyond the authority that the Bureau of Reclamation ("**BOR**" or "**Reclamation**") delegates to FWA for FKC management, as FWA has no authority in equity to unilaterally adjust the Methodology relating to extraordinary maintenance of federal water project contracts.[6] Specifically, at the outer most limit of delegable authority is a requirement that FWA—if it has the basis in this case for reaching the outer most limit at all—must follow certain procedures when adjusting the Methodology for XM costs,[7] the process requires negotiations with project beneficiaries

---

TBID will pursue all legal avenues to ensure the practice is ceased. TBID fully supports the September 18, 2024, letter to FWA from Herr Pedersen Berglund Attorneys at Law LLP regarding FWA's serial violations of the Brown Act ("**Herr Firm Letter**").

[2] See *Special Board of Directors Agenda Report*, Friant Water Authority at p. 3 (Aug. 12, 2024).

[3] *Ibid.*

[4] *Ibid.* (*emphasis added*).

[5] *Ibid.* (*emphasis added*).

[6] The irony of FWA's actions versus the MRCCP cannot be understated given FWA's own statements concerning the Delta-Mendota Canal Subsidence Correction Project ("DMC").

[7] *See* Reclamation Manual, Policy PEC P07 ("**PEC P07**"), ¶ 8.  In April 2024, San Luis & Delta Mendota Water Authority and FWA entered into an MOU formalizing DMC compliance with PEC P07.  (*See Second Amended and Restated Memorandum of Understanding Between Friant Water Authority and San Luis &*

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 90 of 115

TERRA BELLA
IRRIGATION DISTRICT

(who are responsible for repaying reimbursable costs[8]). Here, FWA's process encompassing the Board Action completely ignored that procedure, which appears in paragraph 8 of Reclamation Manual Policy PEC P07, *Allocation of Operation, Maintenance, and Replacement Costs.*[9]

Paradoxically, in the context of the Delta-Mendota Canal Subsidence Correction Project ("**DMC**"), FWA underscores the importance of complying with PEC P07. For example, FWA voiced support for the "establishment of a new Planning Committee that will be responsible for reviewing, evaluating, and recommending cost allocation of any proposed large XM project cost based upon a benefits analysis."[10] Importantly for FWA, the "new Planning Committee will include FWA and other potential ratepayers, and XM project recommendations will require unanimous findings and recommendations from the Committee."[11] Given its conduct in the context of the MRCCP—described in detail in this letter—FWA adds a rather hollow commentary on the importance of full participation of project stakeholders, "[s]uccessful initiation and completion of a project like the DMC Project requires transparency, engagement, and support from stakeholders."[12] TBID asserts that the process for revising the MRCCP Methodology should be the same as the process that FWA demanded in the DMC context.

For these reasons—and numerous others—TBID's position is twofold: (1) the Board Action is void, and (2) BOR should support the Districts in demanding FWA change course.

## I.

### BACKGROUND.

The Board Action arises from FWA's contractual obligation to pay for Phase 1 of the MRCCP. In 2021, FWA and BOR entered into numerous agreements for the MRCCP, including an XM Repayment Contract, a Cost Share Agreement, and an amended Transfer Agreement regarding the operation, maintenance, and replacement of the FKC. In 2021, FWA also entered into a Settlement Agreement with Eastern Tule Groundwater Sustainability Agency ("**ETGSA**") regarding mitigation costs associated with future subsidence along the FKC.

On September 23, 2021, FWA and BOR entered into an agreement entitled, *Contract Between the United States of American and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project* ("**XM Contract**"). In the XM Contract, FWA and BOR both

---

*Delta-Mendota Water Authority Relating to Allocation, Collection, and Payment of Operation, Maintenance, and Replacement Costs for Water Delivered Through Certain Central Valley Project Facilities,* ¶ V.A.4(c).)

[8] *See* PEC P07, ¶ 2 fn. 1 ("Project costs allocated to reimbursable purposes are repaid by project beneficiaries, such as irrigation, municipal and industrial (M&I), and commercial power.").

[9] PEC P07, *Allocation of Operation, Maintenance, and Replacement Costs* (version (345) 5/29/2020).

[10] Friant Water Authority January 18, 2024, letter re *Significant Progress on Resolving Friant Water Authority's Concerns Related to the Proposed Delta-Mendota Canal Subsidence Correction Project* at p. 1.

[11] *Id*. at pp. 1-2.

[12] *Id*. at p. 2.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 91 of 115

specifically acknowledge that the MRCCP "meets the definition of 'Extraordinary Operation and Maintenance Work'" under Title IX, Section 9601 of Public Law 111-11.[13] Furthermore, in the XM Contract, both FWA and BOR *expressly promise* that "[t]he Repayment of XM Project Costs will be structured consistent with P.L. 111-11, Section 9603."[14]

A key basis for FWA's assertion of authority to the XM Methodology for the MRCCP is that certain *Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant Kern Canal and Associated Works* ("**Transfer Agreement**") that BOR and FWA entered into on October 5, 2020.  Article 12 of the Transfer Agreement states that, "Reclamation hereby delegates to the Authority all required authority under statutes, contracts, regulations, and policies to collect for [annual, routine operation, maintenance, and replacement ("**OM&R**")] . . . of the Project Works."[15] Moreover, the XM Contract states that the Transfer Agreement establishes the basis for FWA's identification, planning, financing, construction, and collection of funds for the XM work that is the subject of the XM Contract.[16]  As explained in Section III below, FWA's attempted exercise of this authority contradicts the Districts' 9(d) long-term repayment contracts.

## II.
### FWA'S BOARD ACTION EXCEEDS THE SCOPE OF BOR'S DELEGABLE AUTHORITY.

Put simply, BOR does not have the power to delegate authority to FWA to either (a) *sua sponte* adjust the Methodology for XM costs relating to the MRCCP or (b) unilaterally allocate—*ex post*—such costs to entities based on their alleged culpability in causing damage to the FKC (as opposed to allocating those costs to project beneficiaries).

To start, Public Law 111-11 authorizes BOR to fund XM work and "execute contracts for extended repayment of the reimbursable costs[,]" *e.g.*, agreements concerning repayment for the MRCCP.[17]  Accordingly, it would appear that the authority to establish the Methodology is readily delegable from BOR to FWA.[18]  While such delegation of authority is possible under Public Law 111-11, due to BOR's and FWA's characterization of XM Costs as OM&R costs for the purpose of establishing the Methodology, FWA's Board Action is invalid under Reclamation Manual, Directive and Standards, *Extended*

---

[13] XM Contract, Recital "l." ("Reclamation has determined that the XM Project in this Repayment Contract meets the definition of 'Extraordinary Operation and Maintenance Work' (Title IX, Section 9601 of Public Law 111-11).").

[14] XM Contract, Recital "o."

[15] Transfer Agreement, Article 12 (bracketed language added).

[16] XM Contract, ¶ 3(d) ("[The] Transfer Agreement including but not limited to Articles 1, 3, 5 and 12, establishes what constitutes the OM&R of the Friant-Kern Canal and how FWA may identify, plan, finance, construct and collect funds for such work, including the XM Work that is the subject of this Repayment Contract.").

[17] Reclamation Manual, Directives & Standards, *Extended Repayment of Extraordinary Maintenance Costs* ("**PEC 05-03**"), ¶ 1 (678) 03/08/2022.  Unless otherwise stated, the references to PEC 05-03 stated herein are to the 2022 version cited in this footnote.

[18] *See, e.g.,* RM, Delegations of Authority, ¶ 4.N.(3)(a).

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 92 of 115

TERRA BELLA
IRRIGATION DISTRICT

*Repayment of Extraordinary Maintenance Costs* ("**PEC 05-03**"), which plainly states, "**[t]he XM authority does not include extended repayment of [OM&R] costs**."[19]

More importantly, even if BOR can delegate the authority for FWA to develop the Methodology for XM costs as OM&R costs, that authority does not allow FWA to alter the methodology *ex post*.[20]  At the time BOR advanced funds to FWA for the MRCCP—November 9, 2023[21]—PEC 05-03 did not set forth any power to later adjust the Methodology as provided for in the current version of PEC 05-03.  Specifically, the 2022 version of PEC 05-03 provides, BOR "will allocate costs for XM . . . work in accordance with the *existing* allocation of OM&R costs of the project or facility."[22]  The 2024 version of PEC 05-03, on the other hand, adds the following to the end of the provision quoted in the preceding sentence, "that is in effect when it incurs costs or advances funds for XM work, *subject to any modified cost allocation formally identified in an XM Justification Report prepared for support of the work*, in accordance with CMP 09-04, *provided the modified cost allocation and initiation of changes to the cost allocation are compliant with the Paragraph 8 of RM Policy, Allocation of Operation and Maintenance Costs (PEC P07).*"[23]  Accordingly, in November 2023 when the 2022 version of PEC 05-03 was still in effect, BOR's standard for the allocation of costs for XM work did not contemplate modifying OM&R cost allocations.  Instead, in 2023, BOR was directing that the basis for the allocation of XM costs be *existing* methodologies.

Moreover, even if the 2024 revisions to PEC 05-03 would have authorized FWA to adjust the Methodology for MRCCP XM work, FWA has not met the requirements of Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**"), paragraph 8, which set forth rules concerning the initiation of adjustments to the Methodology, as explained in Section V below.[24]

## III.
## FWA's Conduct is Unlawful, and Violates Multiple Contractual, Statutory, and Regulatory Requirements and Protections.

FWA claims that it possesses the authority to impose XM cost allocations ("XM Charges") based upon Article 12 Transfer Agreement, which provides, "Reclamation hereby delegates to the Authority all required authority under statutes, contracts, regulations, and policies to collect for OM&R of the Project Works."  FWA contends that the authority delegated to it in Article 12 includes the power to unilaterally impose these XM Charges upon the Districts.

---

[19] PEC 05-03, ¶ 1 (*emphasis added*).

[20] PEC 05-03 (678) 03/08/2022).  Notably, FWA apprised none of the Districts as to substantial lobbying efforts undertaken to amend PEC 05-03, despite the clear impacts those changes would have on the Districts.  (*See* Farm Family Alliance memorandum at p. 4 (Dec. 4, 2023), https://www.sldmwa.org/OHTDocs/pdf_documents/Meetings/Board/Prepacket/AgendaItem16b_December _2023_FFA.pdf?_ga=2.114810951.1544190283.1702576819-1600878817.1667342599).

[21] Resolution of San Luis & Delta-Mendota Water Authority (Nov. 9, 2023).

[22] PEC 05-03 (678) 03/08/2022, ¶ 8.A (*emphasis added*).

[23] PEC 05-03 (703) 07/10/2024, ¶ 8.A (*emphasis added*).

[24] Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**"), ¶ 8.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 93 of 115

Unfortunately, FWA has disregarded the basic contractual, statutory, and regulatory requirements and strictures associated with extraordinary maintenance.  Under Reclamation Manual, Directives and Standards, "[t]he XM authority does not address funding for or authorize extended repayment of annual, routine operation, maintenance, and replacement (OM&R) costs."[25]

A similar disregard was recently noted by the Tulare County Superior Court, with respect to FWA's tendency to frame its own obligations in deceptive fashion.  In each case, FWA's attempts to mislead others has led only to its own detriment.  In this case, FWA's act of *purporting to unilaterally "bind"* the Districts to a "cost allocation" without their consent, and above their objection, reflects a fundamental ignorance of very elementary and conspicuous statutory and regulatory requirements.  Attempting to further "double down" on its ill-conceived and unlawful demand for money will only make the situation worse for all parties involved, including BOR.

Even more fundamentally, FWA's actions are clearly unlawful in a number of respects, the result being that FWA's attempt to treat XM Costs under the Transfer Agreement violates the Transfer Agreement, federal "9(d) contracts" (defined below), and the statutory and policy structure governing XM finance.

### A.  FWA's Board Action Violates Article 29(a) of the 9(d) Contracts.

FWA's actions violate the specific protection afforded to the Districts in Article 29(a) of their long-term repayment contracts ("**9(d) contracts**").  In Article 29(a) thereof, BOR agreed that the Transfer Agreement "**shall not interfere with or affect the rights or obligations of the Contractor or the United States hereunder.**"[26]  One of the rights afforded to the Districts by their 9(d) contracts is the *exclusion of capital replacement costs from the contractors' OM&R obligations.*[27]  The complete text of Article 1(w) is as follows (*emphasis added*):

> "Operation and Maintenance" or "O&M" shall mean **normal and reasonable care, control, operation, repair, replacement (other than Capital replacement), and maintenance** of Project facilities . . . .

Neither BOR nor FWA assert that the MRCCP constitutes "normal" operation, maintenance, or repair.  Both FWA and BOR acknowledge that the MRCCP constitutes "extraordinary operation maintenance."  BOR's regulations—like the 9(d) contract—categorically separate XM costs from normal operation and maintenance.  FWA's purported exercise of authority under the Transfer Agreement would destroy the contractual protection found in Article 1(w) of the 9(d) contracts and would, as a

---

[25] PEC 05-03, ¶ 1.

[26] *Contract Between the United States and Terra Bella Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment*, Article 29(a) (Dec. 16, 2010) (*emphasis added*) ("**9(d) Contract**").

[27] 9(d) Contract, Article 1(w).

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 94 of 115

consequence, also violate Article 29(a) of the 9(d) contracts. Neither BOR nor FWA can disregard this categorical distinction and levy charges for XM projects.

### B. FWA's Board Action Violates the Statutory Requirements for Extraordinary Maintenance Repayment Contracts Under 43 U.S.C. § 510b.

Section 510b of Title 43 of the United States Code governs the conditions under which extraordinary operation and maintenance work may be financed. In the XM Contract, FWA and BOR both specifically acknowledge that the MRCCP "meets the definition of 'Extraordinary Operation and Maintenance Work'" under Title IX, Section 9601 of Public Law 111-11.

The Secretary of the Interior advanced the costs of the MRCCP, with BOR and FWA contemplating in the XM Contract that FWA would be responsible for reimbursement. Subdivision (b) of Section 510b imposes specific requirements in the context of such reimbursement (*emphasis added*):[28]

> For transferred works, the Secretary is authorized to advance the costs incurred by the transferred works operating entity in conducting extraordinary operation and maintenance work **and negotiate appropriate 50-year repayment contracts with project beneficiaries** providing for the return of reimbursable costs, with interest, under this subsection . . . .

On April 28, 2021, prior to execution of the XM Contract, BOR and FWA entered into a Cost Share and Contributed Funds Agreement ("**Cost Share Agreement**"). The Cost Share Agreement is appended to the XM Contract. The Cost Share Agreement explicitly recognizes that the phrase "project beneficiaries" means the Friant Contractors—not FWA.[29] Accordingly, 50-year repayment contracts with the Friant Contractors are a legally necessary component of any reimbursement to BOR.

It is noteworthy that, in connection with the Cost Share Agreement in 2021, BOR and FWA *did obtain written MOUs with the actual project beneficiaries*. However, for reasons unknown to TBID, no 50-year repayment contracts with project beneficiaries were negotiated, as required by Section 510b(b).

However, FWA's Board Action simply ignores the basic statutory requirement that BOR must negotiate 50-year repayment contracts with project beneficiaries, rejects the MOUs between BOR, FWA, and the project beneficiaries, and makes not even the slightest pretense of compliance. Instead, without any intelligible analysis, FWA simply claims authority to impose the "charges" under Article 12 of the Transfer Agreement. Had BOR desired to levy those charges for the purposes of reimbursement, Section 510b would have mandated that BOR *negotiate those terms with the project beneficiaries*. As BOR itself

---

[28] 43 U.S.C. § 510b(b).

[29] Cost Share Agreement, Article VI.C. For the purpose of funding and extended repayment of extraordinary maintenance costs, "project beneficiary" is defined as "[a]n entity that receives benefits from a Reclamation project and is responsible for repayment of reimbursable costs on reserved or transferred works." (PEC 05-03, ¶ 11.E.)

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG     Document 1     Filed 01/27/25     Page 95 of 115

could not simply "allocate" costs to project beneficiaries without first negotiating repayment contracts with the project beneficiaries to be charged, FWA certainly also lacks the authority to do so.

### C. FWA's Board Action Violates BOR's Directives and Standards for Repayment of Extraordinary Maintenance Costs.

The Reclamation Manual's Directives and Standards for Funding and Extended Repayment of Extraordinary Maintenance Cost, PEC 05-03, provides as follows at Paragraph 8(a) (*emphasis added*):

> Reclamation will allocate costs for XM and EXM work **in accordance with the allocation of OM&R costs for the project or facility that is in effect when it incurs costs or advances funds for XM work** . . . .[30]

As noted above, although there was no execution of 50-year repayment contracts with FKC project beneficiaries in 2021, there was, at least, a process of negotiating written memorandums of understanding ("**MOUs**") between FWA and certain project beneficiaries, including TBID, PID, and SID. Through the MOUs, project beneficiaries agreed to a specific cost share allocation, equal to a portion of the $50 million set forth in section 2, paragraph A of FWA Resolution No. 2021-02.[31] The methodology for determining that cost share allocation was the allocation in effect at the time FWA incurred and BOR advanced the costs for the MCRRP; *i.e.*, the invalid methodology set forth in the XM Contract. Accordingly, that allocation, insofar as it was lawful in the first place, determines the relative cost share responsibilities of the parties. The Board Action violates the MOUs because (1) it purports to unilaterally increase cost share allocations of the project beneficiaries and (2) rely on a new Methodology altogether.

Despite this fact, on August 12, 2024, FWA determined that it possessed the authority to unilaterally alter the relative responsibilities of the project beneficiaries and the MOUs with project beneficiaries, even though FWA has no such authority.[32] Moreover, the Board Action also violates BOR's regulations for cost allocation as described in Section V below. Even more problematic are FWA's representative's statements at the August 12, 2024 meeting: **FWA's lead executive, Jason Phillips, represented to the Friant Contractors that BOR had sanctioned and approved the "revised allocation," which FWA purported to impose upon the Districts.**

Moreover, as discussed in Section IV below, FWA's conduct is offensive to fundamental constitutional protections, in addition to the contractual, statutory, and regulatory protections discussed above.

---

[30] PEC 05-03 (703) 07/10/2024.
[31] *Memorandum of Understanding Regarding the Project OM&R Budget and the Cost Share and Contributed Funds Agreement with the Bureau of Reclamation for the Friant-Kern Canal Middle Reach Capacity Correction Project* between FWA and TBID, section 1.
[32] Section IV below discusses FWA's egregious and highly improper conduct.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 96 of 115

TERRA BELLA
IRRIGATION DISTRICT

## IV.

### FWA IS ATTEMPTING TO EXTORT THE DISTRICTS IN VIOLATION OF THE EQUAL PROTECTION CLAUSES OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

FWA's action was made in response to a judicial ruling in pending litigation in California, *Friant Water Authority et al. v. Eastern Tule Groundwater Sustainability Agency*, Tulare County Superior Court Case No. VCU306343. For several years, FWA has falsely claimed that a contract between FWA and the ETGSA requires that ETGSA pay FWA a "lump sum" in the amount of $220,000,000.00. This claim is incorrect, as the terms of that contract make clear.

On July 2, 2024, the Tulare County Superior Court made specific findings concerning FWA's claim. Specifically, the Court found that FWA's argument was deceptive, and expressly found that the contract with ETGSA "does not state an obligation to collect an unconditional minimum of $220,000,000.00 . . . ." FWA reacted to this ruling as if there had been some type of surprise change in circumstances. However, the only change occasioned by the Court's ruling was that FWA could no longer rely upon the fiction it had created regarding the ETGSA contract. The contract never contained the terms represented by FWA, and any person willing to read the contract can confirm that conclusion.

In response to the Court's ruling, FWA orchestrated the August 12, 2024 action described in this letter. Incredibly, at the August 12, 2024 meeting, FWA staff did not even present the pretense of compliance with the numerous laws and regulations discussed above. The "reason" for FWA's unlawful conduct, according to FWA at that time, was to cause the Districts—who have voting representatives on *ETGSA's* governing board—to "do something" to provide more money to FWA, in light of the Court's ruling on FWA's own deceptive conduct. The fact that FWA openly admitted to this purpose shows that the action was not based upon any legitimate legal considerations. Moreover, FWA's brazen approach toward the Districts is properly characterized as civil extortion under California law.[33]

An equal protection cause of action exists when specific persons or entities are "singled out" in an irrational and arbitrary manner.[34] **TBID's landowners rely almost exclusively upon surface water and use only minimal groundwater.** PID and SID operate under conjunctive use, primarily relying on surface water. Nevertheless, FWA has purported to "order" TBID to pay millions of dollars in excess of TBID's obligation in reality. The only reason for including TBID in FWA's unlawful attempt at allocation was to *create greater pressure upon TBID as a voting member of ETGSA*. In other words, the only basis for including TBID among the "punished" members was to optimize the extortionary effect of FWA's unlawful conduct.

---

[33] *See* Flatley v. Mauro (2006) 39 Cal.4th 299, 326-333.

[34] *See* Village of Willowbrook v. Olech (2000) 528 U.S. 562, 564 ("[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." (citation omitted)).

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 97 of 115

TERRA BELLA
IRRIGATION DISTRICT


While the Board Action was taking place, text messages between FWA administrative staff, Johnny Amaral, and representatives of other FWA members shows that FWA staff was **fully cognizant** of the fact that minimal groundwater is pumped in TBID, and, therefore, *cannot*, as a matter of both analytic logic and very simple physics, be responsible for overextraction of groundwater.[35]

In light of the foregoing, TBID is skeptical that, as FWA has reported, BOR has joined or will join FWA in this effort to circumvent federal law concerning finance of XM projects. TBID is also highly doubtful that BOR would repudiate the protections it agreed upon in Article 29(a) of the 9(d) contracts. However, BOR would be a necessary party to any federal proceeding concerning the validity of FWA's claims to the authority discussed in this letter.

**V.**

**FWA's Conduct is Wholly Contrary to BOR's Own Polices Concerning the Modification of OM&R Changes.**

As referenced above, pursuant to BOR's own policy, MRCCP XM costs *are not* regular OM&R costs. As such, FWA's attempt to characterize MRCCP construction costs as "OM&R" is sorely misguided.

However, even if that characterization is correct, each of the Friant Contractors—including the Districts—should reasonably expect that FWA follow BOR's Reclamation Manual Policy, *Allocation of Operation, Maintenance, and Replacement Costs* ("**PEC P07**"). But FWA failed to do so. PEC P07 applies "to all future changes in the allocation of project OM&R costs on both reserved and transferred Reclamation project facilities where such allocation is not otherwise specifically addressed in law or in a contract executed prior to the release of this Policy."[36]

Paragraph 8 of PEC P07 sets forth the requirements for the "initiation of changes to present OM&R allocations."[37] Subparagraph A of paragraph 8 sets forth prerequisites for the undertaking of "studies to analyze current benefits for the purpose of modifying the allocation of joint MO&R costs:"[38]

> (1) A determination by the regional director that the study is warranted and that the entity or entities responsible for repayment of the reimbursable joint OM&R costs have been given ample opportunities for consultation and collaboration in the decision to perform the study; and

---

[35] *See* Herr Firm Letter (Sept. 18, 2924).

[36] PEC P07, ¶ 2. As discussed above, the repayment of statutory XM costs is subject to the *statutory* requirement of a contract between BOR and the project beneficiaries. Nonetheless, discussion of the norms governing OM&R modifications appears appropriate in this instance, given the Board Action's degree of deviation from BOR policy.

[37] *Id.*, ¶ 8.

[38] *Id.*, ¶ 8.A.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 98 of 115
TERRA BELLA
IRRIGATION DISTRICT

(2) Payment in advance by the appropriate entity or entities of Reclamation's estimated costs of conducting the benefits study. The payment responsibility will be in accordance with the allocation in effect at the time of the decision to conduct the study.

Moreover, paragraph 8, subparagraph B requires that *all 3 of the following conditions* be met prior to modification of current OM&R charges:[39]

(1) Completion of a current benefits study conducted at no less than an appraisal level and no more than 5 years prior to the proposed modification;

(2) A decision memorandum signed by the regional director detailing the manner in which the OM&R allocation will be modified, the basis for the modification, and the extent to which the entity or entities responsible for payment of the reimbursable OM&R costs have been given opportunities to collaborate with Reclamation in the development of the study and the propose modification to the cost allocation; and

(3) Notification of the entity or entities responsible for payment of the reimbursable OM&R costs of the intent to adopt the propose modification . . . .

FWA's Board Action is violative of portions or all of each component of subparagraphs A and B of paragraph 8 of PEC P07 enumerated above.

First, FWA failed to give entities responsible for the reimbursable joint OM&R costs (e.g., Project Beneficiaries) ample opportunities for consultation and collaboration in the decision of whether to perform a study analyzing current benefits for the purpose of modifying the allocation of the OM&R costs.[40]

Second, FWA failed to collect payment in advance from project beneficiaries for the costs of conducting FWA's purported benefits study.[41]

Third, FWA failed to complete a current benefits study (a) at least at an appraisal level and (b) at least five years prior to the proposed modification to the current OM&R allocations.[42]

Fourth, FWA failed to include in a decision memorandum an explanation of how FWA gave project beneficiaries an opportunity to collaborate with FWA in the development of the study and proposed modification concerning the cost allocation.[43]

Fifth, FWA failed to provide notification to project beneficiaries of FWA's intent to adopt modifications to OM&R allocations as described in a decision memorandum.[44]

---

[39] *Id.*, ¶ 8.B.
[40] *Id.*, ¶ 8.A.1.
[41] *Id.*, ¶ 8.A.2.
[42] *Id.*, ¶ 8.B.1.
[43] *Id.*, ¶ 8.B.2.
[44] *Id.*, ¶ 8.B.3.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

TERRA BELLA
IRRIGATION DISTRICT

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 99 of 115

TBID looks forward to working with BOR in a manner that affords proper consideration to the considerable statutory and regulatory guidance at the parties' disposal.

## VI.
### DEMAND FOR DISPUTE RESOLUTION.

As a result of the forgoing, TBID hereby provides notice of its dispute of FWA's proposed Cost Recovery Methodology for the MRCCP.  The notice is made pursuant to:

1) Article 34 of the Contract Between the United States and Terra Bella Irrigation District Providing for Project Water Service from Friant Division and for Facilities Repayment, Contract No. I75r-2446D;

2) Section 10 of the Agreement Between the United States of America and Friant Water Authority to Transfer the Operation, Maintenance and Replacement and Certain Financial and Administrative Activities Related to the Friant-Kern Canal and Associated Works, Contract No. 8-07-20-X0356-X;

3) Article 8 of the Contract Between the United States of America and Friant Water Authority for the Repayment of Extraordinary Maintenance Costs for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5855; and

4) the Cost Share Agreement and Contributed Funds Agreement Between the Friant Water Authority and the United States of America for the Friant-Kern Canal Middle Reach Capacity Correction Project, Contract No. 21-WC-20-5856.

## VII.
### CONCLUSION.

FWA's Board Action is in violation of numerous laws and regulations as described above. In addition, the revisions to the Methodology is troubling on a policy level.  To allow a non-federal operating entity to adjust the Methodology after the advancement of funds and to the detriment of a small subset of contractors is not sound policy and would result in devasting impacts to the overall project.  The purpose of Reclamation Law, Rules and Regulations, Policies, and Standards and Directives is to avoid this exact result.

**It is imperative that BOR (1) take immediate corrective measures to enforce its own regulations concerning the Methodology, and (2) clarify that it was not involved in FWA's unlawful attempt to circumvent basic statutory and regulatory requirements in a clear attempt to exact severe financial harm upon the Districts.  BOR must strongly condemn FWA's conduct, if only to effectively enforce BOR's own regulations.**

TBID opposes the "Updated Cost Recovery Methodology" as reported at FWA's August 12, 2024, board meeting.

Proposed FWA MRCCP Cost Recovery Methodology
Notice of Dispute Resolution
September 26, 2024

Case 1:25-cv-00112-EPG    Document 1    Filed 01/27/25    Page 100 of 115

TERRA BELLA
IRRIGATION DISTRICT

Very truly yours,

TERRA BELLA IRRIGATION DISTRICT

Edwin L. Wheaton, President

Dated: September 26, 2024

ATTACHMENT 4

**Cliff Loeffler**
Lindsay-Strathmore I.D.
*Chairman of the Board*

**Edwin Camp**
Arvin-Edison W.S.D.
*Vice Chairman*

**Jim Erickson**
Madera I.D.
*Secretary/Treasurer*

**Kole Upton**
Chowchilla W.D.

**Tim Orman**
City of Fresno

**George Porter**
Fresno I.D.

**Loren Booth**
Hills Valley I.D.

**Chris Tantau**
Kaweah Delta W.C.D

**Michael Brownfield**
Lindmore I.D.

**Josh Pitigliano**
Lower Tule River I.D.

**Kent H. Stephens**
Kern-Tulare W.D.

**David Brown**
Orange Cove I.D.

**Eric Borba**
Porterville I.D.

**Steven G. Kisling**
Saucelito I.D.

**Matt Leider**
Tea Pot Dome W.D.

**Edwin L. Wheaton**
Terra Bella I.D.

**Rick Borges**
Tulare I.D.

**Jason R. Phillips**
*Chief Executive Officer*

**Douglas A. DeFlitch**
*Chief Operating Officer*

*854 N. Harvard Ave.*
*Lindsay, CA 93247*

*1121 L St., Ste. 610*
*Sacramento, CA 95814*

*(559) 562-6305*

February 9, 2021

<u>Via E- Mail</u>

Ernest Conant
Regional Director
Region 10, California – Great Basin
United States Bureau of Reclamation

**Re:  Request for a Determination on the Obligation of Friant Division Water Delivery Contractors to Pay for Board Approved Self-Financed Capital Improvements as OM&R under FWA's Transfer Agreement (Contract No. 8-07-20-X0356-X)**

Dear Director Conant:

The Friant Water Authority (FWA) hereby requests that your office provide a written response regarding the obligations of Friant Division "Water Delivery Contractors" (Friant Contractors) to pay for FWA-financed "Capital Improvements" as part of the "OM&R" costs to maintain the Project Works (as such terms are defined in the above-referenced Transfer Agreement) both in general and specifically with respect to existing and anticipated additional OM&R costs to be incurred and self-financed by FWA with respect to the pending Friant-Kern Canal Middle Reach Capacity Correction Project (Project).

As you will recall, the underlying issue regarding certain alleged inconsistencies between the provisions in the Friant Contractors' 9(d) contracts and the Transfer Agreement first surfaced during the 2020 negotiations between Reclamation and FWA regarding the renewal of the Transfer Agreement.  In response to these comments, Reclamation and FWA agreed that it would be appropriate to add the following language to Article 12(a) of FWA's renewed Transfer Agreement:

> "Reclamation acknowledges and agrees that the provisions of its Water Delivery Contracts regarding the obligation to pay the Authority for the operation and maintenance of the Project Works performed by the Authority under this Agreement, but which do not have the same definition of OM&R as in this Agreement, were not intended to and do not limit the delegation of authority to charge and collect for the OM&R of the Project Works as provided in this Article 12."

Although Reclamation did not provide a formal response at the time as to the basis for this clarifying revision to the Transfer Agreement, such a response will be helpful and timely now because comment letters on this issue have been sent to Reclamation and FWA from or on behalf of five Friant Contractors - all of whom assert in some

**Cliff Loeffler**
Lindsay-Strathmore I.D.
*Chairman of the Board*

**Edwin Camp**
Arvin-Edison W.S.D.
*Vice Chairman*

**Jim Erickson**
Madera I.D.
*Secretary/Treasurer*

**Kole Upton**
Chowchilla W.D.

**Tim Orman**
City of Fresno

**George Porter**
Fresno I.D.

**Loren Booth**
Hills Valley I.D.

**Chris Tantau**
Kaweah Delta W.C.D

**Michael Brownfield**
Lindmore I.D.

**Josh Pitigliano**
Lower Tule River I.D.

**Kent H. Stephens**
Kern-Tulare W.D.

**David Brown**
Orange Cove I.D.

**Eric Borba**
Porterville I.D.

**Steven G. Kisling**
Saucelito I.D.

**Matt Leider**
Tea Pot Dome W.D.

**Edwin L. Wheaton**
Terra Bella I.D.

**Rick Borges**
Tulare I.D.

**Jason R. Phillips**
*Chief Executive Officer*

**Douglas A. DeFlitch**
*Chief Operating Officer*

*854 N. Harvard Ave.*
*Lindsay, CA 93247*

*1121 L St., Ste. 610*
*Sacramento, CA 95814*

*(559) 562-6305*

February 23, 2021

FRIANT-KERN CANAL CONTRACTORS

On February 3, 2021, I wrote to your district regarding proposed OM&R charges that could be allocated to your district for the Friant-Kern Canal (FKC) Middle Reach Capacity Correction Project (Project), which is an OM&R project being advanced by the Friant Water Authority (FWA) in partnership with the Bureau of Reclamation (Reclamation).

Both prior to my February 3 letter and after, several Friant districts have raised questions about whether FWA had the authority to implement the Project and collect for costs as an OM&R activity under its transferred works agreement (Transferred Works Agreement) with Reclamation. FWA had previously reviewed this issue with Reclamation during the renewal of its Transferred Works Agreement in 2020 and received confirmation of such authority from Reclamation. In fact, Reclamation inserted language into Article 12 of the Transferred Works Agreement, which the parties thought at the time clarified FWA's authority to impose Project costs, including the costs of "Capital Improvements" (as defined in the Transferred Works Agreement) upon all "Water Delivery Contractors," which term is defined in the Transferred Works Agreement as an entity with a contract "under the provision of Sections 9(c ), 9(d) or 9(e) of the Reclamation Project Act of 1939." In short, both FWA and Reclamation were in agreement that the obligations of a Water Delivery Contractor under the Transferred Works Agreement (including payment for FWA self-financed OM&R costs) apply regardless of the form of contract the Water Delivery Contractor has with Reclamation, and FWA has proceeded with pre-construction activities for the Project, including the assessment of OM&R charges, with that understanding.

In light of the continuing comments on this issue from certain districts, however, FWA requested that Reclamation provide a written opinion on the matter. I am attaching my letter from February 9, 2021 to Reclamation requesting its opinion, and the February 23, 2021 response letter from Reclamation's Regional Director. In its response, Reclamation has confirmed that FWA has "authority to incur and recoup OM&R charges as applied to the Project," and that "any funds expended by FWA, as Reclamation's transferred works partner, must be recouped by FWA from the Friant Contractors pursuant to Article 12 of the OM&R Transferred Works Agreement."

Currently, the likely schedule for the FWA Board of Directors to take preliminary action on the Project OM&R Budget will be at its March meeting. If you would like to learn more about the Project, the proposed Project OM&R Budget and

cost allocation, or possible financing options for your district, please plan to participate in the February 25, 2021 FWA meeting in Visalia starting at 10 am.

For more information on how to participate in this meeting please see the meeting agenda available online at https://friantwater.org/meetings-events/2017/10/26/board-of-directors-meeting-axsdp-28d84-gesfs-2pnra-x6dag-b9crr-fxege-wff5n-gabne-zz6sr-annn8-7kx85-4h5y5-5tdl

You may also contact Toni Marie at 559.562.6305.

Sincerely,

Jason R. Phillips
Chief Executive Officer

fashion that FWA may not self-finance the Project as OM&R.  (These letters are attached as Exhibit A.)

While FWA has made considerable progress in developing a consensus as to potential Friant Contractor obligations to pay for FWA's share of the Project costs as part of OM&R, we believe that the resolution of this issue through a written response from Reclamation would bring needed closure.

Accordingly, on behalf of FWA, I look forward to receiving Reclamation's written response on this issue at the earliest opportunity.

Sincerely,

Jason R. Phillips
Chief Executive Officer


**Electronic Copies**:

Adam Nickels, Regional Resources Manager
Brian Hughes, Attorney-Advisor, Office of the Solicitor – DOI



# United States Department of the Interior

BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, California 95825-1898



IN REPLY REFER TO

CGB-100
2.2.4.23

**FEB 2 3 2021**

VIA ELECTRONIC MAIL

Mr. Jason R. Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave.
Lindsay, CA 95814

Subject: Request for a Determination on the Obligation of Friant Division Water Delivery Contractors to pay for Board Approved OM&R Activities under FWA's Transfer Agreement (Contract No. 8-07-20-X0356-X)

Dear Mr. Phillips:

Thank you for your letter dated February 9, 2021 requesting that Reclamation provide a written response regarding the obligations of Friant Division Contractors to pay for Friant Water Authority (FWA) self-financed capital improvements and replacement maintenance as part of the Operation Maintenance and Replacement (OM&R) costs to maintain the Project Works under the above-referenced agreement (Transfer Agreement). Your letter asks that Reclamation provide this response in general and specifically as it applies to the FWA's participation in the Friant – Kern Canal Middle Reach Capacity Correction Project (Project). Unless defined in this letter, all capitalized terms have the definition set forth in FWA's renewed 2020 Transfer Agreement.

During Reclamation's recent negotiations with FWA regarding the renewal of the Transfer Agreement, an alleged "inconsistency" between what is now Article 5(b) of the renewed Transfer Agreement and Article 29(b) of Friant Division Contractors' 9(d) contracts was brought to our attention. Specifically, the some Contractors noted that while Article 5(b) of the Transfer Agreement expressly authorizes FWA to self-finance capital improvements and collect such costs as OM&R, Article 29(b) of the 9(d) contracts references the payment of "O&M" to the Operating Non-Federal Entity, which term is defined in the 9(d) contract as excluding "Capital replacements." Based on these allegedly differing definitions (OM&R vs. O&M), the Contractors suggested to FWA that their 9(d) contracts could be interpreted as precluding FWA from incurring and assessing the costs of capital improvements an OM&R charge.

In response to these comments, Reclamation added the following clarification to Article 12 of FWA's renewed Transfer Agreement:

> *"Reclamation acknowledges and agrees that the provisions of its Water Delivery Contracts regarding the obligation to pay the Authority [FWA] for the operation and maintenance of the Project Works performed by the Authority under this Agreement,*

> *but which do not have the same definition of OM&R as in this Agreement, were not intended to and do not limit the delegation of authority to charge and collect for the OM&R of the Project Works as provided in this Article 12.*"

This clarification was provided to ensure that the Agreement with FWA made clear FWA's delegated authority to collect all costs for OM&R activities of the Project Works from the Friant Division Contractors.

Further, the 9(d) contracts explicitly define O&M as including "reasonable care, control, operation, repair, replacement (other than Capital replacement), and maintenance" (Article 1(w)). While not specifically defined, "Capital replacement" refers to construction costs associated with the original construction authority for the facilities, not continued replacement maintenance. This is why, for example, Article 7(a)(1), of the 9(d) contracts impose an obligation on the Contractors to pay Reclamation for "charges and deficits" as it is Reclamation's standard practice to include replacement costs as Contractor reimbursable costs.

The use of the term "O&M" in Article 29 of the 9(d) contract is not intended to limit FWA's authority under the Transfer Agreement to recoup "OM&R" costs. This is further evidenced by Article 38 of the 9(d) contracts, acknowledging the "requirements to establish and maintain a minimum reserve fund account to finance extraordinary O&M costs of Friant Division Facilities" under the Transfer Agreement. By contractual definition and federal practice, O&M includes replacement and any use of O&M and OM&R should be considered equivalent.[1]

Reclamation has considered the question of FWA's authority to incur and recoup OM&R charges as applied to the Project. Under authorization granted in P.L. 111-11, Reclamation initiated the Project as an OM&R action. FWA, the non-federal cost-share partner under the WIIN Act, is required to self-finance at least 50% of the total Project costs. However, FWA is also the responsible OM&R entity for the facilities in question. The proposed construction and any other physical activities or funding actions arising from the Project by FWA are inherently done in furtherance of FWA's OM&R responsibilities. This means that any funds expended by FWA, as Reclamation's transferred works partner, must be recouped by FWA from the Friant Contractors pursuant to Article 12 of the OM&R Transferred Works Agreement.

If you have any additional questions, please contact Principle Deputy Regional Director Mr. Richard Welsh at 916-978-5013 or rwelsh@usbr.gov.

Sincerely,

Ernest Conant
Regional Director
California Great Basin – Region 10

---

[1] See Reclamation Directives & Standards PEC 05-11, footnote 1: "Reclamation uses O&M and OM&R interchangeably. This D&S refers to OM&R in order to emphasize the replacement component, however the replacement component is technically a part of the Maintenance component, and O&M always includes Replacement even if not specified."

ATTACHMENT 5

**MEMORANDUM OF UNDERSTANDING**

REGARDING THE PROJECT OM&R BUDGET AND THE COST SHARE AND CONTRIBUTED FUNDS AGREEMENT WITH THE BUREAU OF RECLAMATION FOR THE FRIANT-KERN CANAL MIDDLE REACH CAPACITY CORRECTION PROJECT

This Memorandum of Understanding (**MOU**) is entered into between the Friant Water Authority, a California joint powers authority (**FWA**), and the Tea Pot Dome Water District, a California water district (**District**), (each a "**Party**" and collectively, the "**Parties**"), and is effective as of April 15, 2021.

## RECITALS

A.      The FWA Board adopted Resolution No. 2021-01 on March 26, 2021, establishing a preliminary updated Project OM&R Budget for the Friant-Kern Canal Middle Reach Capacity Correction Project (**Project**).

B.      The FWA Board adopted Resolution No. 2021-04 on April 15, 2021, authorizing the execution of a Cost Share and Contributed Funds Agreement (**Cost Share Agreement**) for the Project between FWA and the United States Bureau of Reclamation (**Reclamation**).

C.      Unless otherwise defined in this MOU, all capitalized terms have the meaning set forth in Resolution No. 2021-01, or Resolution No. 2021-04, as applicable.

D.      The purpose of this MOU is to implement Section 3 of Resolution No. 2021-04, and in accordance with Resolution No. 2019-01, provide for the District's payment of a portion of the $50 million.

1.      <u>Updated Project OM&R Budget and District Allocation</u>.  District agrees to pay its share of the Project Costs under the proposed updated Project OM&R Budget as set forth in Resolution No. 2021-01, and acknowledges that District will be able to make the payment under the proposed updated Project OM&R Budget without financial assistance from FWA.

2.      <u>Non Waiver</u>.  The Parties acknowledge that by FWA entering into the Cost Share Agreement with Reclamation, that approval does not cause the District to waive or release any rights or obligations under its applicable Water Delivery Contract (as such term is defined in the Transfer Agreement) or with respect to the implementation of the Project. The Parties further acknowledge that District expressly preserves its right to make any and all claims it may have now or in the future pursuant to District's Water Delivery Contract, including but not limited to, the obligation to make payments with respect to the Project under its Water Delivery Contract beyond the respective share of Project OM&R costs budgeted and approved by the FWA Board.

3.      <u>Electronic Signatures</u>. This MOU will be considered executed when the signature page of a Party is delivered by electronic transmission.  Such electronic signatures will have the same effect as an original signature.

[Signatures on the following page.]

4811-0352-8931 v4

The Parties execute this MOU, which will become effective as of the date in the Preface to this MOU, upon the signatures from both Parties.

**FRIANT WATER AUTHORITY**

By: _____    Date: _____04/16/2021_____
         Jason R. Phillips, CEO

**TEA POT DOME WATER DISTRICT**

By: _____    Date: __4/16/2021__
         Eric Limas, General Manager

Page **2** of **2**

# EXHIBIT D

# United States Department of the Interior

## BUREAU OF RECLAMATION
2800 Cottage Way
Sacramento, CA  95825-1898

IN REPLY REFER TO:

CGB-100
2.2.4.21

Via Electronic Mail Only

Mr. Jason Phillips
Chief Executive Officer
Friant Water Authority
854 N. Harvard Ave
Lindsay, CA 93277

Subject:  Final Determination of Dispute Regarding Friant Water Authority's Updated Middle
           Reach Capacity Correction Project Cost Recovery Methodology

Dear Mr. Phillips:

I am in receipt of your December 18, 2024, letter requesting my final determination as
Contracting Officer with respect to a dispute that has arisen between Friant Water Authority
(FWA) and the Terra Bella Irrigation District (TBID), the Porterville Irrigation District (PID),
and the Saucelito Irrigation District (SID) (collectively, "Districts") regarding FWA's updated
Middle Reach Capacity Correction Project Cost Recovery Methodology, adopted by the FWA
Board of Directors on August 12, 2024.  FWA requests my final determination as Contracting
Officer pursuant to Article 10, "Resolution of Disputes," and Article 12 "Cost Recovery for
Authority OM&R Activities; Termination of Water Deliveries,"  of *the Agreement  between the
United States of America, Bureau of Reclamation and Friant Water Authority  to Transfer the
Operation, Maintenance, and Replacement and Certain Financial and Administrative Activities
Related to the Friant-Kern Canal and Associated Works* dated October 5, 2020  (Contract no. 8-
07-20-X0356-X or "Transfer Agreement").

On December 18, 2024, and consistent with Article 10, FWA has provided its final position with
respect to such dispute with the Districts. ("FWA Request Memo") As noted in FWA Request
Memo, "*This dispute arises from FWA's recently updated Cost Recovery Methodology, adopted
by the Board of Directors on August 12, 2024.*" In summary, FWA's updated cost recovery
methodology for the costs incurred and owed for the Friant – Kern Canal Middle Reach Capacity
Correction Project sought to collect payment from the Districts who are in the Eastern Tule
Groundwater Sustainability Agency (ETGSA). The updated methodology that was adopted by
the FWA Board of Directors, of which the Districts are members, will recover costs from the
Districts in a manner described at Attachment A to the FWA Request Memo. FWA posits three
specific questions to be resolved in this final determination at pg. 2 (third paragraph) of the FWA
Request Memo.

Accordingly, TID provided a response letter on behalf of the Districts dated December 23, 2024.
Additional communications include PID's Refutation of Final Position letter dated January 6,

2024, and SID's Rebuttal letter also dated January 6, 2024. (collectively, Response Letters) The Districts' Response Letters, among other things, contend that the cost recovery methodology is not equitable, FWA's action exceeded the scope of Reclamation's delegation of authority under the Transfer Agreement, and the Districts should not be responsible for FWA not being able to secure funding for the project in quantities needed to support the required 50% cost share for the Project. Further, the Response Letters contend that FWA had no legal right to enter into repayment contracts with Reclamation for the recovery of reimbursable federal investments in the Project and, further, that 50-year repayment contracts should have been negotiated with each Friant contractor individually.

I have reviewed all the materials provided, as referenced above, and offer the following final determination.  To the extent an argument has been raised but not explicitly addressed in this determination, please be assured that it was considered in my deliberations.

I. Project Beneficiaries for purposes of Contracts entered into per Public Law 111-11

This issue is resolved insofar as Reclamation hereby affirms the determinations from Reclamation's February 23, 2021, letter on this matter which states, in relevant part:

"Reclamation has considered the question of FWA's authority to incur and recoup OM&R charges as applied to the Project. Under authorization granted in P.L. 111-11, Reclamation initiated the Project as an OM&R action. FWA, the non-federal cost-share partner under the WIIN Act, is required to self-finance at least 50% of the total Project costs. However, FWA is also the responsible OM&R entity for the facilities in question. The proposed construction and any other physical activities or funding actions arising from the Project by FWA are inherently done in furtherance of FWA's OM&R responsibilities. This means that any funds expended by FWA, as Reclamation's transferred works partner, must be recouped by FWA from the Friant Contractors pursuant to Article 12 of the OM&R Transferred Works Agreement."

II. Applicability of the Reclamation Manual to this dispute

Reclamation does not find the Reclamation Manual to be relevant to the specific facts in dispute.  Ultimately, the Districts are challenging a FWA Board of Director's action.  Here, the Districts elected to join the FWA as members, have enjoyed the rights, privileges and burdens of that membership, and have agreed to be bound by the FWA Board's decisions pursuant to the rules governing FWA and its Board of Directors.

III. Delegation of Authority under the Transfer Agreement

The explicit language at Article 12 of the Transfer Agreement is not disputed by FWA, the Districts, or Reclamation, namely that FWA "is responsible for directly funding the OM&R of the Project Works…" and that "Reclamation … delegate[d]…all required authority … to collect for OM&R of the Project Works" from FWA's contractors, even if there are non-materially different definitions of OM&R as between the Transfer Agreement and the Water Delivery Contracts of FWA's member agencies.  Subsection (b) of Article 12 goes further to state that

FWA must establish "an equitable allocation of costs" in its chosen cost recovery methodology.

The explicit language of a contract should control its interpretation as Reclamation elects to do in this dispute and as the Districts elected to do when originally voting in favor of FWA entering into Contract no. 21-WC-20-5855 and entering into an MOU with Friant for repayment. FWA has been delegated the requisite authority to impose an equitable allocation of costs in its cost recovery methodology with its member districts. The Districts' allegation that FWA has exceeded its delegation of authority from Reclamation with an allegedly "inequitable" cost recovery methodology (addressed below) is circular to the real question in the dispute, which is whether the methodology is equitable.

> IV. FWA developed and approved the Methodology in a transparent and equitable manner, following the procedures set forth in the Transfer Agreement and consistent with the MOU between FWA and the Districts

FWA imposed the disputed cost recovery methodology pursuant to duly adopted Board actions to discharge FWA's contractual duty to impose equitable allocations. There is no standard definition of equitable as "equitable" is necessarily determined by the individual facts and circumstances at issue. Upon review of Attachment 1 to the FWA Request Memo, Reclamation does not find FWA's decision to be arbitrary, unreasonable or otherwise vulnerable to a Contracting Officer's decision to the contrary. Indeed, FWA's discharge of its duties under Article 12 of the Transfer Agreement to satisfy FWA's obligations under Contract no. 21-WC-20-5855 are perceived to be in compliance with relevant state law governing joint powers authorities, FWA Board policies, its authorities under the Transfer Agreement, its obligations under Contract no. 21-WC-20-5855, and the MOU addressing the Districts' respective repayment obligations to the Contract. It is weighty evidence that the Districts participated in the FWA Board actions to obligate FWA to recover the funds necessary to satisfy Contract no. 21-WC-20-5855 in the first instance. Ultimately, Reclamation believes this dispute is best addressed by FWA and the Districts within the framework of the relationship between FWA and its member agencies.

It is my final determination that FWA has adopted a cost recovery methodology that is otherwise in compliance with state law, and is reasonable in the context of FWA responsibilities under the Transfer Agreement. I consider this matter settled.


Sincerely,



Karl Stock
Regional Director
California-Great Basin Region - 10

Cc – Electronic only
   Edwin Wheaton – President - Terra Bella Irrigation district
   Eric L. Borba – President – Porterville Irrigation District
   Stven G. Kissling – President – Saucelito Irrigation District
   Donald Davis – Council – Friant Water Authority
   Aubrey Mauritson – Council – the Districts
   Sean Geivet – GM – the Districts